**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES OWENS, et al.<br><br>                              *Plaintiffs,*<br><br>         *v.*<br><br>TALIBAN a/k/a ISLAMIC EMIRATE OF AFGHANISTAN<br><br>                              *Defendant.* | Civil Action No. 22-1949 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
*EX PARTE* EMERGENCY MOTION FOR ORDER OF ATTACHMENT**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................... 1

JURISDICTION ......................................................................................................................... 3

BACKGROUND ......................................................................................................................... 4

    I.    The Embassy Attacks.......................................................................................... 4

        A.    The Taliban and al-Qaeda's Origins .................................................... 4

        B.    The Planning and Execution of the Embassy Bombings ..................... 6

        C.    The Aftermath....................................................................................... 7

    II.    Executive Order 14064 and the Blocked Assets .......................................... 8

ARGUMENT ............................................................................................................................. 11

    I.    Plaintiffs Are Likely to Succeed on the Merits............................................ 11

        A.    American Plaintiffs' Claim under the Anti-Terrorism Act Is Likely to Succeed ........................................................................................... 11

        B.    Foreign Plaintiffs' Claim for Violation of the Law of Nations Is Likely to Succeed ................................................................................ 16

        C.    Plaintiffs' State Tort Law Claims Are Likely to Succeed ................ 18

    II.    Plaintiffs Are Entitled to Attachment ......................................................... 19

    III.    This Court Should Grant Plaintiffs' Emergency Motion *Ex Parte* ............................ 23

CONCLUSION............................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banco Internacional, S.A. v. Vilaseca*,
    631 N.Y.S.2d 468 (N.Y. Sup. Ct. 1994) ...................................................................................24

*Bank Leumi Trust Co. v. Istim, Inc.*,
    892 F. Supp. 478 (S.D.N.Y. 1995) ........................................................................................11

*Cnty. of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assocs.*,
    2006 WL 752772 (N.D.N.Y. Mar. 22, 2006) ....................................................................22, 25

*Concord Asset Mgmt., Inc. v. Intercredit Corp.*,
    1992 WL 373477 (S.D.N.Y. Dec. 3, 1992) .......................................................................3, 24

*Elton Leather Corp. v. First Gen. Res. Co.*,
    138 A.D.2d 132 (N.Y. App. Div. 1st Dep't 1988) ..................................................................22

*Finzer v. Barry*,
    798 F.2d 1450 (D.C. Cir. 1986) .............................................................................................17

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...................................................................................14

*Herzi v. Ateliers De La Haute-Garonne*,
    2015 WL 8479676 (S.D.N.Y. Oct. 13, 2015) .......................................................................24

*India S.S. Co. Ltd. v. Kobil Petroleum*,
    620 F.3d 160 (2d Cir. 2010) .....................................................................................................3

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*,
    306 F. Supp. 2d 482 (S.D.N.Y. 2004) ...................................................................................11

*Khulumani v. Barclay Nat'l Bank Ltd.*,
    504 F.3d 254 (2d Cir. 2007) (per curiam) .............................................................................16

*Licci by Licci v. Lebanese Canadian Bank, SAL*,
    834 F.3d 201 (2d Cir. 2016) ...................................................................................................17

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ...................................................................................14

*Mwani v. Bin Laden*,
    2006 WL 3422208 (D.D.C. Sept. 28, 2006) .........................................................................17

*Mwani v. Bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ...................................................................................................17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Mwani v. Bin Laden,*
   947 F. Supp. 2d 1 (D.D.C. 2013) ..............................................................................17

*Nat'l Bank & Trust Co. of N. Am. v. J.L.M. Int'l Inc.,*
   421 F. Supp. 1269 (S.D.N.Y. 1976) ..........................................................................11

*Ofisi v. BNP Paribas, S.A.,*
   278 F. Supp. 3d 84 (D.D.C. 2017) ............................................................................17

*Opati v. Republic of Sudan,*
   140 S. Ct. 1601 (2020) .........................................................................................5, 15

*Owens v. BNP Paribas, S.A.,*
   897 F.3d 266 (D.C. Cir. 2018) ..................................................................................12

*Owens v. Republic of Sudan,*
   864 F.3d 751 (D.C. Cir. 2017) ..................................................................................15

*Owens v. Republic of Sudan,*
   412 F. Supp. 2d 99 (D.D.C. 2006) ..............................................................................4

*Owens v. Republic of Sudan,*
   826 F. Supp. 2d 128 (D.D.C. 2011) .......................................................................5, 13

*Owens v. Turkiye Halk Bankasi A.S.,*
   2021 WL 638975 (S.D.N.Y. Feb. 16, 2021) ............................................................22

*Rothstein v. UBS AG,*
   708 F.3d 82 (2d Cir. 2013) ..................................................................................15, 16

*In re S. African Apartheid Litig.,*
   617 F. Supp. 2d 228 (S.D.N.Y. 2009) .......................................................................16

*Sokolow v. Palestine Liberation Org.,*
   60 F. Supp. 3d 509 (S.D.N.Y. 2014) .........................................................................13

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004) ..................................................................................................16

*TAGC Mgmt., LLC v. Lehman,*
   842 F. Supp. 2d 575 (S.D.N.Y. 2012) .......................................................................19

*Thornapple Assocs., Inc. v. Sahagen,*
   2007 WL 747861 (S.D.N.Y. Mar. 12, 2007) ............................................................22

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Unitrans Int'l, Inc. v. Gulf & Orient S.S. Lines, Inc.*,
  2002 WL 1205744 (S.D.N.Y. Mar. 6, 2002) ........................................................24

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016).................................................................................12

**Statutes**

18 U.S.C. § 2331 .....................................................................................................12, 14

18 U.S.C. § 2332 .....................................................................................................12, 14

18 U.S.C. § 2333 .....................................................................................................11, 14

18 U.S.C. § 2339 .....................................................................................................12, 13

18 U.S.C. § 2339A ..................................................................................................12, 13

28 U.S.C. § 1331 .............................................................................................................3

28 U.S.C. § 1332 .............................................................................................................3

28 U.S.C. § 1350 .......................................................................................................3, 16

28 U.S.C. § 1367 .............................................................................................................3

**Regulations**

Blocked Persons, Specially Designated Nationals, Specially Designated
  Terrorists, Foreign Terrorist Organizations, and Specially Designated
  Narcotics Traffickers; Addition of Persons Blocked Pursuant to 31 CFR Part
  538, 31 CFR Part 597, or Executive Order 13129, 65 Fed. Reg. 39,100 (June
  23, 2000). ..........................................................................................................20

**Executive Orders**

Executive Order 13099 ....................................................................................................7

Executive Order 13129 ..................................................................................................20

Executive Order 14064 ...................................................................................2, 8, 20, 23

**Rules**

CPLR § 6201..................................................................................................11, 19, 23

CPLR § 6211...................................................................................................3, 24, 25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

CPLR § 6212........................................................................................................3, 11, 19, 23, 24

CPLR § 6223.................................................................................................................................24

Fed. R. Civ. P. 64........................................................................................................................11

Local Civil Rule 6.1...............................................................................................................23, 24

**Other Authorities**

Islamic Emirate of Afghanistan: Ministry of Foreign Affairs,
  https://mfa.gov.af/en/home-2/# ...............................................................................................10

