| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>-------------------------------------------------------------- X<br>JAMES OWENS, et al.,<br>　　　　　　　　　　　　　Plaintiffs,<br>　　　　　-against-<br><br>TALIBAN a/k/a ISLAMIC EMIRATE OF<br>AFGHANISTAN,<br>　　　　　　　　　　　　　Defendant.<br>-------------------------------------------------------------- X | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #:_____<br>DATE FILED: 4/11/22<br><br>22-CV-1949 (VEC)<br><br>OPINION AND ORDER |

VALERIE CAPRONI, United States District Judge:

On August 7, 1998, al-Qaeda killed more than 200 people and injured thousands in terrorist attacks on the U.S. embassies in Dar es Salaam, Tanzania and Nairobi, Kenya ("Embassy Bombings"). Although al-Qaeda was responsible for the attack, several countries and groups provided assistance that made the attacks possible, including Iran, Sudan, and, allegedly, the Taliban, a fundamentalist Islamic organization that then controlled, and now again controls, Afghanistan.

In 2021, about 20 years after being ousted from Afghanistan, the Taliban effectively reseized control of Afghanistan, after which it laid claim to funds held by the Afghan central bank at the Federal Reserve Bank of New York ("N.Y. Fed."). In February 2022, President Joseph R. Biden issued an Executive Order blocking the Taliban from moving or using those funds; that Executive Order also designated some of the blocked funds for payment of civil judgments that have been obtained by victims of the Taliban's acts of terrorism. *See* McGill Decl., Ex. 1, Dkt. 6-1. The Executive Order prompted approximately 200 surviving victims, estates of victims who did not survive, and family members of the victims of the Embassy Bombings, both domestic and foreign, to sue the Taliban for its alleged role in the attack. *See*

1

*generally* Compl., Dkt. 1.  To preserve their chance of collecting on a future judgment, they have filed an *ex parte* emergency motion seeking pre-judgment attachment of the funds.  *See* Dkt. 4.  For the reasons that follow, their motion is GRANTED.

## BACKGROUND[1]

In 1996, after being expelled from Sudan, al-Qaeda and its leader, Osama bin Laden, relocated to Afghanistan, where the Taliban had recently emerged as a fundamentalist movement that was attempting to take over Afghanistan.  Once in Afghanistan, al-Qaeda allegedly began to receive support from the Taliban in the form of, among other things, weapons, training, facilities, and protection.  McGill Decl., Ex. 5, Part II at 66, Dkt. 6-6; McGill Decl., Ex. 6 at 3, Dkt. 6-8.  While he was allegedly being protected by the Taliban, bin Laden declared war on the United States in a 1996 fatwa; he reiterated that declaration in February 1998.  McGill Decl., Ex. 7 at 1–2, Dkt. 6-9; McGill Decl., Ex. 8 at 2, Dkt. 6-10.  Eventually, bin Laden and al-Qaeda orchestrated the attacks on two U.S. embassies in the summer of 1998, killing hundreds and injuring thousands.  McGill Decl., Ex. 10 at 2, Dkt. 6-12.

Horrific in their own right, the 1998 bombings were a harbinger of what was to come.  On September 11, 2001, al-Qaeda perpetrated terrorist attacks against the United States with far-reaching domestic and international consequences.  *See generally* McGill Decl., Ex. 18, Dkt. 6-20.  The Taliban was pushed from power in Afghanistan when North Atlantic Treaty Organization ("NATO") forces, led by the United States, invaded the country.  *Id.*  Although a fragile democracy was formed, Afghanistan was rocked by insurgent attacks from the Taliban for years.  Eventually, in the summer of 2021, NATO allies and the United States withdrew their troops from the country, and the Taliban retook control.  *Id.*  Although no country has recognized

---

[1]     The facts are taken from the Complaint and supporting Declaration and are assumed to be true for purposes of this opinion.

it as an official, legitimate government, the Taliban is currently governing Afghanistan. McGill Decl., Ex. 19 at 1, Dkt. 6-21. In that role, the Taliban laid claim to roughly $7 billion in assets of the Afghan central bank held at the N.Y. Fed. McGill Decl., Ex. 20 at 2, Dkt. 6-22. On February 11, 2022, President Biden, via Executive Order, froze those assets and made half of them available for victims of terrorism to collect on civil judgments. McGill Decl., Ex. 1, Dkt. 6-1.[2]

