**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

JAMES OWENS, et al.,

        *Plaintiffs,*

    *v.*

TALIBAN a/k/a ISLAMIC EMIRATE OF
AFGHANISTAN,

        *Defendant.*

Civil Action No. 22-cv-01949 (VEC)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>MOTION TO CONFIRM THE ORDER OF ATTACHMENT</u>**

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ....................................................................................................... 3

    I.    The Embassy Attacks .................................................................................... 3

        A.    The Taliban and al-Qaeda's Origins ................................................... 3

        B.    The Planning and Execution of the Embassy Bombings ...................... 4

    II.    The Taliban Takeover and Executive Order 14064 ........................................ 5

    III.    Procedural History ....................................................................................... 9

ARGUMENT .......................................................................................................... 10

    I.    Plaintiffs Are Likely To Succeed On The Merits. ......................................... 10

        A.    The Court Correctly Concluded that Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ................................................ 10

        B.    Plaintiffs' Claims Are Not Barred by the Statute of Limitations ........ 12

    II.    Plaintiffs Remain Entitled To Attachment ................................................... 14

        A.    Attachment Is Necessary To Secure a Potential Judgment ................. 15

        B.    Attachment Is Warranted Even If There Are Disputed Issues of Ownership. ..................................................................................... 16

        C.    The Taliban Has An Attachable Interest In The Blocked Funds. ....... 18

        D.    The FSIA Poses No Obstacle To Confirmation ................................ 23

CONCLUSION ....................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Beauvais v. Allegiance Sec., Inc.*,
  942 F.2d 838 (2d Cir. 1991)............................................................................18

*Boim v. Am. Muslims for Palestine*,
  9 F.4th 545 (7th Cir. 2021) ................................................................20, 21, 24

*Cap. Ventures Int'l v. Republic of Argentina*,
  443 F.3d 214 (2d Cir. 2006)......................................................................15, 16

*A.Q.C. ex rel. Castillo v. United States*,
  656 F.3d 135 (2d Cir. 2011)............................................................................13

*Comm'n for Polish Relief v. Banca Nationala a Rumaniei*,
  43 N.E.2d 345 (N.Y. 1942)..............................................................................17

*Cont'l Transfert Technique, Ltd. v. Fed. Gov't of Nigeria*,
  2019 WL 3562069 (D.D.C. Aug. 6, 2019) ................................................22, 25

*Davis v. Bryan*,
  810 F.2d 42 (2d Cir. 1987)..............................................................................13

*EM Ltd. v. Banco Central de la Republica Argentina*,
  800 F.3d 78 (2d Cir. 2015)..............................................................................18

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) ........................................................................................19

*Hanger v. Abbott*,
  73 U.S. (6 Wall.) 532 (1867) .....................................................................13, 14

*Havlish v. Bin Laden*,
  No. 03-cv-09848 (S.D.N.Y. Jan. 19, 2022) ...................................................9, 18

*Herzi v. Ateliers De La Haute-Garonne*,
  2015 WL 8479676 (S.D.N.Y. Oct. 13, 2015) ...................................................10

*John Does 1 Through 7 v. Taliban*,
  No. 20-mc-00740 (S.D.N.Y. Sept. 27, 2021) ...............................................9, 18

*Last Time Beverage Corp. v. F & V Distrib. Co.*,
  98 A.D.3d 947 (N.Y. App. Div. 2012) ..............................................................19

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  834 F.3d 201 (2d Cir. 2016)............................................................................11

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Linde v. Arab Bank, PLC,*
97 F. Supp. 3d 287 (E.D.N.Y. 2015) .......................................................................20

*Maalouf v. Islamic Republic of Iran,*
923 F.3d 1095 (D.C. Cir. 2019) ...............................................................................13

*Metro. Diagnostic Imaging Grp., LLC v. U.S. Heartcare Mgmt., Inc.,*
2010 WL 3073727 (N.Y. Sup. Ct. July 26, 2010) ...................................................19

*Minpeco, S.A. v. Hunt,*
686 F. Supp. 427 (S.D.N.Y. 1988) ...........................................................................19

*Motorola Credit Corp. v. Uzan,*
739 F. Supp. 2d 636 (S.D.N.Y. 2010).......................................................................23

*Mwani v. Bin Ladin,*
2006 WL 3422208 (D.D.C. Sept. 28, 2006) .............................................................12

*Nat'l Bank & Tr. Co. of N. Am. v. J.L.M. Int'l, Inc.,*
421 F. Supp. 1269 (S.D.N.Y. 1976).........................................................................11

*Nat'l Council of Resistance of Iran v. Dep't of State,*
373 F.3d 152 (D.C. Cir. 2004)..................................................................................19

*New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.,* 502 F. Supp. 120 (S.D.N.Y. 1980) .................................................................25

*Nippon Emo-Trans Co. v. Emo-Trans, Inc.,*
744 F. Supp. 1215 (E.D.N.Y. 1990) .........................................................................17

*NML Cap., Ltd. v. Banco Central de la Republica Argentina,*
652 F.3d 172 (2d Cir. 2011).............................................................................21, 24

*Opati v. Republic of Sudan,*
140 S. Ct. 1601 (2020)........................................................................................4, 12

*Osbourne v. United States,*
164 F.2d 767 (2d Cir. 1947).....................................................................................13

*Owens v. Republic of Sudan,*
826 F. Supp. 2d 128 (D.D.C. 2011).......................................................................4, 12

*Owens v. Republic of Sudan,*
864 F.3d 751 (D.C. Cir. 2017)..................................................................................12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Owens v. Turkiye Halk Bankasi A.S.*,
    2021 WL 638975 (S.D.N.Y. Feb. 16, 2021) ................................................................15

*Palestine Monetary Auth. v. Strachman*,
    873 N.Y.S.2d 281 (N.Y. App. Div. 2009) .............................................................18, 20

*Peterson v. Islamic Republic of Iran*,
    2013 WL 5538652 (S.D.N.Y. Oct. 8, 2013) ...............................................................25

*Port Chester Elec. Constr. Corp. v. Atlas*,
    40 N.Y.2d 652 (1976) ...................................................................................................19

*Rohmer Assocs., Inc. v. Rohmer*,
    36 A.D.3d 990 (N.Y. App. Div. 2007) ..................................................................19, 21

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ......................................................................................................11

*Stathos v. Murphy*,
    276 N.Y.S.2d 727 (N.Y. App. Div. 1966) ...................................................................17

*Strauss v. Credit Lyonnais, S.A.*,
    2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ...............................................................19

*Strauss v. Crédit Lyonnais, S.A.*,
    2007 WL 2296832 (E.D.N.Y. Aug. 6, 2007) ..............................................................14

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) .........................................................................20

*TAGC Mgmt., LLC v. Lehman*,
    842 F. Supp. 2d 575 (S.D.N.Y. 2012) .........................................................................15

*In re Terrorist Attacks on September 11, 2001*,
    No. 03-md-1570 (S.D.N.Y.) ...........................................................9, 16, 18, 23, 25

*Thornapple Assocs., Inc. v. Sahagen*,
    2007 WL 747861 (S.D.N.Y. Mar. 12, 2007) ..............................................................16

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*,
    933 F.2d 131 (2d Cir. 1991) ...................................................................................19, 23

**Statutes**

18 U.S.C. § 2331 ..................................................................................................................11

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

18 U.S.C. § 2332 .............................................................................................................11

18 U.S.C. § 2333 .............................................................................................................11

18 U.S.C. § 2335 .............................................................................................................14

18 U.S.C. § 2339 .............................................................................................................11

18 U.S.C. § 2339A ..........................................................................................................11

28 U.S.C. § 564 ...............................................................................................................10

28 U.S.C. § 1350 .............................................................................................................11

28 U.S.C. § 1603 .........................................................................................................3, 24

28 U.S.C. § 1611 .........................................................................................................3, 23

**Rules**

CPLR § 5225 ...................................................................................................................18

CPLR § 6201 ..............................................................................................................10, 15

CPLR § 6202 ...................................................................................................................17

CPLR § 6211 ...........................................................................................................2, 10, 25

CPLR § 6212 ..............................................................................................................10, 11