## PRELIMINARY STATEMENT

Plaintiffs are victims of the 1998 United States embassy bombings in Nairobi, Kenya, and Dar es Salaam, Tanzania perpetrated by Osama Bin Laden and al-Qaeda, with substantial assistance from the Taliban, Iran, and Sudan.  To date, Plaintiffs have obtained significant U.S. court judgments—largely unsatisfied—against Iran and Sudan.  But the Taliban has never been made accountable for its role in the embassy bombings.  Plaintiffs brought this action to hold the Taliban responsible for the untold suffering its actions have caused.  And they have identified Taliban assets currently held at the Federal Reserve Bank of New York that could be used to satisfy a judgment.  Most of those assets, however, have already been levied by other creditors of the Taliban, and there are thousands of other individuals with unpaid judgments against the Taliban who may seek to do the same.  Additionally, there is a danger that the United States, which has already siphoned off half of the Taliban assets to advance its own foreign policy objectives, may itself transfer or claim the remaining funds.  Thus, to preserve their ability to obtain recovery, Plaintiffs seek an *ex parte* emergency prejudgment order of attachment against the Taliban assets.

For years, the Taliban provided safe haven and extensive support to Osama Bin Laden and al-Qaeda.  The 1998 embassy bombings were planned from Taliban-controlled territory in Afghanistan.  Key participants in the plot trained at al-Qaeda camps there.  And the Taliban provided al-Qaeda with weapons and shelter from U.S. authorities.  In a crucial moment, the Taliban denied a U.S. request to hand over Bin Laden just months before the embassy attacks.  It also afforded al-Qaeda use of Afghanistan's state airline to transport personnel and supplies.

On August 7, 1998, al-Qaeda carried out the bombings.  Collectively, the simultaneous bombings of the American embassies in Nairobi and Dar es Salaam killed 224 people (16 of whom are represented here), including 12 Americans, and injured over 4,500 others (21 of whom are

Plaintiffs here).   The United States and the international community immediately linked the embassy bombings to al-Qaeda and the Taliban.  The United States launched airstrikes against Taliban-controlled Afghanistan, froze Taliban assets, and demanded that the Taliban turn over Bin Laden for his role in the attacks.

But the Taliban has not been haled into U.S. courts for perpetrating the embassy bombings. This action comes at a time when domestic assets belonging to the Taliban have finally been made available for potential judgments to victims of terrorism.   After the Taliban seized control of Afghanistan following the U.S. withdrawal of troops in August 2021, the Taliban installed its own personnel at the Central Bank of Afghanistan—Da Afghanistan Bank, or "DAB"—and claimed the right to nearly $7 billion in assets currently held in DAB's name at the Federal Reserve Bank of New York.   In response, President Biden signed Executive Order 14064, which deemed the situation in Afghanistan "an unusual and extraordinary threat to the national security and foreign policy of the United States" and invoked the President's powers under the International Emergency Economic Powers Act ("IEEPA") to block any further transactions on those assets absent a license from the Executive Branch.   McGill Decl., Ex. 1, at 8391.   The order specifically noted that "victims of terrorism" may wish to assert "legal claims" against the blocked funds—half of which have been made potentially available for this purpose.  *Id.*

In light of the Taliban's substantial involvement in the embassy bombings, Plaintiffs are likely to succeed on numerous causes of action: for violations of the Anti-Terrorism Act, violations of the law of nations under the Alien Tort Statute, and state law torts.  But because of the insurgent nature of the Taliban's control, tracking down the Taliban is an arduous task—its contact information is not readily accessible.  And it is nearly impossible to collect from the Taliban, given the few Taliban assets in the United States.  In light of the claims of competing creditors, who are

already set to begin turnover proceedings against the blocked funds, numerous other outstanding debts owed by the Taliban, and the uncertainty of U.S. sanctions, the attachable assets that are available now may be dissipated long before the Taliban has been served or this action reaches final judgment.  Plaintiffs thus seek immediate *ex parte* attachment of the blocked assets to secure them for satisfaction of a judgment against the Taliban.

Plaintiffs are entitled to a prejudgment order of attachment under New York Civil Practice Law & Rules (CPLR) § 6212 because the Taliban is a non-domiciliary residing outside the state, Plaintiffs are likely to succeed on numerous causes of action, and there are no known counterclaims.  Because the Taliban is not easily reachable and there is an imminent risk that the funds may be dissipated, either to other creditors or diverted by the United States, Plaintiffs seek an emergency *ex parte* "temporary order of attachment" under CPLR § 6211, which functions as the "practical equivalent" of a temporary restraining order, *Concord Asset Mgmt., Inc. v. Intercredit Corp.*, 1992 WL 373477, at *2 (S.D.N.Y. Dec. 3, 1992).  Plaintiffs have long sought redress against the perpetrators of the embassy bombings, have obtained final judgments against other culpable parties, and yet have been unable to satisfy them.  They hope to avoid the same result here.  For the reasons explained below, the Court should grant this *ex parte* emergency motion for attachment of the blocked assets pending confirmation and final judgment in this action.

## JURISDICTION

This Court has jurisdiction over Plaintiffs' suit under 28 U.S.C. §§ 1331, 1332, 1350, and 1367(a).  It has jurisdiction to order attachment of the funds held at the Federal Reserve Bank of New York because they are within the territorial limits of the State in which this Court is located. *India S.S. Co. Ltd. v. Kobil Petroleum*, 620 F.3d 160, 162 (2d Cir. 2010).

## BACKGROUND

### I.     The Embassy Attacks

#### A.     The Taliban and al-Qaeda's Origins

Established by cleric Mullah Mohammad Omar in 1994, the Taliban is a militant, Islamic fundamentalist organization that seeks to establish a Shariah-governed state in Afghanistan. McGill Decl., Ex. 2, at 1.  Its original members largely consisted of insurgent forces that contested the Soviet occupation of Afghanistan from 1969 to 1989.  *Id.* at 2.  Among those forces was the Saudi-born Osama Bin Laden.  McGill Decl., Ex. 3, at 2.

By 1996, the Taliban had seized control of much of Afghanistan and purported to establish the Islamic Emirate of Afghanistan, with Omar serving as head of state.  McGill Decl., Ex. 2, at 3. The Islamic Emirate of Afghanistan was never recognized as the legitimate government of Afghanistan by the United States or the majority of the world.  *Id.*  Nonetheless, the Taliban ruled until 2001, when an American-led coalition invaded Afghanistan after the September 11 terrorist attacks and removed the Taliban from power.  *Id.* at 4.