President Biden's order set off a race among creditors to attach funds. Among the terrorism victims seeking to lay claim to those funds are victims of the September 11, 2001 terrorist attacks — many of whom have been engaged in a complex set of lawsuits filed years ago in this District — who wish to levy previously-stayed writs of execution on the now-available funds in the amount of more than $2.1 billion. Order, *In Re: Terrorist Attacks on September 11, 2001*, No. 03-MD-01570, Dkt. 7717 (S.D.N.Y. Mar. 2, 2022) (lifting stays on writs of execution for two sets of plaintiffs in cases related to the September 11 attacks). Those plaintiffs are now engaged in turnover proceedings, which will be fully briefed at the end of April 2022. Order, *In Re: Terrorist Attacks on September 11, 2001*, No. 03-MD-01570, Dkt. 7750 (S.D.N.Y. Mar. 14, 2022) (setting briefing schedule). In part because of those judgment creditors, this case was filed with an *ex parte* emergency motion for prejudgment attachment. Pls. Mem., Dkt. 5 at 1, 25.[3] Although Plaintiffs seek pre-judgment attachment of Taliban assets in the amount of approximately $4.6 billion plus pre-judgment interest, with respect to the funds located at the N.Y. Fed., they seek only their expected compensatory damages, in the amount of

---

[2]     Whether the funds Plaintiffs seek to attach are actually funds belonging to the Taliban is a complicated question. That issue, however, is not ripe for final decision at this stage of Plaintiffs' case.

[3]     Magistrate Judge Sarah Netburn denied certain of the September 11 plaintiffs' request to consolidate this action with the September 11 cases. Order, *In Re: Terrorist Attacks on September 11, 2001*, No. 03-MD-01570, Dkt. 7754 (S.D.N.Y. Mar. 15, 2022).

approximately $1.4 billion plus pre-judgment interest (the amount of the funds that have not already been attached). *Id.* at 25. After oral argument, the Court granted Plaintiffs' motion, indicating that an opinion would follow. Order, Dkt. 32.

## DISCUSSION

### I. Legal Standard

Pursuant to Federal Rule of Civil Procedure 64, New York state law governs the ability of a party to attach property prior to obtaining a judgment. Fed. R. Civ. P. 64. Under New York law, in order to obtain a pre-judgment attachment, the plaintiff must show that: (1) the plaintiff has a cause of action for a money judgment; (2) it is probable that the plaintiff's claim will succeed on the merits; (3) one or more grounds for attachment provided under New York law exist; and (4) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. CPLR § 6212(a). A plaintiff must make this showing via affidavit or other written evidence. *Id.* The remedy of pre-judgment attachment "is discretionary with the Court and should be used sparingly." *Katz Agency, Inc. v. Evening News Ass'n*, 514 F. Supp. 423, 429 (S.D.N.Y. 1981), *aff'd sub nom. Katz Commc'ns, Inc. v. Evening News Ass'n*, 705 F.2d 20 (2d Cir. 1983) (citation omitted). Although the remedy is discretionary, the Second Circuit has made clear that where all the statutory requirements have been satisfied, a district court has no option but to grant pre-judgment attachment. *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006) ("Where . . . a statutory ground for attachment exists and both need and likelihood of success are established, [a district court's] discretion does not permit denial of the

remedy for some other reason, at least absent extraordinary circumstances and perhaps even then.").

New York law provides for granting orders of attachment without notice to the adversarial party. *See* CPLR § 6211(a). The adversary is protected by the fact that if the order of attachment is obtained *ex parte*, the plaintiff must then serve a motion on the defendant seeking to confirm the order of attachment within a certain time period, or the order of attachment will be vacated. *Herzi v. Ateliers De La Haute-Garonne,* No. 15-CV-7702, 2015 WL 8479676, at *1 (S.D.N.Y. Oct. 13, 2015). In the Southern District of New York, Local Rule 6.1 allows for an *ex parte* application so long as the moving party provides an affidavit with good and sufficient reasons why proceeding *ex parte* is necessary; Plaintiffs have satisfied that requirement. *See generally* McGill Decl., Ex. 1, Dkt. 6-1.

## II.     Plaintiffs Meet the Requirements for Pre-Judgment Attachment Under New York Law

Although this litigation may present other complicated issues of law at a later stage, Plaintiffs have met the statutory requirements to be granted pre-judgment attachment.