CPLR § 6223 ..............................................................................................................10, 25

Fed. R. Civ. P. 64 .........................................................................................................1, 10

**Regulations**

31 C.F.R. § 594.101 ........................................................................................................25

31 C.F.R. § 594.312 ........................................................................................................25

Blocked Persons, Specially Designated Nationals, Specially Designated
   Terrorists, Foreign Terrorist Organizations, and Specially Designated
   Narcotics Traffickers; Addition of Persons Blocked Pursuant to 31 CFR Part
   538, 31 CFR Part 597, or Executive Order 13129, 65 Fed. Reg. 39,100,
   39,100 (June 23, 2000).................................................................................................22

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Executive Orders**

Executive Order 13129 ........................................................................................22

Executive Order 14064 ..........................................................1, 5, 8, 21, 22, 25

**Other Authorities**

David D. Siegel, N.Y. Prac. (6th ed.) ..............................................................17, 18

Merriam-Webster.com Dictionary,
    https://www.merriam-webster.com/dictionary/transfer........................................25

## PRELIMINARY STATEMENT

Plaintiffs move to confirm this Court's Order of Attachment entered on March 21, 2022 under Federal Rule of Civil Procedure 64 and Article 62 of New York's Civil Practice Law and Rules ("CPLR"). Dkts. 33, 38. The Court's Order was correct, and nothing has changed to warrant a different decision here.

Plaintiffs are victims of the 1998 United States embassy bombings in Nairobi, Kenya, and Dar es Salaam, Tanzania, who have filed suit against the Taliban for its role in perpetrating the bombings, which were committed by al-Qaeda. As described more fully in the Complaint and Plaintiff's memorandum in support of its original Motion for Order of Attachment, Dkt. 5, the Taliban provided safe haven and extensive support—including the camps at which key operatives trained, weapons, transportation, and shelter from U.S. authorities—to Bin Laden and al-Qaeda leading up to the attacks. Thus, as this Court has already held, Plaintiffs are likely to succeed on numerous causes of action against the Taliban: for violations of the Anti-Terrorism Act, violations of the law of nations under the Alien Tort Statute, and state law torts. *See* Dkt. 33; Dkt. 38, at 5.

The Taliban has shown no interest in satisfying its obligations, and its assets in the United States are limited. Assets belonging to the Taliban—held in the name of Da Afghanistan Bank ("DAB") at the Federal Reserve Bank of New York ("FRBNY"), which the Taliban claimed for itself almost immediately after taking power in Afghanistan—were blocked by President Biden under Executive Order 14064 and are currently available to satisfy judgments for victims of terrorism. But the majority of these funds have already been levied by other Taliban creditors, and there are thousands of other individuals with unsatisfied claims that the Taliban has so far effectively managed to evade. To preserve their ability to obtain recovery, in the face of the Taliban's limited resources and its longstanding efforts to avoid U.S. courts and its attempts to

Case 1:22-cv-01949-VEC   Document 48   Filed 05/02/22   Page 9 of 33

seize, and likely remove, the substantial assets held at the FRBNY, Plaintiffs moved *ex parte* for an emergency order of prejudgment attachment against the blocked funds.  Dkt. 4.  This Court granted the motion, finding that Plaintiffs are likely to prevail on numerous claims, have grounds for attachment, and that the amount demanded exceeded any known counterclaims.  Dkt. 33; Dkt. 38, at 5.  Those conclusions remain correct, and this Court should therefore confirm the Order of Attachment.

A confirmation motion is a mechanism to "protec[t]" an adversarial party when a plaintiff receives an order of attachment *ex parte* under CPLR § 6211(a), but it imposes no additional substantive requirements.  Dkt. 38, at 5.  Thus, this Court need decide no more than it already has, and there are no legal obstacles to confirmation.  The statute of limitations is an affirmative defense that must be raised by the Taliban, if and when it appears, *id.* at 8, and the "complicated question" whether the blocked funds belong to the Taliban will "be addressed during turnover proceedings," *id.* at 3 n.2, 10 n.5.

If the Court does probe those questions now, the result should be the same.  Plaintiffs' claims were statutorily and equitably tolled during the war in Afghanistan.  And the Taliban holds an attachable interest in the assets held in DAB's name at the FRBNY:  Overwhelming evidence shows that DAB is now nothing more than an alter ego of the Taliban.  As current and former U.S. government officials have recognized, DAB is operating under the Taliban's direct and complete control.  The Taliban is using DAB not as a central bank, but to facilitate illegal narcotics trafficking, the Taliban's leading revenue-generating activity.

For similar reasons, the Foreign Sovereign Immunities Act ("FSIA") confers no attachment immunity on the blocked DAB assets.  Today, DAB is an agent of the Taliban, a *non-state* actor.  It is no longer an agent or instrumentality of the legitimate "foreign state"

of Afghanistan.  28 U.S.C. §§ 1603(b), 1611(b).  And while in name it purports to remain a central

bank, DAB fails to perform the central banking activities necessary to justify a finding that the

blocked assets are "held for [DAB's] own account," triggering FSIA immunity, *id* § 1611(b).

Thus, the Court should confirm the Order of Attachment.

## BACKGROUND

I.      **The Embassy Attacks.**[1]

A.      **The Taliban and al-Qaeda's Origins.**

Established by cleric Mullah Mohammad Omar in 1994, the Taliban is a militant, Islamic

fundamentalist organization that seeks to establish a Shariah-governed state in Afghanistan.  Dkt.

6-2, at 2.  By 1996, the Taliban had seized control of much of Afghanistan and purported to

establish the Islamic Emirate of Afghanistan, with Omar serving as head of state.  *Id.* at 3.  The

Islamic Emirate of Afghanistan was never recognized as the legitimate government of Afghanistan

by the United States or the majority of the world.  *Id.*  Nonetheless, the Taliban ruled until 2001,

when an American-led coalition invaded Afghanistan after the September 11 terrorist attacks and

removed the Taliban from power.  *Id.* at 4.

For virtually its entire existence, the Taliban has extensively supported the international

terrorist organization known as al-Qaeda.  Founded by Osama Bin Laden in Afghanistan in the

late 1980s, al-Qaeda operates with the stated objective of purging the Islamic world of American

and Western influences.  Dkt 6-3, at 1–2.  Originally based in Afghanistan and Pakistan, al-Qaeda

relocated to Sudan in 1991.  Dkt. 6-4 ¶ 1.  For the next five years, the Sudanese government

provided al-Qaeda with substantial support, and Sudan has previously been found liable for its role

---

[1]  For additional factual background, see Plaintiffs' Memorandum of Law in Support of Plaintiffs' *Ex Parte*
Emergency Motion for Order of Attachment, Dkt. 5.

in the embassy bombings.  *See Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1606–07 (2020).[2]

In 1996, Bin Laden was expelled from Sudan and returned to Afghanistan, where al-Qaeda set up its new base of operations and assisted the Taliban in its conquest of the country.  Dkt. 6-3, at 3.  Similar to Sudan, the Taliban provided al-Qaeda with protection, weapons, training facilities, and use of Afghanistan's national airline to transport members, money, recruits, and weapons overseas.  Dkt. 6-6, at 66; Dkt. 6-8, at 3.  Al-Qaeda operatives entered and exited the country without following immigration procedures, purchased and imported vehicles and weapons, and enjoyed the use of official Ministry of Defense license plates on their vehicles.  Dkt. 6-6, at 66.

**B.      The Planning and Execution of the Embassy Bombings.**

While in Taliban-controlled Afghanistan, Bin Laden declared war on the United States via fatwa in 1996.  Dkt. 6-9, at 1–2.  In February 1998, Bin Laden issued another widely circulated fatwa declaring it to be the "individual duty for every Muslim" to "kill the Americans and their allies—civilians and military."  Dkt. 6-10, at 2.  Two months later, the U.S. Ambassador to the United Nations asked the Taliban to surrender Bin Laden.  The Taliban refused.  Dkt. 6-11, at 5.