For virtually its entire existence, the Taliban has extensively supported the international terrorist organization known as al-Qaeda.  Founded by Bin Laden in Afghanistan in the late 1980s, al-Qaeda operates with the stated objective of purging the Islamic world of American and Western influences.  McGill Decl., Ex. 3, at 1–2.  Al-Qaeda was based in Afghanistan and Pakistan from 1989 until 1991, when Bin Laden and al-Qaeda leadership relocated to Sudan at the invitation of its government.  McGill Decl., Ex. 4 ¶ 1.  For the next five years, the Sudanese government provided al-Qaeda with shelter and substantial support.  *Id.*  Among other things, Sudan permitted al-Qaeda to use Sudanese Airways to transport rockets and missiles from Afghanistan to Sudan, provided security for al-Qaeda and facilitated the movement of weapons in and out of Sudan, and allowed al-Qaeda to bypass tax and customs duties on international shipments.  *Owens v. Republic*

*of Sudan*, 412 F. Supp. 2d 99, 106–07 (D.D.C. 2006).  Sudan has previously been found liable for its role in facilitating the embassy bombings.[1]  *See Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1606–07 (2020) (noting district court judgments entered after "detailed factual findings" against Sudan).[2]

In 1996, Bin Laden was expelled from Sudan and returned to Afghanistan, where al-Qaeda set up its new base of operations and assisted the Taliban in its conquest of the country.  McGill Decl., Ex. 3, at 3.  Like Sudan, the Taliban provided al-Qaeda with protection, weapons, training facilities, and use of Afghanistan's national airline to transport members, money, recruits, and weapons overseas.  McGill Decl., Ex. 5, at 66; McGill Decl., Ex. 6, at 3.  If anything, the Taliban's support for al-Qaeda was even more robust than the support Sudan had provided.  In the words of the 9/11 Commission Report, "Bin Laden appeared to have in Afghanistan a freedom of movement that he had lacked in Sudan."  McGill Decl., Ex. 5, at 66.  Al-Qaeda operatives entered and exited the country without following immigration procedures, purchased and imported vehicles and weapons, and enjoyed the use of official Ministry of Defense license plates on their vehicles.  *Id.*  In short, "[t]he alliance with the Taliban provided al Qaeda a sanctuary in which to train … terrorists, import weapons, forge ties with other jihad groups and leaders, and plot and staff terrorist schemes."  *Id.*

---

[1]  The district court's judgments in those cases were later vacated as part of a settlement between Sudan and the United States, under which Sudan deposited $335 million into escrow to provide compensation for victims of terrorism, including the 1998 embassy bombings.  *See* Lauren Ploch Blanchard, Cong. Research Serv., IN11531, *Sudan's Removal from the State Sponsors of Terrorism List* 2 (2020).

[2]  Courts have also found Iran liable for its role in the embassy bombings, based on ties between Iran and Sudan and Iran's support for the radical Islamist terrorist organization Hezbollah, which helped perpetrate the embassy bombings.  *See* Compl. ¶ 109; *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) ("The Iranian defendants, through Hezbollah, provided explosives training to Bin Laden and al Qaeda and rendered direct assistance to al Qaeda operatives.").

**B.      The Planning and Execution of the Embassy Bombings**

While located in Taliban-controlled Afghanistan, Bin Laden declared war on the United States via fatwa in 1996.  He called on all "his Muslim Brothers across the world" to "raise the banner of *jihad* up high against the Judeo-American alliance that has occupied the holy places of Islam."  McGill Decl., Ex. 7, at 1–2.  In February 1998, again from the mountains of Afghanistan, Bin Laden issued another fatwa declaring it to be the "individual duty for every Muslim who can do it in any country in which it is possible to do it" to "kill the Americans and their allies—civilians and military."  McGill Decl., Ex. 8, at 2.  The fatwa was widely published and circulated throughout the Islamic world.  Shortly afterwards, in April 1998, the U.S. Ambassador to the United Nations went to Afghanistan and asked the Taliban to surrender Bin Laden.  The Taliban refused.  McGill Decl., Ex. 9, at 5.  Around the same time, al-Qaeda and Egyptian Islamic Jihad, another terrorist organization operating under al-Qaeda's umbrella, began to plan the attacks on the American embassies in Nairobi and Dar es Salaam.  McGill Decl., Ex. 5, at 69.

Bin Laden and his deputy, Ayman al-Zawahiri, the leader of Egyptian Islamic Jihad, led the overall planning while operating out of Taliban-controlled Afghanistan.  *Id.* at 67–70.  An al-Qaeda leader in Kenya assisted with planning, while other members of al-Qaeda obtained equipment, built the explosives, and reconnoitered the American embassies.  *Id.*  On August 7, 1998, the eighth anniversary of American deployment of troops to Saudi Arabia, al-Qaeda operatives concurrently detonated suicide bombs at the American embassies in Nairobi and Dar es Salaam.  McGill Decl., Ex. 10, at 2.  In addition to the bomber, the Nairobi explosion killed 213 people, including 12 Americans (11 of whom are represented in this action).  *Id.*  Over 4,000 other people were injured (including 16 of the Plaintiffs here).  *Id.* at 1–2.  The Dar es Salaam explosion killed 11 people (five of whom are represented in this action), and injured 85 more (including five of the Plaintiffs in this suit).  *Id.* at 2.

None of this would have been possible without the Taliban's support.  If the Taliban had handed over Bin Laden to American authorities as requested in the spring of 1998, it is doubtful that the bombings would have occurred.  Key operatives were trained in Taliban-controlled territory.  One of the Dar es Salaam bombers received explosives training at an al-Qaeda camp in Afghanistan.  McGill Decl., Ex. 11, at 70.  Another who carried out the Nairobi bombing, Mohammed Rashed Daoud al-Owhali, also trained at the camps and fought alongside the Taliban against an American-backed military group.  McGill Decl., Ex. 12, at 6.  Al-Owhali requested a jihad mission from Bin Laden personally and received additional training in Afghanistan after he was given the embassy bombings.  *Id.*  The Taliban's shelter and material support of Bin Laden and al-Qaeda—through the provision of weapons, training camps, air travel, and protection from the outside world—were crucial to their ability to plan and carry out the attacks.

### C.     The Aftermath

The United States immediately linked the embassy bombings to al-Qaeda and the Taliban. On August 20, 1998, President Clinton signed Executive Order 13099, which froze all al-Qaeda assets in the United States.  McGill Decl., Ex. 13, at 45167 § 2.  The same day, President Clinton ordered airstrikes on al-Qaeda training camps throughout Taliban-controlled territory in Afghanistan—strikes that missed Bin Laden by mere hours.  McGill Decl., Ex. 14, at 1.  American diplomats again unsuccessfully attempted to convince the Taliban to surrender Bin Laden.  McGill Decl., Ex. 5, at 121–26.  Omar, the Taliban leader, refused to do so, and the Taliban vowed to protect Bin Laden "at any cost."   McGill Decl., Ex. 15; *see also* McGill Decl., Ex. 22, at 2.

Federal prosecutors later indicted 17 members of al-Qaeda for their role in the bombings on charges of conspiracy to kill United States nationals, bombing the American embassies, use of weapons of mass destruction, and murder.  McGill Decl., Ex. 16.  The indictments reveal the extent

of the Taliban's protection and support for al-Qaeda.  Many of those indicted received training and security from the Taliban in the lead-up to the embassy bombings.  *Id.* at 12, 14, 16, 22, 25–26.

The international community also recognized the crucial role the Taliban played in the attacks.  The United Nations Security Council declared the Taliban to be a  "threat to international peace and security" and imposed sanctions on the Taliban's funding, travel, and purchases.  McGill Decl., Ex. 17, at 2.  The Council condemned "the continuing use of Afghan territory, especially areas controlled by the Taliban, for the sheltering and training of terrorists and planning of terrorist acts" and "the fact that the Taliban continues to provide safe haven to Usama bin Laden and to allow him and others … to use Afghanistan as a base from which to sponsor international terrorist operations."  *Id.* at 1.