### A. Plaintiffs Have Brought a Cause of Action for a Money Judgment

Plaintiffs bring claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a); the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for foreign Plaintiffs; and New York state tort law claims for different subsets of Plaintiffs. *See generally* Compl., Dkt. 7. These are clearly causes of action that, were they to succeed, would result in a money judgment. *See, e.g.*, Mem. and Order, *Mattel Inc. v. Entities et al.*, No. 20-CV-11075, Dkt. 55 at 10 (finding "[t]here is, of course, a cause of action here" where plaintiff brought standard trademark claim); *Disney Enterprises, Inc. v. Finanz St. Honore, B.V.*, No. 13-CV-6338, 2017 WL 1862211, at *2 (E.D.N.Y. May 8, 2017) (noting in passing "there is a cause of action" in trademark case);

*Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*, No. 15-CV-9003, 2018 WL 6340600, at *1 (S.D.N.Y. July 23, 2018) (finding cause of action in passing in case bringing breach of contract claim). Plaintiffs therefore easily meet the first prong for pre-judgment attachment under New York law. CPLR § 6212(a).

### B. Plaintiffs Have Demonstrated a Probability of Success on the Merits

In order to attach the assets in question, Plaintiffs must prove a likelihood of success on the merits for at least one of their claims. Although Plaintiffs have brought claims under two federal statutes and several state tort laws, the Court addresses only their likelihood of success under the federal statutes.

#### 1. Plaintiffs Are Likely to Succeed on Their ATA Claim

The ATA provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). To succeed on a claim under the ATA, "a plaintiff must prove three formal elements: unlawful *action*, the requisite *mental state*, and *causation*." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (internal quotation marks and citations omitted) (emphasis in original).

To establish an "unlawful action," Plaintiffs must show that their injuries resulted from an act of "international terrorism." *Id.* at 336. The ATA defines activities that constitute "international terrorism" as those that (1) "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"; (2)

"appear to be intended" to intimidate or coerce a civilian population; influence the policy of a government by intimidation or coercion; or affect the conduct of a government by mass destruction, assassination, or kidnapping; and (3) occur outside the United States.  18 U.S.C. § 2331(1)(A)–(C).

Plaintiffs allege that, leading up to the Embassy Bombings, the Taliban violated numerous U.S. laws, including harboring and concealing terrorists, providing material support to terrorists, and conspiring to kill U.S. nationals.  Pls. Mem. at 12–14 (citing 18 U.S.C. § 2339; 18 U.S.C. § 2339A; 18 U.S.C. § 2332(b)).  This assertion rests primarily on the fact that the Taliban gave bin Laden refuge after he was ousted from Sudan, at a time when bin Laden was overtly calling for acts of violence to be committed against the United States.  *Id.*  Plaintiffs allege that the Taliban maintained the terroristic intent required — to influence government policy — based on bin Laden's actions, specifically his issuance of fatwas, and that the acts in question occurred entirely outside the United States.  *Id.* at 14.  Plaintiffs provide numerous exhibits supporting these contentions, including a criminal indictment that incorporates discussion of bin Laden's relationship with the Taliban beginning in 1996, *see* McGill Decl., Ex. 4, Dkt. 6-4 ¶ 8; bin Laden's 1996 and 1998 fatwas, *see generally* McGill Decl., Exs. 7–8, Dkts. 6-9–6-10; news articles, such as one in which the Taliban pledges to protect bin Laden "at any cost" following the Embassy Bombings, *see* McGill Decl., Ex. 15 at 1, Dkt. 6-17; and a criminal indictment of bin Laden and other members of al-Qaeda for the bombings, *see* McGill Decl., Ex. 16, Dkt. 6-18, among others.

On causation, Plaintiffs argue that the Taliban's role in helping al-Qaeda and specifically bin Laden proximately caused the Embassy Bombings.  Pls. Mem. at 14–16.  Plaintiffs argue that given that Sudan, which provided less significant support to bin Laden, was found to have

proximately caused the injuries stemming from the Embassy Bombings, the Taliban, which offered more significant support, is as responsible, if not more so, for those same injuries. *Id.* Plaintiffs also contend that it was "reasonably foreseeable" that individuals would die as a result of the bombings. *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 515–16 (S.D.N.Y. 2014) (citation omitted).