Around the same time, al-Qaeda began to plan the attacks on the American embassies in Nairobi and Dar es Salaam.  Dkt. 6-6, at 69.  Bin Laden and one of his deputies led the planning from Taliban-controlled Afghanistan.  *Id.* at 67–70.  An al-Qaeda leader in Kenya assisted with planning, while other al-Qaeda members built the explosives and reconnoitered the embassies.  *Id.*

On August 7, 1998, al-Qaeda operatives concurrently detonated suicide bombs at the embassies.  Dkt. 6-12, at 2.  In addition to the bomber, the Nairobi explosion killed 213 people, including 12 Americans (11 represented in this action).  *Id.*  Over 4,000 other people were injured

---

[2]  Courts have also found Iran liable for its role in the embassy bombings, based on ties between Iran and Sudan and Iran's support for the radical Islamist terrorist organization Hezbollah, which helped perpetrate the embassy bombings.  *See* Compl. ¶ 109, Dkt. 7; *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011).

(including 16 of the Plaintiffs here).  *Id.* at 1–2.  The Dar es Salaam explosion killed 11 people

(five represented here), and injured 85 more (including five of the Plaintiffs here).  *Id.* at 2.

## II.      The Taliban Takeover and Executive Order 14064.

After the September 11, 2001 terrorist attacks, the United States invaded Afghanistan and

toppled the Taliban, sending its leaders and members into hiding.  When the war in Afghanistan

ended in summer 2021 and American forces withdrew, however, the Taliban launched an offensive

to retake the country.  On August 15, Kabul, Afghanistan's capital, fell to the Taliban.  Not a single

country has recognized the Taliban as Afghanistan's legitimate government.  Dkt. 6-21, at 1.

The Taliban's takeover left around $7 billion dollars in assets of Afghanistan's central

bank, DAB, which is headquartered in Kabul, sitting idle in U.S. financial institutions.  Shortly

after seizing Kabul, the Taliban installed its own personnel at DAB and claimed the assets.  Dkt.

6-22, at 2.  DAB's senior leaders, including its Acting Governor, fled Afghanistan or went into

hiding.  Piatetsky Decl. ¶ 47.  Taliban loyalists took their place.  On August 23, the Taliban

appointed Haji Mohammed Idris—an "obscure official" and "Taliban loyalist" with little formal

education or training—as Acting Governor of DAB.  McGill Decl., Ex. 5 ¶ 55; *see* Piatetsky Decl.

¶¶ 48–49.  Idris had previously headed the Taliban's finance commission, which was responsible

for collecting money from narcotics trafficking and illegal taxes from business and farmers to fund

the Taliban's insurgency.  McGill Decl., Ex. 5 ¶¶ 55, 58.  The Taliban appointed two more

individuals designated as Specially Designated Global Terrorists to the next-most senior leadership

positions—Ahmad Zia Agha as First Deputy Governor of DAB, and Abdul Qadeer Ahmad, an

alias for Abdul Qadeer Basir Abdul Baseer ("Baseer"), as Second Deputy Governor.  Piatetsky

Decl. ¶¶ 51–57.  Agha is a "[s]enior Taliban official with military and financial responsibilities,"

who "distributed money to Taliban commanders" and allegedly managed funds intended for

bombs.  *Id.* ¶ 52; McGill Decl., Ex. 5 ¶ 62.  Baseer, for his part, previously provided tens of

thousands of dollars to Taliban commanders to carry out attacks and collected narcotics trafficking money for the Taliban.  Piatetsky Decl. ¶ 57; McGill Decl. Ex. 5, ¶ 75.  Personnel changes have permeated every level of DAB.  Piatetsky Decl. ¶¶ 58–59; Templeton Decl. ¶ 43.

DAB's operations are further directed by the Taliban's Council of Ministers and Economic Commission.  Piatetsky Decl. ¶ 60.  The Taliban operates DAB without "any pretense" of independence.  McGill Decl., Ex. 5 ¶ 92.  A senior Taliban official sanctioned by the United Nations for narcotics trafficking, Mawlawi Abdul Salam Hanafi, recently led a financial meeting at DAB.  Piatetsky Decl. ¶ 61; McGill Decl., Ex. 5 ¶¶ 94, 139.  And the Taliban's Economic Commission, itself chaired by a U.N.-sanctioned official, has issued direct commands to DAB on economic issues like currency depreciation, Piatetsky Decl. ¶ 60, McGill Decl., Ex. 5 ¶¶ 92, 139.

The Taliban has also established a committee to revise Afghanistan's central banking laws and eliminate the modern framework of DAB, replacing it with traditional Islamic banking, which has stringent limitations on loans and credits.  Piatetsky Decl. ¶ 66.  DAB bears the Taliban's imprimatur in numerous ways.  The Taliban flag now flies behind officials at DAB meetings, *id.* ¶ 62; McGill Decl., Ex. 5 ¶¶ 115–19, which begin with Taliban-mandated prayer, Piatetsky Decl. ¶¶ 62–63; McGill Decl., Ex. 5 ¶¶ 120–21.  DAB has a newly created Propagation of Virtue and Prevention of Vice section, and DAB employees must keep beards and pray five times a day, on pain of losing their salaries.  Piatetsky Decl. ¶ 65.

Unsurprisingly, the Taliban has turned DAB from a legitimate central bank into an arm of its narcotics trafficking and money laundering operations.  As U.S. Special Representative for Afghanistan Thomas West recently confirmed, important banking "functions" have "atroph[ied] or all together disappear[ed]."  *Id.* ¶ 59; McGill Decl., Ex. 5 ¶ 102.  Tellingly, the United Nations has been shipping hundreds of millions of dollars in international aid to Afghanistan since late

2021, but has been transferring those funds not to DAB, but to a private bank.  Piatetsky Decl.
¶¶ 76–78.  Non-governmental organizations ("NGOs") that formerly transacted with DAB have
likewise pursued alternative channels to avoid DAB.  *Id.* ¶ 79; McGill Decl., Ex. 5 ¶ 141.

The Taliban is using its control over DAB to promote its illicit narcotics trade—the primary
source of Taliban funding.  Piatetsky Decl. ¶¶ 81–89.  While "decommissioning" central bank
capacities, the Taliban has "supercharg[ed]" its ability to engage in money laundering and conceal
terrorist financing transactions.  McGill Decl., Ex. 5 ¶¶ 155, 163.  The Taliban is not enforcing
anti-money laundering/combating the financing of terrorism ("AML/CFT") laws and regulations.
Piatetsky Decl. ¶¶ 87–88; McGill Decl., Ex. 5 ¶ 151.  In fact, Agha, who has been sanctioned *for*
terrorism financing, now runs DAB's AML/CFT functions.  McGill Decl., Ex. 5 ¶ 160.

The Taliban's takeover of DAB has also given it new tools to intimidate and retaliate
against dissidents.  It has access to sensitive financial intelligence information that was collected
by the Financial Transactions and Reports Analysis Center of Afghanistan ("FinTRACA"), the
DAB unit previously responsible for identifying and investigating financial improprieties.
Piatetsky Decl. ¶¶ 90–96.  The Taliban can now use such information to retaliate against
confidential sources who provided derogatory information about the Taliban's illicit activities.  *Id.*
¶ 97; McGill Decl., Ex. 5 ¶ 156.  Accordingly, the Egmont Group of Financial Intelligence Units—
an intergovernmental organization that provides financial intelligence units "a secure platform to
facilitate the exchange of AML and counterterrorism information"—has suspended FinTRACA
from its secure communications platform.  Piatetsky Decl. ¶¶ 98–99.

Because the Taliban has gutted DAB's central banking functions, numerous experts and
officials have observed the need for a legitimate, independent central bank in Afghanistan.  Special
Representative West suggested that the United States provide aid to Afghanistan for "potential

recapitalization of a central bank that is recognized." McGill Decl., Ex. 5 ¶ 104 (emphasis omitted). In recent sworn testimony before a Senate subcommittee, Graeme Smith of the International Crisis Group testified that "Afghanistan needs an entity to serve the functions of a central bank." *Id.* ¶ 138; *see also* Piatetsky Decl. ¶ 71. A bipartisan group of Members of Congress recently underscored the same—"Afghanistan will need an entity to serve as a central bank." McGill Decl., Ex. 5 ¶ 138.