## II.    Executive Order 14064 and the Blocked Assets

After American forces withdrew from Afghanistan in the summer of 2021, the Taliban launched an offensive to retake the country.  McGill Decl., Ex. 18, at 1.  The Taliban's campaign created a humanitarian crisis, with hundreds of thousands of civilians fleeing the country.  *Id.*  On August 15, 2021, Kabul, Afghanistan's capital, fell to the Taliban.  *Id.*  Not a single country has recognized the Taliban as Afghanistan's legitimate government.   McGill Decl., Ex. 19, at 1.

The lack of a recognized government in Afghanistan left around $7 billion dollars in assets of its Central Bank, DAB, sitting idle in U.S. financial institutions.  Shortly after the fall of Kabul, the Taliban installed its own personnel at DAB and claimed the assets.  McGill Decl., Ex. 20, at 2.

Because of Taliban control of Afghanistan—including its banking system—the United States has blocked those funds and made half of them potentially available to victims of terrorism. On February 11, 2022, President Biden issued Executive Order 14064, which directs U.S. financial institutions holding DAB assets around the country to transfer those assets into a single consolidated account at the Federal Reserve Bank of New York and blocks any further transactions

involving those assets absent a license from the Executive Branch.  *See* McGill Decl., Ex. 1, at 8391 § 1(b)–(c).  The order explains that "the preservation of certain property of [DAB] held in the United States" is necessary in light of the humanitarian crisis in Afghanistan and the pressing "legal claims" filed or soon to-be-filed by victims of terrorism.  *Id.* at 8391.  At the same time, the Department of the Treasury's Office of Foreign Assets Control issued a license directing the Federal Reserve Bank of New York to segregate $3.5 billion of DAB's consolidated assets into a separate account for humanitarian purposes related to Afghanistan.  McGill Decl., Ex. 21 § 1.  This leaves approximately $3.5 billion available to satisfy judgments to victims of terrorism.

Plaintiffs, comprising approximately 200 victims from the 1998 embassy bombings, including both U.S. citizens who were killed or injured in the attacks and their family members ("American Plaintiffs") and foreign citizens who were killed or injured in the attacks and their family members ("Foreign Plaintiffs"), brought this suit to hold the Taliban responsible for its role in the bombings.  *See* Compl. ¶¶ 8–79.  To preserve their ability to collect damages from the Taliban after judgment, they seek attachment of $4,669,011,012.21 ($1,373,761,042.95 in compensatory damages and $3,295,249,969.26 in punitive damages) plus prejudgment interest to the blocked DAB funds, and any other funds belonging to Defendant in this District.[3]

Given the current insurgent nature of the Taliban's rule, tracking down Taliban officials to inform them of this suit and attachment motion is no easy task.  The regime remains unstable, and the Taliban has not set up basic governmental functions.  For example, while the website for the

---

[3] Although Plaintiffs seek an attachment order against any and all Taliban assets in New York for the full amount of their damages, similar to other creditors, they are now requesting a levy only against the DAB funds held at the Federal Reserve Bank of New York in the amount of their compensatory damages.  *See* Memo. ISO Mot. to Lift Stay of Writ of Execution 3–4, *Havlish v. Bin Laden*, No. 03-cv-09848 (S.D.N.Y. Feb. 14, 2022), ECF No. 565 (seeking turnover only of compensatory damages and interest).

Taliban's purported Ministry of Foreign Affairs lists a supposed Minister of Foreign Affairs, the contact information for the Ministry, including any details about its "Legal Affairs" department, is wholly missing.    *See* Islamic Emirate of Afghanistan: Ministry of Foreign Affairs, https://mfa.gov.af/en/home-2/# (last accessed March 4, 2022).  Difficulties with service are further amplified by concerns about the volatility of the situation in Afghanistan, McGill Decl., Ex. 25, at 3–4, and "divisions within" the interim Taliban government, McGill Decl., Ex. 26, at 8.

In the interim, other creditors have levied writs of execution on the blocked Taliban funds totaling over $2.1 billion, and those creditors will soon begin turnover proceedings.  Writ of Execution, *John Does 1 Through 7 v. The Taliban*, No. 20-mc-00740 (S.D.N.Y.), ECF entry dated Sept. 27, 2021 (writ in the amount of $138,418,741); Writ of Execution, *Havlish*, No. 03-cv-09848 (S.D.N.Y.), ECF entry dated Jan. 19, 2022 (revised writ in the amount of $6,839,548,468.75); Memo. ISO Mot. to Lift Stay of Writ of Execution 3–4, *Havlish*, No. 03-cv-09848 (S.D.N.Y. Feb. 14, 2022), ECF No. 565 (*Havlish* creditors are only seeking turnover of approximately $2 billion dollars in recoverable compensatory damages and interest).[4]   And there are numerous other creditors with unpaid judgments against the Taliban—underscoring the regime's insolvency and refusal to pay its debts—who may seek to do to the same.  *See* Letter at 2, *O'Neill v. Republic of Iraq, et al.*, No. 04-cv-01076 (S.D.N.Y. Feb. 15, 2022), ECF No. 612 (discussing the "many" individuals with "liability judgments against the Taliban" and others with "pending motions for

---

[4]  Initially, enforcement of the *Doe* and *Havlish* writs of execution was stayed.    Memo Endorsement, *Havlish*, No. 03-cv-09848 (S.D.N.Y. Sept. 20, 2021), ECF No. 527; Memo Endorsement, *John Does 1 Through 7*, No. 20-mc-00740 (S.D.N.Y. Sept. 23, 2021), ECF No. 26.  The district court recently lifted the stays on the execution of both writs, Order, *Havlish*, No. 03-cv-09848 (S.D.N.Y Mar. 2, 2022), ECF No. 589, and on March 3, 2022, the *Havlish* creditors proposed an expedited briefing schedule for turnover proceedings under CPLR §§ 5225 and 5227, Letter, *Havlish*, No. 03-cv-09848 (S.D.N.Y Mar. 3, 2022), ECF No. 591.

judgment of money damages"); Letter at 2, *Havlish*, No. 03-cv-09848 (S.D.N.Y. Feb. 15, 2022), ECF No. 568 (same).

## ARGUMENT

Under Federal Rule of Civil Procedure 64, which incorporates the New York state court procedures set forth in Article 62 of the CPLR, Plaintiffs are entitled to prejudgment attachment of the Taliban's assets because: (1) "there is a cause of action"; (2) "it is probable that the plaintiff will succeed on the merits"; (3) "one or more grounds for attachment provided in section 6201 exist"; and (4) "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." CPLR § 6212(a); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 306 F. Supp. 2d 482, 484–85 (S.D.N.Y. 2004). Each element is easily satisfied.

## I.       Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on numerous causes of action against the Taliban for its direct involvement and substantial aid to al-Qaeda and Bin Laden in perpetrating the embassy bombings. When considering whether it is probable that a plaintiff will succeed on the merits of a cause of action, "the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the stated facts." *Nat'l Bank & Trust Co. of N. Am. v. J.L.M. Int'l Inc.*, 421 F. Supp. 1269, 1272 (S.D.N.Y. 1976) (cleaned up); *see also Bank Leumi Trust Co. v. Istim, Inc.*, 892 F. Supp. 478, 482 (S.D.N.Y. 1995). Plaintiffs are likely to succeed on all of their claims; indeed, other courts have already found Iran and Sudan liable for providing similar—if not less robust— support for the very same embassy bombings.