While there is essentially no doubt that at least some Plaintiffs have an ATA claim that is likely to be meritorious, an affirmative defense that Plaintiffs left unmentioned in their briefing is the statute of limitations, which for the ATA is 10 years. 18 U.S.C. § 2335(a). At oral argument, Plaintiffs urged the Court not to consider the statute of limitations due to the fact that it is an affirmative defense for the Defendant to raise. Hearing Tr., Dkt. 34 at 6–7. In the alternative, they noted that the ATA is subject to both statutory and equitable tolling. *See id.*; 18 U.S.C. § 2335(b) ("[t]he time of the absence of the defendant from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff, or of any concealment of the defendant's whereabouts, shall not be included in the 10-year period."); *Litle v. Arab Bank, PLC*, 507 F. Supp. 2d 267, 276–77 (E.D.N.Y. 2007), *vacated in part sub nom. Linde v. Arab Bank*, *PLC*, 950 F. Supp. 2d 459 (E.D.N.Y. 2013) (applying equitable tolling analysis in ATA case). The Court agrees with Plaintiffs that because the statute of limitations is an affirmative defense and because they have colorable arguments that the affirmative defense, if asserted, would not be successful, the statute of limitations does not undercut the Plaintiffs' likelihood of success on the merits on their ATA claim.

### 2. Foreign Plaintiffs Are Likely to Succeed on Their ATS Claim

With respect to the ATS claim, the foreign Plaintiffs allege that the Taliban infringed on the rights of ambassadors in violation of the law of nations, which is actionable under ATS. Pls.

Mem. at 16–18.  Those claiming jurisdiction under the ATS must allege facts sufficient to establish that: (1) they are aliens; (2) they are suing for a tort; and (3) the tort in question has been committed in violation of the law of nations or a treaty of the United States.  *Kadic v. Karadzic,* 70 F.3d 232, 238, 238 n.1 (2d Cir. 1996).

The foreign Plaintiffs certainly meet the first prong; as to the second and third, the U.S. Supreme Court has held that infringement of the rights of ambassadors[4] is one of the three primary offenses covered by Congress' recognition of private causes of action for torts in violation of the law of nations.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004).  In the Second Circuit, plaintiffs can succeed on an ATS claim via aiding and abetting liability.  *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007), *aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008).  The U.S. District Court for the District of Columbia has previously held that foreign victims from the 1998 bombings can bring a claim under the ATS for infringement of the rights of ambassadors.  *Mwani v. Bin Ladin*, No. 99-CV-125, 2006 WL 3422208, at *4 (D.D.C. Sept. 28, 2006); *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 107 (D.D.C. 2017), *order vacated in part*, 285 F. Supp. 3d 240 (D.D.C. 2018).  Finally, based on the same evidence supporting the ATA claim, *see supra* Section II(B)(1), the foreign Plaintiffs are likely able to prove causation as well.

As with the ATA claim, an affirmative defense to the ATS claim that went unmentioned in Plaintiffs' memorandum is the statute of limitations.  The Court again agrees with Plaintiffs that because the statute of limitations is an affirmative defense and because they have colorable arguments that could overcome the affirmative defense — here only in the form of equitable, and

---

[4] The victims need not actually be ambassadors.  *See*, *e.g.*, *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 106–07 (D.D.C. 2017), *order vacated in part*, 285 F. Supp. 3d 240 (D.D.C. 2018).

not statutory, tolling, *see generally* 28 U.S.C. § 1350; *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002) (describing standard for equitable tolling) — the statute of limitations does not undercut Plaintiffs' likelihood of success on the merits on their ATS claim.

As a result, Plaintiffs, both U.S. nationals and non-U.S. nationals, meet this prong.

### C. Plaintiffs Have Established Grounds for Attachment

The third prong Plaintiffs must meet for pre-judgment attachment has proven to be the most contentious. Plaintiffs' statutory ground for attachment is that the Taliban is a "nondomiciliary residing without the state." CPLR § 6201(1). While that description aptly fits the Taliban, because attachment in this case is only for purposes of securing a judgment, Plaintiffs must also prove that the Taliban "has assets within the State that could satisfy a judgment"[5] and that "fear that the judgment will not be satisfied is reasonable." *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586 (S.D.N.Y. 2012). What circumstances can give rise to such a reasonable fear is contested.[6]