Recognizing the Taliban's complete control of DAB, the United States has blocked DAB reserves located in the United States. On February 11, 2022, President Biden issued Executive Order 14064, which directed U.S. financial institutions holding DAB assets around the country to transfer those assets into a single consolidated account at the FRBNY and blocks further transactions involving those assets absent a license from the Executive Branch. *See* Dkt. 6-1, at 8391 § 1(b)–(c). The order explains that "the preservation of certain property of [DAB] held in the United States" is necessary in light of the ongoing crisis in Afghanistan and the pressing "legal claims" of victims of terrorism. *Id.* at 8391. At the same time, the Office of Foreign Assets Control ("OFAC") issued a license instructing the FRBNY to segregate $3.5 billion of DAB's assets into a separate account for foreign policy purposes related to Afghanistan. Dkt. 6-23 § 1. This leaves approximately $3.5 billion available to satisfy the Taliban's creditors, including victims of terrorism. *See* Dkt. 38, at 1 (the executive order "designated some of the blocked funds for payment of civil judgments that have been obtained by victims of the Taliban's acts of terrorism").

Given the Taliban's history of debt avoidance and attempts to remove funds in the United States, multiple writs of execution granted by the Court have already concluded that the blocked

funds are attachable to satisfy judgments for victims of terrorism against the Taliban.[3]   Writs

totaling over $2.1 billion are in turnover proceedings, and a third writ of $14.7 billion has now

been issued and will soon be in turnover proceedings.   *See* Dkt. 5, at 10; Writ of Execution, *In re*

*Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Apr. 20, 2022).   Notably, in

the pending turnover proceedings, the writ holders purportedly have "reached agreement" with

various other plaintiffs with default judgments against the Taliban on a "framework" for

distributing all of the blocked $3.5 billion, without accounting for the Court's order of prejudgment

attachment in this suit.[4]   And there remain numerous other creditors with unpaid claims or

judgments against the Taliban that the Taliban has so far evaded.[5]   *See* Dkt. 5, at 10.

## III.   Procedural History.

On March 8, 2022, Plaintiffs brought this suit to hold the Taliban responsible for its role in

the embassy bombings.   *See* Dkt. 1.   To preserve their ability to collect damages from the Taliban

after judgment, Plaintiffs moved *ex parte* on the same day for an order of attachment of the blocked

DAB funds in the amount of $4,669,011,012.21 ($1,373,761,042.95 in compensatory damages and

$3,295,249,969.26 in punitive damages), plus prejudgment interest.[6]   Dkt. 4.

---

[3]   *See* Writ of Execution, *John Does 1 Through 7 v. Taliban*, No. 20-mc-00740 (S.D.N.Y. Sept. 27, 2021); Writ of Execution, *Havlish v. Bin Laden*, No. 03-cv-09848 (S.D.N.Y. Jan. 19, 2022).

[4]   *See* Letter at 1, 3–4 & n.2, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Mar. 22, 2022), Dkt. 7790 (contending that plan would "protect the blocked funds" from "new claimants" like Plaintiffs here).   The framework is based on the $14.7 billion writ of execution the so-called *Federal Insurance* Plaintiffs received on April 20, after the Court's order of prejudgment attachment in this case.   *Id.* at 1; Letter, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Apr. 20, 2022), Dkt. 7893.

[5]   Another group of 9/11 plaintiffs with unsecured claims against the Taliban filed a purported class action on April 20, seeking "equitable distribution" of the blocked assets and requested a temporary restraining order ("TRO") and preliminary injunction of "all judgment enforcement proceedings in any court affecting the DAB assets."   Dkt. 39, at 1.   Judge Daniels promptly dismissed the complaint, and that ruling is now on appeal.   *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Apr. 27, 2022), Dkt. 7923 (order of dismissal); *id.*, Dkt. 7931 (notice of interlocutory appeal).

[6]   Although Plaintiffs sought an attachment order against any and all Taliban assets in New York for the full amount of their damages, similar to other writ holders, they requested a levy only against the DAB funds held at the FRBNY in the amount of their compensatory damages.   *See* Dkt. 5, at 9 n.3, 25.

After holding oral argument, this Court granted the motion on March 21, 2022.  Dkt. 33. The Court's Order noted that "Plaintiffs have demonstrated that they are entitled to an order of attachment" because "(1) they have 'a cause of action,' (2) 'it is probable that [they] will succeed on the merits,' (3) 'one or more grounds for attachment provided in section 6201 exist,' and (4) 'the amount demanded from the defendant exceeds all counterclaims known to the plaintiff[s].'"  *Id*. at 1 (alterations in original) (quoting CPLR § 6212(a)); *see also* Dkt. 38, at 5–12 (Court's opinion). The Court thus directed the United States Marshals Service to levy, upon service of the Order, $1,373,761,042.95, plus prejudgment interest, held in DAB's name at FRBNY.  Dkt. 33, at 2; *see* 28 U.S.C. § 564.  The Marshals Service levied upon the assets on April 21, 2022, McGill Decl., Ex. 1, and Plaintiffs timely filed this Motion to Confirm the Order of Attachment within ten days.

## ARGUMENT

The statutory requirements to confirm prejudgment attachment are the same as the requirements for the original *ex parte* application.  Plaintiffs must show "grounds for the attachment, the need for continuing the levy and the probability that [they] will succeed on the merits."  CPLR §§ 6211(b), 6223(b).  Under Federal Rule of Civil Procedure 64, which incorporates CPLR Article 62, Plaintiffs are entitled to prejudgment attachment because: (1) "there is a cause of action"; (2) "it is probable that the plaintiff will succeed on the merits"; (3) "one or more grounds for attachment provided in section 6201 exist"; and (4) the amount demanded "exceeds all [known] counterclaims."  CPLR § 6212(a); *see Herzi v. Ateliers De La Haute-Garonne*, 2015 WL 8479676, at *1 (S.D.N.Y. Oct. 13, 2015).

## I.   Plaintiffs Are Likely To Succeed On The Merits.

### A.   The Court Correctly Concluded that Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

In assessing likelihood of success, "the court must give the plaintiff the benefit of all the

legitimate inferences that can be drawn from the stated facts." *Nat'l Bank & Tr. Co. of N. Am. v. J.L.M. Int'l, Inc.*, 421 F. Supp. 1269, 1272 (S.D.N.Y. 1976) (citation omitted).  After drawing all such inferences, this Court has already held that Plaintiffs are likely to succeed on the merits of their various state law and federal law claims.  *See* CPLR § 6212(a); Dkt. 33; Dkt. 38, at 5–12. Nothing has changed to warrant a different conclusion.

*First*, as this Court concluded, "there is essentially no doubt" that the American Plaintiffs "have an [Anti-Terrorism Act ('ATA')] claim that is likely to be meritorious."  Dkt. 38, at 8; *see* 18 U.S.C. § 2333(a); Dkt. 5, at 11–16.  The Taliban committed an unlawful act of international terrorism by engaging in acts dangerous to human life—including harboring or concealing terrorists under 18 U.S.C. § 2339, providing material support or resources to terrorists under 18 U.S.C. § 2339A, and conspiring to kill United States nationals in violation of 18 U.S.C. § 2332(b)—with the terroristic intent "to influence the policy of a government by intimidation or coercion."  18 U.S.C. § 2331(1)(A)–(C).  These acts of international terrorism caused death and injuries to American nationals.

*Second*, the Foreign Plaintiffs have shown a "likelihood of success on the merits" on their claim that the Taliban violated the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, by infringing upon the rights of ambassadors both as a primary violator and an aider-and-abettor. Dkt. 38, at 10; *see* Dkt. 5, at 16–18.  "[I]nfringement of the rights of ambassadors" is a paradigmatic example of actionable conduct.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). And aiding and abetting liability—*i.e.*, providing "practical assistance" to al-Qaeda with the "purpose" of facilitating the embassy bombings—is well established under the Alien Tort Statute. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 217 (2d Cir. 2016).  Critically, courts have already found that the embassy bombings here infringed upon the rights of

ambassadors by damaging the embassy, interfering with its mission, and causing harm to embassy officials. *See, e.g.*, *Mwani v. Bin Ladin*, 2006 WL 3422208, at *4 (D.D.C. Sept. 28, 2006). Now, the Taliban should be held responsible for its role in causing these same injuries.