### A.       American Plaintiffs' Claim under the Anti-Terrorism Act Is Likely to Succeed

The Anti-Terrorism Act ("ATA") provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or

her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States" and shall recover treble damages. 18 U.S.C. § 2333(a). Accordingly, a claim under the ATA lies against a defendant who commits (1) an unlawful act of international terrorism (2) that causes (3) injury or death to an American national. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 270 (D.C. Cir. 2018); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335–36 (2d Cir. 2016). All three elements are met here.

### 1.      Unlawful Act of International Terrorism

By harboring and providing material support to Bin Laden and al-Qaeda in their murderous plot, the Taliban engaged in acts of international terrorism that caused the embassy bombings and wounded or killed Americans. An unlawful act of "international terrorism" requires (1) predicate "acts dangerous to human life" that would violate domestic criminal laws if committed within the United States, (2) committed with the intent "to influence the policy of a government by intimidation or coercion," (3) outside the United States. 18 U.S.C. § 2331(1)(A)-(C).

The Taliban's acts leading up to the embassy bombings plainly would have violated a number of federal laws if committed domestically—including those which prohibit harboring or concealing terrorists, 18 U.S.C. § 2339, providing material support to terrorists, 18 U.S.C. § 2339A, and conspiring to kill United States nationals, 18 U.S.C. § 2332(b). First, in violation of 18 U.S.C. § 2339, the Taliban harbored and concealed Bin Laden and al-Qaeda operatives despite knowing—or at least having "reasonable grounds to believe," *id.* § 2339(a)—that Bin Laden and al-Qaeda intended to bomb American embassies in Kenya and Tanzania. The Taliban willingly gave Bin Laden and al-Qaeda refuge in Afghanistan after they had been ousted from Sudan, provided them a new headquarters, and maintained a close relationship with Bin Laden and al-Qaeda before and after the embassy bombings, offering them the security and resources needed to plan and execute the bombings. With the Taliban's blessing, al-Qaeda even used Afghanistan's

national airline to transport members, recruits, and supplies.  Given Bin Laden's public fatwas calling for attacks against the United States and its allies, the Taliban's denial of the U.S. request to hand over Bin Laden before the attacks, and its close connections to Bin Laden and al-Qaeda, the Taliban was well aware of Bin Laden's plan to commit terrorist attacks against the United States generally and had ample reason to know of the plot to bomb the American embassies specifically.  The Taliban thus plainly violated § 2339.  *See, e.g.*, *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 521 (S.D.N.Y. 2014) (holding there was a triable question whether defendant committed ATA predicate offense for harboring or concealing terrorists by "providing material support" "in the form of money, a phone, weapons, bomb-making supplies, and a safehouse" to a "Hamas operative and a known terrorist").

Second, the Taliban violated 18 U.S.C. § 2339A, which prohibits the provision of "material support or resources," "knowing or intending that they are to be used in preparation for, or in carrying out," certain violent crimes, including arson or bombing of government property and use of weapons of mass destruction.  Courts have already held that Sudan violated this statute by providing al-Qaeda "a base of operations for the planning and execution of terrorist attacks." *Owens*, 826 F. Supp. 2d at 151 (internal quotation marks omitted).  And the Taliban's support was even more significant than that of Sudan:  The Taliban gave Bin Laden and al-Qaeda a "safehouse[]" in the months and years immediately preceding the embassy bombings, *after* Bin Laden had been expelled from Sudan.  18 U.S.C. § 2339A(b).  It also provided "training, expert advice[,] … assistance," transportation, weapons, and other resources in support of al-Qaeda's terrorist mission.  *Id.*  And by sheltering Bin Laden and refusing to turn him over to the United States before the embassy bombings, the Taliban indisputably acted with the requisite "knowledge

13

or intent that the resources given to terrorists" would be "used in the commission of terrorist acts." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 586 n.9 (E.D.N.Y. 2005).

Finally, the Taliban conspired to kill United States nationals in violation of 18 U.S.C. § 2332(b).  "Proof of a conspiracy under § 2[3]32(b) requires a plaintiff to establish that the defendant (1) knew about the aims and objectives of the [alleged] criminal conspirac[y], (2) agreed to the essence of these objectives, and (3) performed acts … intended to further these objectives." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 554 (E.D.N.Y. 2012) (cleaned up).  By providing al-Qaeda with vital resources before, during, and after the embassy bombings with full knowledge that Bin Laden and al-Qaeda intended to attack U.S. targets, the Taliban conspired to kill U.S. nationals.  Its support helped al-Qaeda and Bin Laden accomplish the goal they publicly announced mere months before the embassy bombings—the mass murder of Americans and their allies.

The Taliban committed all of these criminal acts with the terroristic intent "to influence the policy of a government by intimidation or coercion."  *See* 18 U.S.C. § 2331(1)(B).  Bin Laden issued fatwas specifically calling for acts of violence against the United States and American citizens, in an effort to intimidate the United States and affect U.S. foreign policy.  The Taliban acted with the same shared intent by providing ongoing refuge and resources to Bin Laden and al-Qaeda and by refusing to hand over Bin Laden to the United States after those fatwas issued.  By supporting al-Qaeda's attacks, *id.* § 2331(1)(A), the Taliban thus intended to affect United States foreign policy and intimidate the United States and her allies, *id.* § 2331(1)(B).  These acts, which occurred entirely outside the United States, *id.* § 2331(1)(C), are textbook predicate acts of "international terrorism" under the ATA.

### 2.    Caused Death and Injuries to American Nationals

There is also no question that the Taliban's unlawful acts of international terrorism caused the deaths and injuries of the American Plaintiffs in this case.  *See* 18 U.S.C. § 2333(a).  The ATA

requires only proximate causation:  The unlawful acts of international terrorism must have been a "substantial factor" that led to the injuries and deaths of Americans, and those injuries and deaths must have been "reasonably foreseeable" as a result of the acts.  *See Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (internal quotation marks omitted).

Here, the Taliban's acts were a "substantial factor"—if not a direct cause—in the embassy bombings.  The D.C. Circuit held in *Owens v. Republic of Sudan* that Sudan's more attenuated support of Al-Qaeda proximately caused the 1998 embassy bombings.  864 F.3d 751, 797 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).  Sudan was responsible, the court reasoned, because it fostered al-Qaeda's economic growth, sheltered the terrorist group from local police, and provided it with financial support.  864 F.3d at 794.  And although Sudan cut ties with Bin Laden in 1996 by expelling him from the country, disassociated from al-Qaeda, and offered no support specifically for the embassy bombings, *id.* at 796, the court held that Sudan was a proximate cause of the injuries stemming from the embassy bombings because it was obvious that al-Qaeda "would attack American interests wherever it could find them," *id.* at 798.

The Taliban offered even more significant support.  As noted above, in addition to weapons and training, the Taliban gave al-Qaeda operatives a "freedom of movement" inside and outside of the country that the operatives "had lacked in Sudan."  McGill Decl., Ex. 5 at 66.  The Taliban provided refuge and resources to al-Qaeda in the days, months, and years immediately leading up to the attacks, while Sudan expelled Bin Laden and disassociated with al-Qaeda in 1996.  The Taliban provided the camp where multiple members of the embassy bombings trained, and the Taliban refused to hand Bin Laden over to the United States mere months before the embassy bombings.  The Taliban's actions were clearly a "substantial factor" in the bombings.