The Second Circuit has explained that pre-judgment attachment under New York law "serves to protect the plaintiff against defendant's ability to pack his bags, abandon his place of convenience within the state, and remain at his permanent residence outside the reach of New York enforcement procedures." *ITC Ent., Ltd. v. Nelson Film Partners*, 714 F.2d 217, 221 (2d Cir. 1983). Several New York cases suggest that the animating concerns behind attachment are the depletion of funds due to the defendant's behavior, and not the role of other creditors. *See, e.g., Ames v. Clifford*, 863 F. Supp. 175, 177 (S.D.N.Y. 1994) ("New York courts have required

---

[5] Because President Biden's Executive Order has frozen the relevant assets to pay victims' judgments, the Court does not turn to the question of whether the Taliban's claim to the assets is proper, which will likely be addressed during turnover proceedings. *See supra* note 2.

[6] Although this is an *ex parte* motion and is, therefore, technically non-adversarial, as discussed later in this section, non-parties to this case, with their own claims against the Taliban, have provided certain arguments in opposition to Plaintiffs' motion.

an additional showing that something, whether it is a defendant's financial position or past and present conduct, poses a real risk to the enforceability of a future judgment."). Plaintiffs argue that attempts by others to collect unpaid judgments against the Taliban and the danger that the United States will transfer or claim the remaining funds support a "reasonable" fear necessitating attachment, and they urge the Court to find the same. Pls. Mem. at 1, 23, 25. Although they are not a party to this case, the Plaintiffs' Executive Committees ("PECs") in the multi-district litigation involving victims of the September 11, 2001 attacks argue that these Plaintiffs are improperly using pre-judgment attachment as a mechanism, essentially, to jump the line to collect on a limited pool of funds. PECs Letters, Dkts. 22, 29.

The unfortunate reality that the numerous victims of acts of terror perpetrated by the Taliban may not collect on judgments is not lost on the Court, and the Court does not seek to engage in gamesmanship over which victims are more deserving to collect on the limited funds available. New York law contemplates that pre-judgment attachment provides priority among creditors. *See* CPLR § 5234(b). Allowing plaintiffs who have not obtained a judgment to jump the line cannot be the reason for granting pre-judgment attachment; but, by the same token, the Second Circuit has held that the fact that granting a motion for pre-judgment attachment establishes priority also cannot be a reason *not* to grant pre-judgment attachment. *See Cap. Ventures Int'l*, 443 F.3d at 221–22.[7] Plaintiffs' sole purpose of seeking pre-judgment attachment is not to disrupt the claims of creditors who already have judgments against the Taliban; instead, Plaintiffs seek pre-judgment attachment only of the remaining funds held in New York, for which no judgments or writs of execution have yet been levied. Hearing Tr. at 19–20. The only

---

[7] Although Plaintiffs relied heavily on *Capital Ventures International* at oral argument, *see*, *e.g.*, Hearing Tr. at 24, the Court notes that, curiously, they did not cite it even once in their briefing.

question for the Court, therefore, is whether Plaintiffs have proven a need to secure the remaining available funds.  While establishing priority over other potential creditors is clearly a motivating factor behind Plaintiffs' motion, *see* Pls. Mem. at 1, 25, the nature of the Taliban's limited assets in the United States and the potential disbursal of the funds — apart from writs of execution that have already issued and are now subject to turnover proceedings — prevent this Court from finding anything other than that the statutory ground has been met.  *Cap. Ventures Int'l*, 443 F.3d at 222.[8]

### D.  There Are No Known Counterclaims

Finally, Plaintiffs must demonstrate that there are no known counterclaims from Defendant that would exceed the amount sought by them.  CPLR § 6212(a).  The Court is convinced by their representation that there are none.  Pls. Mem. at 23; McGill Decl., Dkt. 6 ¶ 35.

## CONCLUSION

Although pre-judgment attachment is a drastic remedy, Plaintiffs have shown that under Second Circuit precedent they are entitled to attach the funds at issue.  For that reason, Plaintiffs' *ex parte* emergency motion was GRANTED.

**SO ORDERED.**

**Date:  April 11, 2022**                                                               **VALERIE CAPRONI**
**New York, New York**                                                          **United States District Judge**

---

[8]   The Court notes that there is something unseemly about the race-to-the-courthouse aspect of the New York attachment law.  This Court has no basis for deciding that any victims of the Taliban are more or less deserving of monetary recovery than any others.  New York law, however, seems to favor the fleetest of foot.