American and Foreign Plaintiffs also are likely to prevail on multiple tort claims against the Taliban: wrongful death, survival, assault and battery, intentional infliction of emotional distress ("IIED"), loss of consortium, and related aiding-and-abetting claims. *See* Dkt. 5, at 18–19; *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 153–57 (D.D.C. 2011) (allowing tort claims to proceed for foreign victims of same embassy bombings). The bombings caused injuries and deaths to hundreds of Americans and foreign citizens.

Common to all of these claims is the requirement of proximate causation, and the evidence leaves no doubt that the Taliban caused the embassy bombings. *See* Dkt. 38, at 9. The Taliban provided critical resources and safe haven to Bin Laden and al-Qaeda when they needed it most— in the years, months, and days leading up to the bombings. Not only did the Taliban refuse to hand over the mastermind of the embassy bombings mere months before they took place, it also supplied the camp where multiple bombers trained. *See* Dkt. 5, at 15; Dkt. 6-13, at 70; Dkt. 6-14, at 6. The D.C. Circuit's holding that Sudan proximately caused the same embassy bombings, based on attenuated support years before the embassy bombings, compels the same conclusion for the Taliban here. *See Owens v. Republic of Sudan*, 864 F.3d 751, 797 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

### B.       Plaintiffs' Claims Are Not Barred by the Statute of Limitations.

As this Court held in its opinion ordering attachment, "the statute of limitations does not undercut the Plaintiffs' likelihood of success." Dkt. 38, at 8. It is a waivable "affirmative defense" that the Court need not, and respectfully should not, consider *sua sponte*. *Id.* Before adjudication, the Taliban will have been notified of this Motion and the Court's Order of Attachment. It is up

to the Taliban to decide whether to appear and—if so—which defenses to raise.  Unless and until
the Taliban raises a limitations issue, the Court should—as it has done already—decline to address
the question.  *See Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987) ("If a defendant fails to assert
the statute of limitations defense, the district court ordinarily should not raise it *sua sponte*.");
*Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1115 (D.C. Cir. 2019) (statute of limitations"
"may not be raised by the court *sua sponte*" "when an entirely absent defendant" has forfeited it).

But even if the issue is considered now, as explained in their March 15 letter, Plaintiffs are
entitled to equitable and statutory tolling.  Dkt. 30; *see* Dkt. 38, at 8, 9 (finding "colorable
arguments" that the statute of limitations, "if asserted, would not be successful" because of tolling).
First, Plaintiffs are entitled to equitable tolling, which applies when a litigant has been "pursuing
his rights diligently" and "some extraordinary circumstance" prevents a timely filing, on *all* of
their claims.  *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (citation
omitted).  It is well established that war is such an "extraordinary circumstance."  The Supreme
Court and the Second Circuit have applied equitable tolling in cases where the plaintiff—whether
a U.S. citizen or an enemy alien—could not assert his rights because of the disruption caused by
war.  *See, e.g.*, *Hanger v. Abbott*, 73 U.S. (6 Wall.) 532, 534 (1867) (applying equitable tolling
where Civil War prevented plaintiffs from "instituting their action" and serving the defendant);
*Osbourne v. United States*, 164 F.2d 767, 769 & nn.9–10 (2d Cir. 1947) (collecting cases and
applying equitable tolling).  From 2001 to 2021, the United States was at war with the Taliban.
*See* McGill Decl., Ex. 2.  It would have been inappropriate—and even dangerous—for Plaintiffs
to insert themselves into that geopolitical conflict.  For both foreign policy and safety purposes, in
times of war, interacting with enemy combatants—or their leaders—is entrusted exclusively to the
government.  *See Hanger*, 73 U.S. (6 Wall.) at 535–36, 540–41.

In the interim, Plaintiffs diligently pursued their rights.  The overwhelming majority of Plaintiffs have already received judgments and damage awards against Iran or Sudan for their injuries from the attacks.  Compl. ¶ 123 (listing judgments).  Once the United States withdrew from Afghanistan in summer 2021, the path was finally cleared for Plaintiffs to seek justice from the Taliban, and they promptly filed this action.  *See Hanger*, 17 U.S. (6 Wall.) at 538 ("[W]ith the return of peace we return to the creditor the right and the remedy."); Dkt. 7.

Moreover, the American Plaintiffs are entitled to statutory tolling on their ATA claims.  The ATA's ten-year statute of limitations is tolled during times when the defendant has concealed its "whereabouts," 18 U.S.C. § 2335(b)—that is, "[t]he general locale where a person or thing is," *Strauss v. Crédit Lyonnais, S.A.*, 2007 WL 2296832, at *3 (E.D.N.Y. Aug. 6, 2007) (alteration in original; citation omitted).  The purpose of this tolling provision is to remedy the problems that arise when an entity "put[s] itself outside of the jurisdiction of the courts."  *Id.* at *3 & n.8.  Here, the Taliban carefully concealed its location for most of the time between 2001 and 2021.  After the United States invaded Afghanistan in 2001, "Taliban leadership fled" and "[laid] dormant in . . . Afghan and Pakistani hideouts."  Dkt. 6-2, at 5; *see also* McGill Decl., Exs. 3–4.  The Taliban's efforts made it difficult, if not impossible, to identify and locate appropriate officials on whom to serve process.  *Cf.* McGill Decl., Ex. 3 at 7 (describing the Taliban as operating a "government in exile" where key leaders hid and operated out of Pakistan), Ex. 4 (describing the Taliban as a "shadow" government).  Thus, the Court should toll the ATA's ten-year statute of limitations.[7]

## II.    Plaintiffs Remain Entitled To Attachment.

Where Plaintiffs "satisf[y] the statutory requirements and establish[] the need for an

---

[7]    As Plaintiffs' March 15 letter explains, the Taliban's unstable presence in Qatar after 2013 does not change the analysis.  *See* Dkt. 30, at 4 n.1.  It would have been inappropriate for Plaintiffs to contact the Taliban in Qatar while the United States remained at war with the Taliban.  *Id.*

attachment," this Court's "discretion does not permit denial of the remedy for some other reason." *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 221–22 (2d Cir. 2006). As this Court has already concluded, Plaintiffs have a basis for attachment under CPLR § 6201(1) because the plaintiff has demanded a money judgment against a "nondomiciliar[y] residing without the state"—the Taliban—and attachment is necessary because Plaintiffs have a "reasonable" "fear that the judgment will not be satisfied" absent attachment, *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586–87 (S.D.N.Y. 2012) (citation omitted). There are also no known counterclaims. Dkt. 38, at 12. Nothing has changed to warrant a different result here—if anything, the imminent risk that the Taliban's assets will be dissipated has only heightened the need for attachment.

### A.    Attachment Is Necessary To Secure a Potential Judgment.

Plaintiffs have no less need for a levy today than when this Court initially ordered attachment. As Plaintiffs have explained, it is incredibly difficult for victims "to actually collect on their judgments" against perpetrators of terrorism. Dkt. 6-26, at 2–3. Plaintiffs' attempts to enforce their prior judgments against Iran and Sudan illustrate how recalcitrant foreign debtors can immunize their assets from the powers of U.S. courts by keeping them abroad. A years-long chase has produced little recovery. *See* Compl. ¶ 123; *see also Owens v. Turkiye Halk Bankasi A.S.*, 2021 WL 638975, at *1 (S.D.N.Y. Feb. 16, 2021). Because the Taliban currently has assets in the United States, Plaintiffs hope to avoid the same result here.

No one suggests the Taliban will pay a judgment voluntarily, and if the Taliban could access the blocked funds, it almost certainly would remove them from New York instantaneously. *See* Dkt. 6-22, at 2. Although the United States has currently reserved $3.5 billion for victims of terrorism, the real prospect that it could divert further funds to address the shifting situation in Afghanistan or otherwise unblock the funds provides ample reason to confirm attachment.