15

And the deaths and injuries to innocent Americans were, of course, a "reasonably foreseeable" result of the bombings—they were the entire point. *Rothstein*, 708 F.3d at 91. Thus, American Plaintiffs are likely to succeed on their claims that the Taliban violated the ATA.

**B.     Foreign Plaintiffs' Claim for Violation of the Law of Nations Is Likely to Succeed**

Foreign Plaintiffs are equally likely to prevail on their claim against the Taliban for violation of the law of nations and for aiding and abetting such violation. The Alien Tort Statute ("ATS"), which was initially enacted in the Judiciary Act of 1789, provides district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. This jurisdictional grant, the Supreme Court has explained, was "enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations" that at the time bore "a potential for personal liability." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004).

"[I]nfringement of the rights of ambassadors" is a paradigmatic violation of the law of nations long recognized as actionable under the ATS. *Id.* at 715, 719–20. Courts have also recognized aiding-and-abetting liability when an entity purposefully assists another in violating the law of nations. *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam), *aff'd sub nom. Am. Isuzu Motors, Inc v. Ntsebeza*, 553 U.S. 1028 (2008); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 265 (S.D.N.Y. 2009).

Whether as a primary violator or an aider-and-abettor, the Taliban clearly infringed on the rights of ambassadors. The Taliban proximately caused the embassy bombings by providing material support to Bin Laden and al-Qaeda with purpose and full knowledge that they intended to attack the United States. The bombings destroyed the embassy buildings, killed hundreds of embassy employees, visitors, and bystanders, and wounded thousands more. The Taliban's actions

16

risked serious injury or death to ambassadors and impinged upon the diplomatic mission of the
United States in Kenya and Tanzania. *Cf. Finzer v. Barry*, 798 F.2d 1450, 1455 (D.C. Cir. 1986)
(holding that embassy bombings and other violence perpetrated against embassies infringes on the
rights of ambassadors), *aff'd in part, rev'd in part sub nom. Boos v. Barry*, 485 U.S. 312 (1988).[5]

The United States District Court for the District of Columbia has *already* held that foreign
victims from the same 1998 embassy bombing in Kenya could bring a claim under the Alien Tort
Statute against Bin Laden and al-Qaeda. *Mwani*, 2006 WL 3422208, at *4; *Ofisi*, 278 F. Supp. 3d
at 106–07. The court reasoned that the embassy bombings "'touched and concerned' the United
States with 'sufficient force' to displace the presumption against extraterritorial application of the
ATS." *Mwani v. Bin Laden*, 947 F. Supp. 2d 1, 5 (D.D.C. 2013). The bombings "were directed
at the United States government, with the intention of harming this country and its citizens." *Id.*
Indeed, the "attack was orchestrated 'not only to kill both American and Kenyan employees inside
the building, but to cause pain and sow terror in the embassy's home country, the United States.'"
*Id.* (quoting *Mwani v. Bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005)). The same analysis applies
here. As a proximate cause of the attacks, the Taliban's material support for the bombings also
infringed on the rights of ambassadors, providing Foreign Plaintiffs with an ATS claim.

At minimum, the Taliban is liable for aiding and abetting that violation by providing
"practical assistance" to al-Qaeda with the "purpose" of facilitating the embassy bombings. *See
Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 217 (2d Cir. 2016). Again, the

---

[5] A claim for infringement on the rights of ambassadors need not be brought by ambassadors;
"victims" and "survivors" from an embassy attack and their "relatives" have standing to bring
the claim. *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 106–07 (D.D.C. 2017) (so holding
in the context of the same 1998 embassy bombings), *vacated on other grounds by Ofisi v. BNP
Paribas, S.A.*, 285 F. Supp. 3d 240 (D.D.C. 2018); *see also Mwani v. Bin Laden*, 2006 WL
3422208, at *1 (D.D.C. Sept. 28, 2006).

Taliban chose to provide al-Qaeda and Bin Laden with substantial support in the form of weapons, training facilities, and a base of operations in Taliban-controlled territory, while fully aware that they intended to attack U.S. targets.   In fact, Bin Laden issued the fatwa that precipitated the embassy bombings from the Afghan mountains in territory controlled by the Taliban.   And the Taliban aided in the preparation and execution of the bombings by allowing al-Qaeda to transport operatives, weapons, and cash freely in and out of Afghanistan.   The Taliban did so with the unmistakable purpose of facilitating the embassy bombings—as its continued support for Bin Laden after the attacks only confirms.  *See, e.g.*, McGill Decl., Ex. 15, at 1.

### C.    Plaintiffs' State Tort Law Claims Are Likely to Succeed

Beyond federal-law claims, Plaintiffs are likely to prevail on a litany of tort claims against the Taliban: assault and battery, intentional infliction of emotional distress, wrongful death, survivorship, loss of consortium, and aiding-and-abetting claims.   The bombs detonated by al-Qaeda operatives—bombs the Taliban provided material support to prepare—were intended to cause and did cause severe physical and emotional harm to those Plaintiffs who survived.   The injuries suffered by Plaintiffs encompass nearly every imaginable harm—including but not limited to brain injuries, concussions, internal bleeding, lung injuries, spinal injuries, shoulder injuries, destruction of joints, blast burns, severe lacerations that have resulted in permanent scarring, permanent blindness, permanent loss of hearing, shrapnel and glass wounds, fractures, loss of memory and mental ability, and severe post-traumatic stress disorder.  Compl. ¶¶ 8–79.  And the family members of victims injured or killed in the attacks have themselves suffered extreme mental anguish and distress as a consequence.  *Id.*  For those intentional acts inflicted by al-Qaeda that the Taliban enabled, the Taliban is liable for assault and battery, intentional infliction of emotional distress, and for aiding-and-abetting the same.

Plaintiffs are also likely to prevail on their claim for loss of consortium and aiding-and-abetting loss of consortium.  The bombings caused crippling injuries to victims married to some of the Plaintiffs.  As a direct and proximate cause of the acts perpetrated by al-Qaeda and the Taliban, those Plaintiffs have lost support, love, companionship, and consortium to the detriment of their marital relationships.

Finally, the Taliban's and al-Qaeda's heinous acts killed hundreds of Americans and foreign citizens.  Because the Taliban would have been liable to the decedents if death had not occurred and the decedents suffered extreme pain before death, the decedents' estates are likely to succeed on their claims for wrongful death and survival and the related aiding-and-abetting counts.

In sum, Plaintiffs are likely to succeed on multiple causes of action.  *See* CPLR § 6212.

## II.      Plaintiffs Are Entitled to Attachment

Plaintiffs also have a basis for attachment under CPLR § 6201.  "An order of attachment may be granted … where the plaintiff has demanded and would be entitled, in whole or in part, … to a money judgment" against a "nondomiciliary residing without the state."  CPLR § 6201(1).  "[A]ttachment under New York law solely for security purposes is appropriate only when it appears likely that a plaintiff will have difficulty enforcing a judgment."  *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586–87 (S.D.N.Y. 2012) (citation omitted).  Accordingly, in invoking CPLR § 6201(1), Plaintiffs must show that the foreign "defendant has assets within the State that could satisfy a judgment" and that their "fear that the judgment will not be satisfied" absent attachment of those assets "is reasonable."  *TAGC Mgmt.*, 842 F. Supp. at 586 (citation omitted).  Those requirements are fully met here.