Moreover, the Taliban's assets in the United States remain limited, and it owes significant

judgments to other creditors.  At least two writs of execution totaling over $2.1 billion are already in turnover proceedings against the $3.5 billion that remains blocked at the FRBNY, a third writ of $14.7 billion was granted on April 20, and thousands of other plaintiffs have obtained or are seeking liability judgments against the Taliban.  *See* Dkt. 5, at 10; Letter at 2–4, No. 03-md-1570 (S.D.N.Y. Mar. 22, 2022), Dkt. 7790.  As part of the pending turnover proceedings, a subset of 9/11 plaintiffs have apparently negotiated and agreed amongst themselves on a "framework" to divide up *all* of the $3.5 billion in blocked funds, which relies on the new $14.7 billion writ, to the exclusion of other 9/11 victims and Plaintiffs here.  *See* Letter at 1, No. 03-md-1570 (S.D.N.Y. Mar. 29, 2022), Dkt. 7810 (discussing "thousands of plaintiffs [who] will receive nothing").  Thus, if anything, the need for attachment is even greater now.  Unless the Court confirms the attachment, the limited funds that are available will be exhausted by the time of final judgment.

Courts routinely order prejudgment attachment when a defendant's deleterious financial position "may justify a plaintiff's fear that a potential judgment will not be satisfied." *Thornapple Assocs., Inc. v. Sahagen*, 2007 WL 747861, at *6 (S.D.N.Y. Mar. 12, 2007).  Thus, in *Capital Ventures*, there was no "question that [the plaintiff] ha[d] need for [an] attachment" where Argentina had defaulted on its debts, and its assets were claimed by numerous other creditors.  443 F.3d at 218–19.  Here, too, the thousands of other unpaid creditors only further demonstrate the Taliban's insolvency, its unwillingness to pay its debts, and the need for prejudgment attachment. *See* Dkt. 5, at 21–22 (collecting cases).  Accordingly, as this Court already determined, Plaintiffs' duty to show a "need to secure the remaining available funds" "has been met."  Dkt. 38, at 11–12.

**B.     Attachment Is Warranted Even If There Are Disputed Issues of Ownership.**

To confirm attachment, this Court need not decide whether the blocked funds "actually" belong to the Taliban.  Now, no less than when this Court initially ordered attachment, that issue "is not ripe for final decision."  Dkt. 38, at 3 n.2.  Confirmation is merely a procedural vehicle to

"afford[] the defendant" due process when a plaintiff obtains an *ex parte* order of attachment. David D. Siegel, N.Y. Prac. § 315 (6th ed.); Dkt. 38, at 5. And "the standard for confirming an attachment is the same as that for granting an *ex parte* order of attachment in the first instance." *Nippon Emo-Trans Co. v. Emo-Trans, Inc.*, 744 F. Supp. 1215, 1234 (E.D.N.Y. 1990).

Notably, New York contemplates prejudgment attachment even when there is uncertainty whether the garnishee actually holds assets belonging to the defendant, or the defendant's interest in the assets is disputed. *See, e.g.*, Siegel, N.Y. Prac. § 320 (discussing levy where "garnishee may not know that the property belongs to the defendant, such as where it stands of record in the garnishee's possession under some other name"). Insofar as the Taliban has a *claim* to the blocked DAB funds, Plaintiffs may attach that claim, and thus the blocked funds, regardless of whether the claim has yet been adjudicated. *See* CPLR § 6202 (allowing prejudgment attachment of "[a]ny debt or property against which a money judgment may be enforced"); *id.* § 5201(a) ("[a] debt may consist of a cause of action"); *see also id.* § 5201(b) ("A money judgment may be enforced against any property . . . whether it consist of a present or future right of interest and whether or not it is vested[.]"); Siegel, N.Y. Prac. § 485 (New York law reaches "intangibles as incorporeal as a cause of action"). This is because a "judgment creditor stands in the shoes of the judgment debtor," making Plaintiffs' claim to the funds—and ability to attach them—coextensive with the Taliban's. Siegel, N.Y. Prac. § 488; *see also Stathos v. Murphy*, 276 N.Y.S.2d 727, 730, 733 (N.Y. App. Div. 1966) (assignee was entitled to "full claim to the proceeds to which her assignor was entitled," though claim "was quite uncertain as to realization because it was disputed and being seriously litigated" at the time of assignment); *cf. Comm'n for Polish Relief v. Banca Nationala a Rumaniei*, 43 N.E.2d 345, 346–47 (N.Y. 1942) (prejudgment attachment of blocked bank accounts where plaintiff had been assigned cause of action against bank). Here, of course, the Taliban has

vociferously claimed a right to the blocked DAB assets.  *E.g.*, Dkt. 6-22, at 2.

Thus, it is unnecessary for this Court to decide any more than it already has.  The extent of the Taliban's interest in the assets may be adjudicated *post*-judgment, "during turnover proceedings." Dkt. 38, at 10 n.5.  At that stage, "it must be shown that the judgment debtor 'has an interest' in the property the creditor seeks to reach" and "that the judgment debtor is 'entitled to the possession of such property,'" or has "'superior'" interest in it.  *Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 840 (2d Cir. 1991) (quoting CPLR § 5225(b)).  "If there is any doubt" that the "property or debt belongs to or is owed to the judgment debtor," the garnishee may withhold payment until there been a "special" turnover proceeding resolving the issue.  Siegel, N.Y. Prac. § 515.  Indeed, disputes about the Taliban's interest in the blocked DAB funds were not resolved before the court granted two other writs of execution that have been levied on the blocked funds (or the recently issued third writ, which has yet to be levied).  *See* Writ of Execution, *John Does 1 Through 7*; Writ of Execution, *Havlish*.  But those issues are now being addressed in the turnover proceedings in those cases.  *Compare* Mem. in Supp. of Turnover Mot., *Havlish*, No. 03-cv-09848 (S.D.N.Y. Mar. 20, 2022), Dkt. 598, *with* Br. *Amici Curiae* Afghan Civil Society Organizations Opposing Turnover, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Apr. 21, 2022), Dkt. 7896-1.  Respectfully, the same process should be employed by this Court.

**C.    The Taliban Has An Attachable Interest In The Blocked Funds.**

In any event, there is ample evidence demonstrating that the Taliban has an attachable interest in the blocked assets.  DAB is an "alter ego" of the Taliban under hornbook principles of corporate and agency law.  Thus, "all of [DAB's] assets" are subject to "potential attachment by [the Taliban's] judgment creditors."  *EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 85 (2d Cir. 2015) (emphasis omitted); *see Palestine Monetary Auth. v. Strachman*, 873 N.Y.S.2d 281, 288 (N.Y. App. Div. 2009) (alter ego's assets "can be levied to enforce the

18

judgment"); *Metro. Diagnostic Imaging Grp., LLC v. U.S. Heartcare Mgmt., Inc.*, 2010 WL 3073727 (N.Y. Sup. Ct. July 26, 2010) (granting prejudgment motion to attach assets of alter ego).

The law of alter ego liability tracks "general principles of agency." *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 656–57 (1976). Where a "corporate entity has been so dominated by an individual . . . and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego, the corporate form may be disregarded to achieve an equitable result." *Rohmer Assocs., Inc. v. Rohmer*, 36 A.D.3d 990, 991 (N.Y. App. Div. 2007) (citation omitted); *see also Last Time Beverage Corp. v. F & V Distrib. Co.*, 98 A.D.3d 947, 950–51 (N.Y. App. Div. 2012) (similar). Alter ego liability is "predicated . . . upon complete control by the dominating corporation that leads to a wrong against third parties." *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991); *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983) ("[W]here a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other.").[8]

Here, the Taliban exercises complete control of DAB, and treating DAB as a separate legal entity would wrong third parties. In determining "complete control" of entities commandeered by terrorist organizations, courts have considered "whether the organizations share leadership" and "whether one operates as a division of the other." *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *10 (E.D.N.Y. Oct. 5, 2006); *see also Nat'l Council of Resistance of Iran v. Dep't of*

---

[8] Insofar as Plaintiffs' suit is based on both federal question and diversity jurisdiction, it may be debatable whether federal common law or New York law governs the alter ego analysis. *See, e.g.*, *Wm. Passalacqua Builders*, 933 F.2d at 137 (applying New York law when New York was the forum in diversity suit). In any event, the two inquiries are substantially similar. *See Minpeco, S.A. v. Hunt*, 686 F. Supp. 427, 433 n.7 (S.D.N.Y. 1988) (noting that federal common law criteria for alter ego analysis "do not differ in any material way" from those "under New York law of corporations").