First, the Taliban is plainly a non-domiciliary of New York, and the blocked DAB assets may properly be attached to satisfy a judgment against the Taliban.  "After the Taliban took over Afghanistan, they appointed their own official to lead the central bank" and claimed the blocked

assets.  *See* McGill Decl., Ex. 20, at 2.  Executive Order 14064 *assumes* that the blocked assets are controlled by the Taliban through DAB; the very purpose of blocking them is to "keep[] [the funds] out of the hands of the Taliban," which could otherwise use them.  McGill Decl., Ex. 23, at 1.

In granting post-judgment writs of execution on the same assets, two other decisions in this District have already ruled that the assets held in DAB's name at the Federal Reserve Bank of New York may be attached to satisfy judgments against the Taliban.  *See* Writ of Execution, *John Does 1 Through 7*, No. 20-mc-00740 (S.D.N.Y.), ECF entry dated Sept. 27, 2021; Writ of Execution, *Havlish*, No. 03-cv-09848 (S.D.N.Y.), ECF entry dated Jan. 19, 2022.  Implicit in these rulings is a determination that the assets belong to the Taliban, given the Taliban's "ownership and control of [DAB]."  Emergency Mot. for Writ of Execution at 8, *John Does 1 Through 7*, No. 20-mc-00740 (S.D.N.Y. Aug. 26, 2021), ECF No. 15.  Those decisions are determinative here.  The same assets in the same account cannot be treated as the Taliban's in two cases but not in a third.

When the Taliban previously controlled Afghanistan, the United States also recognized that DAB was "owned or controlled by" or "act[s] for or on behalf of, the Taliban."  *See* Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers; Addition of Persons Blocked Pursuant to 31 CFR Part 538, 31 CFR Part 597, or Executive Order 13129, 65 Fed. Reg. 39,100 (June 23, 2000).  After President Clinton blocked "all property and interests in property of the Taliban" under IEEPA in the aftermath of the embassy bombings, Executive Order 13129, 64 Fed. Reg. 36,759, 36,759 (July 4, 1999), the Department of the Treasury's Office of Foreign Assets Control issued orders determining that DAB's funds were also properly blocked as, in effect, property of the Taliban.  *E.g.*, 65 Fed. Reg. at 39,100.  As President Biden's Executive Order 14064 illustrates, the same is true now that the Taliban has once again seized control of

Afghanistan.  Then, as now, the United States had not recognized the Taliban as the rightful government of Afghanistan, but in blocking the funds, it realized that the Taliban effectively controlled the DAB.  Thus, DAB funds may be used to satisfy a judgment against the Taliban.

Second, Plaintiffs will have difficulty enforcing a judgment absent attachment.  It is incredibly difficult for victims "to actually collect on their judgments" against perpetrators of terrorism.  *See* McGill Decl., Ex. 24, at 2–3 (noting that in most cases defendants "have not even appeared in suits"; defendants do not "have very many assets in the United States"; and "[w]hat property is here is frequently blocked and often subject to competing claims of ownership").

The Taliban has limited assets in the United States and already owes significant judgments to other creditors.  As noted, at least two writs of execution totaling over $2.1 billion have already been levied on the $3.5 billion that remains blocked at the Federal Reserve Bank of New York.  *See supra* p. 10.  In addition to those writs, thousands of other plaintiffs have obtained or are seeking liability judgments against the Taliban arising from the terrorist attacks of September 11, 2001.[6]  The Taliban's unwillingness to pay its debts demonstrates the weakness of its financial position in the United States.  Unless the Court orders attachment now, the limited funds that are available will almost certainly be exhausted by the time of final judgment in this suit.

As a result of judgments owed to other creditors, a defendant's deleterious financial position "may justify a plaintiff's fear that a potential judgment will not be satisfied and thus

---

[6]  *See, e.g.*, *Ashton, et al. v. al Qaeda Islamic Army, et al.*, No. 02-cv-06977 (S.D.N.Y.), ECF Nos. 1576, 1584, 1586, 1588, 1597, 1600, 1601; *Bauer, et al. v. al Qaeda Islamic Army, et al.*, No. 02-cv-07236 (S.D.N.Y.), ECF Nos. 132, 135; *Burlingame, et al. v. Bin Laden, et al.*, No. 02-cv-07230 (S.D.N.Y.), ECF Nos. 182, 187, 190; *Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-09849 (S.D.N.Y.), ECF Nos. 941, 945; Letter, *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-01570 (S.D.N.Y. Dec. 22, 2021), ECF No. 7496; Mot. for Partial Final Judgment, *O'Neill v. Republic of Iraq*, No. 04-cv-01076 (S.D.N.Y. Feb. 11, 2022), ECF No. 604.

provide a ground for an attachment." *Thornapple Assocs., Inc. v. Sahagen*, 2007 WL 747861, at *8 (S.D.N.Y. Mar. 12, 2007).  Courts routinely order attachment where a defendant owes "significant sums to other creditors" and lacks sufficient assets to satisfy a potential judgment. *Cnty. of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assocs.*, 2006 WL 752772, at *1–2 (N.D.N.Y. Mar. 22, 2006); *see also Elton Leather Corp. v. First Gen. Res. Co.*, 138 A.D.2d 132, 134 (N.Y. App. Div. 1st Dep't 1988) (upholding attachment where defendants had failed to make payments to two secured creditors).  In *In re Amaranth Natural Gas Commodities Litigation*, for example, Judge Scheindlin ordered attachment of funds held in a $2.4 billion "Master Fund" managed by a defendant hedge fund.  711 F. Supp. 2d 301, 304 (S.D.N.Y 2010).  The hedge fund had already distributed the vast majority of the money in the Fund—and had proposed a plan to distribute the remainder—to investors as part of an effort to unwind its positions.  *Id.*  The court held that the plaintiffs, who were investors in the Fund, were entitled to attachment because the Fund's "proposed distribution" to *other* investors "pose[d] a significant risk that plaintiffs w[ould] not be able to enforce a future judgment" against the hedge fund based on violations of federal law.  *Id.* at 312.  The same reasoning applies here.  Plaintiffs simply wish to ensure that their rights are fully protected, and that they are not foreclosed by other creditors from obtaining recovery.

Plaintiffs' attempts to enforce their prior judgments against Iran and Sudan illustrate the challenges of recovering against recalcitrant foreign debtors, who can immunize their assets from the powers of U.S. courts by keeping them abroad.  A years-long chase through the courts has produced little recovery.  *See* Compl. ¶ 123; *see also Owens v. Turkiye Halk Bankasi A.S.*, 2021 WL 638975, at *1 (S.D.N.Y. Feb. 16, 2021) ("Collectively, the plaintiffs in this action are owed over $10 billion by Iran.  Iran has not satisfied any of the judgments.").  Plaintiffs hope to avoid the same result here, especially now that the Taliban finally has available assets in New York

within the power of this Court to attach.