*State*, 373 F.3d 152, 157–58 (D.C. Cir. 2004) (applying similar factors to address aliases of foreign terrorist organizations under the Anti-Terrorism and Effective Death Penalty Act of 1996).  But there is "not a rigid checklist."  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 333–34 (E.D.N.Y. 2015), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018).  As the Seventh Circuit explained, "the alter ego doctrine is not rigid," and in the context of terrorism, "[f]actors like overlap in leadership, same organizational purpose, similarity of operations, and unlawful motive" should have "added weight."  *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 559 (7th Cir. 2021).  There is "strong evidence" that an organization is a terrorist group's alter ego if "governments" have "found [it] to be controlled by [a terrorist group]."  *Linde*, 97 F. Supp. 3d at 333–34.  Importantly, because the Taliban is not the recognized government of Afghanistan, DAB is not entitled to a "presumption of independence" from the Taliban.  *Strachman*, 873 N.Y.S.2d at 288–89.

The New York Appellate Division's decision in *Strachman* is instructive.  *Strachman* involved attempts to enforce a final judgment against the Palestinian Authority ("PA") for terrorist activities that led to the death of an American citizen and his wife, by collecting from the Palestine Monetary Authority ("PMA"), the PA's alleged alter ego.  873 N.Y.S.2d at 284–85.  Although the trial court granted summary judgment to PMA, holding that it was "a separate juridical entity from the Palestinian Authority," the Appellate Division reversed and remanded, noting that the evidence "tended to support the contention that the PMA [was] legally indistinguishable from the PA."  *Id.* at 289, 294.  Among other things, the PMA's profits were paid to the PA, the PMA's governor and board members were appointed and removable by the PA's governor, and the PMA used the PA's letterhead.  *Id.* at 285.  And while the PMA performed some "operations" "typical of central banks," it issued no currency and held no gold reserves.  *Id.* at 286; *see also Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 435–36 (E.D.N.Y. 2013), *on reconsideration in part*, 2017

WL 4480755 (E.D.N.Y. Sept. 30, 2017) (similarly analyzing claim against Hamas alter egos).

The evidence is even stronger in this case. Taliban leaders—including individually sanctioned terrorists—have been installed at DAB. Piatetsky Decl. ¶¶ 48–59. The Taliban Council of Ministers governs DAB's day-to-day operations, supervising meetings and issuing directives for DAB to implement. Piatetsky Decl. ¶¶ 60–61. DAB's own social media accounts evince the Taliban's pervasive influence on DAB. Piatetsky Decl. ¶¶ 62–64; McGill Decl., Ex. 5 ¶¶ 115–21.

Moreover, DAB "primarily transacts the [Taliban's] business instead of its own." *Rohmer*, 36 A.D.3d at 991, and the Taliban relies on DAB to advance its own "organizational purpose" and "unlawful motive[s]," *Boim*, 9 F.4th at 559. The Taliban is using DAB to facilitate and enhance illegal narcotics trafficking—the Taliban's principal revenue-generating activity. Piatetsky Decl. ¶¶ 87–89; Templeton Decl. ¶¶ 52, 57–59; McGill Decl., Ex. 5 ¶¶ 55, 58. The Taliban has apparently removed—and is certainly not enforcing—any controls against money laundering and terrorism financing in Afghanistan. Piatetsky Decl. ¶ 87; McGill Decl., Ex. 5 ¶ 151. That is no surprise; a Taliban official who has been sanctioned *for* terrorism financing is now responsible for DAB's functions to *counter* terrorism financing. McGill Decl., Ex. 5 ¶ 160. And the Taliban may now employ FinTRACA's archive of investigations to identify, punish, and retaliate against opponents. Piatetsky Decl. ¶ 97; Templeton Decl. ¶¶ 54–56; McGill Decl., Ex. 5 ¶ 156.

DAB is no longer performing the functions of a central bank. Templeton Decl. ¶ 61. It has been blocked from utilizing its foreign reserves in the United States by Executive Order 14064, apparently because of fear that the Taliban would misappropriate them, Dkt. 6-25, at 1, and the United Nations and NGOs have been bypassing DAB as a conduit for international aid because of the Taliban's pervasive control, Piatetsky Decl. ¶¶ 76–77, McGill Decl., Ex. 5 ¶¶ 140–41; *see NML Cap., Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 195 (2d Cir. 2011) ("central

banking functions" include "accumulation of foreign exchange reserves to facilitate the regulation of the [foreign state's currency]"); *Cont'l Transfert Technique, Ltd. v. Fed. Gov't of Nigeria*, 2019 WL 3562069, at *18 (D.D.C. Aug. 6, 2019) (central banks "pay[] certain commercial debts [of the government] in the United States," "serv[e] as a depository for government funds . . . and receiv[e] and disburs[e] government moneys" (citations omitted)). Thus, experts and government officials have observed the need for an Afghan entity, independent from the Taliban, that actually performs central banking functions. McGill Decl., Ex. 5 ¶¶ 104, 138.

When the Taliban previously controlled Afghanistan, the United States determined that DAB was "owned or controlled by" or "act[ed] for or on behalf of, the Taliban."[9] After President Clinton blocked "all property and interests in property of the Taliban" in the aftermath of the embassy bombings, Exec. Order 13129, 64 Fed. Reg. 36,759, 36,759 (July 4, 1999), OFAC determined that DAB's funds were also blocked as property of the Taliban, *e.g.*, 65 Fed. Reg. at 39,100. The same logic applies now that the Taliban has again seized control of Afghanistan. Indeed, Executive Order 14064 is premised on the Taliban's control of DAB; the purpose of blocking is to "keep[] [the funds] out of the hands of the Taliban." Dkt. 6-25, at 1. The evidence leaves no doubt: DAB is the Taliban's alter ego. Piatetsky Decl. ¶ 109; Templeton Decl. ¶ 61.

Treating DAB as a separate legal entity would also work a significant injustice to victims of terrorism like Plaintiffs. At all times relevant to this litigation, DAB has been controlled and directed by the Taliban—both today, and in 1998, when the Taliban helped al-Qaeda perpetrate the embassy bombings. *See* Templeton Decl. ¶¶ 12, 19–27. Then, as now, the country's "formal banking system was not operational," and Taliban leaders "helm[ed] national institutions" like

---

[9] Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers; Addition of Persons Blocked Pursuant to 31 CFR Part 538, 31 CFR Part 597, or Executive Order 13129, 65 Fed. Reg. 39,100, 39,100 (June 23, 2000).

DAB.  Templeton Decl. ¶¶ 21–22.  The Taliban even "ordered" payment from DAB to a "number of" designated terrorists, including a financier to al-Qaeda.  Templeton Decl. ¶ 24.  Whenever the Taliban has been in power, it has used DAB to further its terroristic ends, and the Taliban should not be allowed to hide behind DAB's purported separate legal status to perpetuate Plaintiffs' injuries and deny them recovery now.  *Cf. Motorola Credit Corp. v. Uzan*, 739 F. Supp. 2d 636, 640 (S.D.N.Y. 2010) (defendants could not use alter ego "to avoid" judgment obligations).  Ultimately, the question is whether the "policy behind" respecting DAB's supposed separateness is "outweighed by the policy justifying" its disregard.  *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139.  That balance here is one-sided.  As explained, the Taliban uses DAB to support narcotics trafficking, money laundering, and terrorism financing.  Allowing the Taliban to exploit DAB for its terroristic purposes while denying victims of terrorism access to DAB funds to satisfy their judgments against the Taliban would be an affront to equity.  DAB is the Taliban's alter ego, and DAB funds may be used to satisfy a judgment against the Taliban.