Finally, although the United States has currently reserved $3.5 billion for potential attachment by victims of terrorism, it is entirely possible that it could reallocate or unblock those funds in light of the shifting situation in Afghanistan. Of the initial $7 billion blocked by Executive Order 14064, the United States has already siphoned off half of the funds—$3.5 billion—to advance its foreign policy aims in Afghanistan. *See* McGill Decl., Ex. 1, at 8391 § 1(b)-(c); McGill Decl., Ex. 20, at 1; McGill Decl., Ex. 21 § 1. Given that it has already done so once before, the United States could easily choose to divert further funds for various purposes. This provides yet another ground for immediate attachment.

*     *     *

In sum, the requirements of CPLR § 6212 are met. As explained above, the Plaintiffs have numerous causes of action on which they are likely to succeed; CPLR § 6201(1) provides a ground for prejudgment attachment; and there are no known counterclaims. Because attachment is necessary to secure the assets to satisfy a judgment, the Court should order attachment.[7]

## III.   This Court Should Grant Plaintiffs' Emergency Motion *Ex Parte*

Under Local Civil Rule 6.1(d), this Court may grant an "*ex parte* order . . . upon a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary, and stating whether a previous application for similar relief has been made." This is Plaintiffs' first request for such relief. McGill Decl. ¶ 2.

---

[7] CPLR § 6212(b) requires a plaintiff moving for an order of attachment to post an undertaking in an "amount fixed by the court" of "not less than five hundred dollars" to provide surety for any damages a defendant might suffer as a result of the attachment. Here, Plaintiffs, who are individual victims of terrorism, request an undertaking of not more than $10,000. The DAB funds they seek to levy are already blocked by Executive Order 14064, so prejudgment attachment will not cause any additional harm to the Taliban.

CPLR § 6211(a) likewise provides for an order of immediate attachment "without notice." The substantive "standard [in CPLR § 6212] applies regardless of whether a plaintiff is seeking an order of attachment pursuant to an *ex parte*—that is, without notice—application or a motion on notice." *Herzi v. Ateliers De La Haute-Garonne*, 2015 WL 8479676, at *1 (S.D.N.Y. Oct. 13, 2015). Because an *ex parte* order of attachment under CPLR § 6211 provides urgent, temporary relief, this Court has characterized it as the "practical equivalent" of a temporary restraining order. *Concord Asset Mgmt., Inc.*, 1992 WL 373477, at *2.[8]

Here, *ex parte* disposition of Plaintiffs' application is necessary because of the severe challenges posed by serving process on the Taliban. As explained, the Taliban currently consists of an "interim government made up of hard-line leaders," with no officials from the previous government in the Taliban's cabinet. McGill Decl., Ex. 25, at 4. And given "divisions within the Taliban," the situation in Afghanistan may grow "increasingly unstable in the coming months." McGill Decl., Ex. 26, at 8–9. The difficulty of identifying an official representative of the Taliban on whom process could be served—and the volatility of the interim Taliban government—provide "good and sufficient reasons," Local Civil Rule 6.1(d), to permit Plaintiffs to proceed *ex parte* against the Taliban. *Cf. Unitrans Int'l, Inc. v. Gulf & Orient S.S. Lines, Inc.*, 2002 WL 1205744, at *1 (S.D.N.Y. Mar. 6, 2002) (permitting Plaintiff to seek release of security *ex parte* because Defendant had gone out of business and "there [was] no new address or phone number available

---

[8] Once the attachment is granted, the requesting party has "ten days after levy" to move "for an order confirming the order of attachment." CPLR § 6211(b). "Upon the motion to confirm," the burden-of-proof provisions in CPLR § 6223(b) "shall apply." *Id*. Thus, Plaintiffs will ultimately bear "the burden of establishing the grounds for the attachment, the need for continuing the levy and the probability that [they] will succeed on the merits." CPLR § 6223(b). To obtain an *ex parte* order of attachment, however, Plaintiffs must merely demonstrate a "prima facie case." *Banco Internacional, S.A. v. Vilaseca*, 631 N.Y.S.2d 468, 469–70 (N.Y. Sup. Ct. 1994).

by which to contact the defunct Defendant or any successor, assignee, or representative" and "Plaintiff ha[d] no means by which it [could] effectively provide Defendant with notice"). At best, the process of serving the Taliban could take weeks.

In the interim, as discussed, Plaintiffs have reason to believe that the Taliban assets held in DAB's name at the Federal Reserve Bank of New York may be distributed imminently to other creditors, which makes a prompt attachment of Plaintiffs' claims essential. Certainly, given the numerous outstanding creditors of the Taliban, it is unlikely that the Taliban will have any attachable assets left to satisfy Plaintiffs' judgment without attachment now. *See Cnty. of Oswego Indus. Dev. Agency*, 2006 WL 752772, at *1–2 (upholding attachment where defendant owed "significant sums to other creditors"); *supra* pp. 10, 21 & n.6 (listing judgments and pending cases against the Taliban). Thus, immediate, emergency attachment under CPLR § 6211 is warranted.

Additionally, given the volatility of the Taliban's rule, the changing situation in Afghanistan, and the United States' shifting policy priorities, it is possible that the United States could move or unblock the funds before Plaintiffs receive judgment. The possibility that the funds could be redistributed by the government at any time creates another basis for prompt attachment.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' *ex parte* emergency motion for an order of attachment of assets held in the name of Da Afghanistan Bank at the Federal Reserve Bank of New York in this District, and any and all other funds belonging to Defendant in this District, in the amount of $4,669,011,012.21, plus prejudgment interest. Plaintiffs request, however, a levy against the Da Afghanistan Bank assets only in the amount of their compensatory damages, $1,373,761,042.95, plus prejudgment interest.

Dated:  March 8, 2022                                    Respectfully submitted,

                                                        /s/ Matthew D. McGill
Rebecca Monck Ricigliano                                Matthew D. McGill
CROWELL & MORING LLP                                    Jessica L. Wagner
590 Madison Avenue, 20th Floor                          (*pro hac vice* application forthcoming)
New York, NY 10022                                      GIBSON, DUNN & CRUTCHER LLP
Telephone:  (212) 895-4000                              1050 Connecticut Avenue, N.W.
Facsimile:  (212) 223-4134                              Washington, D.C. 20036
rricigliano@crowell.com                                 Telephone:  (202) 955-8500
                                                        Facsimile:  (202) 530-9522
                                                        mmcgill@gibsondunn.com
John L. Murino
(*pro hac vice* application forthcoming)
Stuart H. Newberger                                     Robert L. Wiegel
(*pro hac vice* application forthcoming)                Jason W. Myatt
Emily M. Alban                                          GIBSON, DUNN & CRUTCHER LLP
(*pro hac vice* application forthcoming)                200 Park Avenue
CROWELL & MORING LLP                                    New York, New York 10166
1001 Pennsylvania Ave. NW                               Telephone:  (212) 351-4000
Washington, DC 20004                                    rweigel@gibsondunn.com
Telephone:  (202) 624-2500                              jmyatt@gibsondunn.com
Facsimile:  (202) 628-5116


Caragh Glenn Fay
(*pro hac vice* application forthcoming)
Amanda Fox Perry
(*pro hac vice* application forthcoming)
FAY LAW GROUP, P.A.
6205 Executive Boulevard
Rockville, MD 20852
Telephone:  (202) 589-1300
Facsimile: (202) 216-0298


*Counsel for Plaintiffs*