D.     **The FSIA Poses No Obstacle To Confirmation.**

In other litigation, Taliban judgment creditors have suggested that the FSIA renders the blocked assets immune from attachment through any vehicle other than a post-judgment enforcement action under the Terrorism Risk Insurance Act ("TRIA").  Letter at 2, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Mar. 29, 2022), Dkt. 7809.  Because Plaintiffs are not yet seeking turnover, the Court need not resolve FSIA immunity at this juncture.  But the argument is wrong in any event.  The FSIA provides that "the property of a foreign state" is immune from attachment if it is the property of a central bank "held for its own account."  28 U.S.C. § 1611(b)(1).  Here, DAB's property is neither that of "a foreign state," nor that of a central bank "held for its own account."

First, property belongs to a "foreign state" only if it belongs to "an organ of a foreign state"

or an entity the "majority of whose shares or other ownership interest is owned by a foreign state." 28 U.S.C. § 1603(a), (b)(2). But despite its formal legal structure, DAB today is "an organ of" the Taliban, a non-state actor—not an organ of the state of Afghanistan. *Compare* The Afghanistan Bank Law arts. I–IV (establishing "central bank of Afghanistan," art. 1.1, as a "juridical person with full capacity under the law," arts. 1.2, 2.1, "entirely independent" in the pursuit of its objectives, art. 3.3), *with* Piatetsky Decl. ¶ 109 ("DAB is an alter ego of the Taliban"); Templeton Decl. ¶ 61 ("Under Taliban control, DAB no longer functions as a central bank"). Showing that one entity is the alter ego of another necessarily implies that the two entities are, in reality, "one and the same." *Boim*, 9 F.4th at 553. And because DAB now *is* the Taliban, a non-state actor, the threshold predicate for the FSIA's application is absent.

Second, even if the FSIA applied to the blocked assets, the assets are immune only if "held for [the central bank's] own account"—that is, "used for central banking functions." *NML Cap.*, 652 F.3d at 194. While funds held in a central bank's name are presumed to satisfy this test, that presumption can be rebutted by specific evidence that the funds are not used for traditional central banking functions. *Id.* And overwhelming evidence dislodges that presumption here.

As noted above, the Taliban has weaponized DAB to support the illicit narcotics trade—the Taliban's primary source of funding. Piatetsky Decl. ¶¶ 81–89; Templeton Decl. ¶ 13. DAB's central banking functions have "atrop[hied]." Piatetsky Decl. ¶ 59; McGill Decl., Ex. 5 ¶ 102. Its dollar auctions "have been curtailed," and it is not apparent that it will be able to obtain more currency. Piatetsky Decl. ¶ 67; *see* Templeton Decl. ¶¶ 33, 48. Far from being used for central banking functions, half of DAB's assets at the FRBNY have been diverted by the United States for its foreign policy purposes. And if DAB were ever able to access the remaining blocked funds, the Taliban would undoubtedly use the funds to further its terroristic ends. Templeton Decl. ¶ 48.

If there were ever a case of "unusual circumstances" and "obvious departures from the norm" sufficient to rebut the presumption that assets are held for central banking functions, *Cont'l Transfert Technique*, 2019 WL 3562069, at *15, the takeover of a central bank by a recognized terrorist organization qualifies.  *See* Piatetsky Decl. ¶¶ 70, 100 (situation is "unprecedented"); McGill Decl., Ex. 5 ¶ 45 (there has "never been a case" like this one); *see also Peterson v. Islamic Republic of Iran*, 2013 WL 5538652, at *4 (S.D.N.Y. Oct. 8, 2013) (complaint plausibly alleged that "Bank Markazi engages in non-central bank activities" based on allegations that it "does not segregate its foreign currency reserve . . . from money" used to "support international terrorism," Second Am. Compl., ¶ 179, *Peterson*, No. 10-cv-4518 (S.D.N.Y. Mar. 19, 2012), Dkt. 216 ).[10]

## CONCLUSION

Because Plaintiffs have shown "the probability that [they] will succeed on the merits," "grounds for the attachment," and "the need for continuing the levy," CPLR §§  6211(b), 6223(b), Plaintiffs respectfully request that this Court confirm the Order of Attachment.

---

[10]  Any suggestion that Executive Order 14064 precludes relief here is meritless.  *Contra* Letter at 3 n.2, No. 03-md-1570 (S.D.N.Y. Apr. 25, 2022), Dkt. 7913 ("April 25 Letter").  Executive Order 14064 forbids the "transfe[r]" of blocked assets, but an order of prejudgment attachment transfers nothing; it merely creates a lien on the assets.  *See*  Merriam-Webster.com  Dictionary,  https://www.merriam-webster.com/dictionary/transfer  (defining "transfer" as "to convey from one person . . . to another: MOVE").  The broader definition of "transfer" in OFAC regulations implementing *other* blocking executive orders, *see* April 25 Letter at 3 n.2 (citing 31 C.F.R. § 594.312), is inapplicable here.  Those definitions are limited to the "part" of the C.F.R. in which they appear. *See* 31 C.F.R. § 594.101 ("This part is separate from, and independent of, the other parts of this chapter," and "[d]iffering foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter").  Unless and until OFAC issues regulations to the contrary, the word "transfer" in Executive Order 14064 bears its ordinary meaning.  And it would be strange to construe "transfer" in Executive Order 14064 to forbid prejudgment attachment by victims of terrorism, when the order was crafted to protect the DAB assets for victims of terrorism who "inten[ded] to make" claims against the Taliban.  Dkt. 6-1, at 8391.  Sanctions blocking orders do not inexorably foreclose prejudgment attachment.  *See, e.g.*, *New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.*, 502 F. Supp. 120, 131 (S.D.N.Y. 1980) (Iranian assets blocked under executive order and accompanying regulations "are subject to pre-judgment attachment").

TRIA also does not bar attachment.  *Contra* Letter at 4, No. 03-md-1570 (S.D.N.Y. Mar. 22, 2022), Dkt. 7790. Plaintiffs seek prejudgment attachment under New York law, not TRIA.  TRIA provides an avenue to *execute* against—*i.e.* transfer—blocked funds, but Plaintiffs are not seeking turnover of the blocked funds at this juncture. Nothing in TRIA displaces ordinary prejudgment attachment remedies under state law, and if the funds remain blocked after judgment, TRIA will allow Plaintiffs to execute against them.

Dated:  May 2, 2022                                    Respectfully submitted,

                                                       /s/ Matthew D. McGill
Rebecca Monck Ricigliano                               Matthew D. McGill
CROWELL & MORING LLP                                   Jessica L. Wagner
590 Madison Avenue, 20th Floor                         (admitted *pro hac vice*)
New York, NY 10022                                     GIBSON, DUNN & CRUTCHER LLP
Telephone:  (212) 895-4000                             1050 Connecticut Avenue, N.W.
Facsimile:  (212) 223-4134                             Washington, D.C. 20036
rricigliano@crowell.com                                Telephone:  (202) 955-8500
                                                       Facsimile:  (202) 530-9522
John L. Murino                                         mmcgill@gibsondunn.com
(*pro hac vice* application forthcoming)
Stuart H. Newberger                                    Robert L. Weigel
(*pro hac vice* application forthcoming)               Jason W. Myatt
Emily M. Alban                                         GIBSON, DUNN & CRUTCHER LLP
(admitted *pro hac vice*)                              200 Park Avenue
CROWELL & MORING LLP                                   New York, New York 10166
1001 Pennsylvania Ave. NW                              Telephone:  (212) 351-4000
Washington, DC 20004                                   Facsimile: (212) 351-5236
Telephone:  (202) 624-2500                             rweigel@gibsondunn.com
Facsimile:  (202) 628-5116                             jmyatt@gibsondunn.com

Caragh Glenn Fay
(*pro hac vice* application forthcoming)
Amanda Fox Perry
(*pro hac vice* application forthcoming)
FAY LAW GROUP, P.A.
6205 Executive Boulevard
Rockville, MD 20852
Telephone:  (202) 589-1300
Facsimile: (202) 216-0298

Jane Carol Norman
(admitted *pro hac vice*)
BOND & NORMAN LAW, PC
6205 Executive Blvd.
Rockville, MD 20852
Telephone:  (202) 682-4100
Facsimile: (202) 207-1041
jnorman425@icloud.com

                            *Counsel for Plaintiffs*