UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES OWENS, et al.,

*Plaintiffs*,

v.

TALIBAN a/k/a ISLAMIC EMIRATE
OF AFGHANSTAN,

*Defendant*.

22-cv-1949 (VEC)

**RESPONSE OF FEDERAL RESERVE BANK OF NEW YORK
TO PLAINTIFFS' MOTION TO CONFIRM
*EX PARTE* PREJUDGMENT ATTACHMENT ORDER**

**RULE 7.1 DISCLOSURE STATEMENT**

The Federal Reserve Bank of New York ("New York Fed") is a corporation chartered under the laws of the United States pursuant to the Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq.*  The New York Fed, a corporate instrumentality of the United States, has no parent company or publicly owned subsidiaries or affiliates.

Although stock of the New York Fed is owned by member commercial banks within the Second Federal Reserve District, none of the stockholders control the New York Fed.  New York Fed stock, unlike stock in a typical private corporation, is not acquired for investment purposes or for purposes of control.  Rather, such stock is acquired because its ownership is a condition of membership in the Federal Reserve System.  Unlike owners of a typical private corporation, New York Fed stockholders do not possess a residual equity interest in New York Fed assets.  That residual interest remains always with the United States.

Non-party garnishee the Federal Reserve Bank of New York ("New York Fed") submits this brief in response to Plaintiffs' Motion to Confirm the Order of Attachment ("Motion").

## PRELIMINARY STATEMENT

In this action, Plaintiffs (referred to here as the "Owens Plaintiffs") are pursuing claims against the Taliban and seek to confirm an *ex parte* order of prejudgment attachment (the "*Ex Parte* Attachment Order") they obtained against funds held at the New York Fed for Da Afghanistan Bank ("DAB"), the central bank of Afghanistan, which the Owens Plaintiffs allege is being used by the Taliban for non-central banking activities. The DAB funds at issue are blocked pursuant to Executive Order 14064 and are the subject of numerous proceedings brought by various plaintiff groups seeking to collect money judgments against the Taliban.

The Owens Plaintiffs' Motion raises numerous legal questions, many of which are being challenged by other creditors, including the *Federal Insurance* plaintiffs, who have moved to vacate the *Ex Parte* Attachment Order. The New York Fed condemns the acts of terrorism that are the basis of the claims in this and other proceedings, and has deep sympathy for plaintiffs' suffering. The New York Fed takes no position on the Motion or the competing priority and legal claims of the various judgment creditors seeking to attach DAB funds held at the New York Fed. The New York Fed offers its views solely to assist the Court in analyzing issues concerning the immunity afforded to foreign central bank property under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602 *et seq.*, to the extent those issues apply in this action.

## PROCEDURAL BACKGROUND

The New York Fed is part of the central bank of the United States. Among its many functions, the New York Fed acts as the international operating arm for the nation's central bank and in that capacity offers banking services and maintains accounts for over 200 foreign central banks, foreign governments and international organizations, including DAB.

On February 11, 2022, President Biden issued Executive Order 14064, titled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan" (the "Executive Order"). In recognition of the "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by the "widespread humanitarian crisis in Afghanistan," the Executive Order blocks all DAB assets in the United States, including those at the New York Fed. *Id.* at 1-2. On the same day, the United States issued a Directive License to the New York Fed to direct the transfer of $3.5 billion of DAB funds held at the New York Fed "so that they can be used for the benefit of the Afghan people, in view of the acute humanitarian and economic crisis facing Afghanistan." Statement of Interest of the United States of America, *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MD 1570 (GBD)(SN), Dkt # 49 (S.D.N.Y. Feb. 11, 2022) ("U.S. SOI") at 2-3. Various groups of creditors with judgments against the Taliban have since served process on the New York Fed seeking to execute on the blocked DAB funds that are not subject to the Directive License (the "Funds") pursuant to the Terrorism Risk Insurance Act ("TRIA") or related causes of action.[1]

On March 21, 2022, the Owens Plaintiffs obtained the prejudgment *Ex Parte* Attachment Order against the Funds, which they now seek to confirm with their pending Motion.

## RESPONSE TO MOTION

**A. As Part of the Nation's Central Bank, the New York Fed Has an Interest in Clear and Certain FSIA Immunity for Foreign Central Bank Property**

As one of the largest custodians in the world, if not the largest custodian, of foreign official reserves, the New York Fed has a substantial interest in a stable and certain legal environment for foreign central bank property, including the immunities afforded that property

---

[1] *See Doe v. Taliban*, No. 20 Misc. 740 (KPF) (ECF Entry dated September 27, 2021), and *Havlish v. Bin-Laden*, No. 03 Civ. 9848 (GBD) (SN) (ECF Entry dated January 19, 2022); *Federal Insurance Co., et al. v. Taliban, et al.*, 03-cv-6978 (GBD) (SN) (consolidated with *Does* and *Havlish* into *In re: Terrorist Attacks on September 11, 2001*,

under the FSIA.  When it enacted the FSIA, Congress was concerned that if foreign central bank property in the United States were left vulnerable to attachment and execution, deposits in foreign central bank accounts would be discouraged.  According to the House Report on the FSIA:

> If execution could be levied on such funds without an explicit waiver, deposit of foreign funds in the United States might be discouraged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems.

H.R. Rep. No. 94-1487, at 31 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6630.

Congress thus granted foreign central banks and monetary authorities their own protection under Section 1611(b)(1) of the FSIA to provide clarity and ensure that foreign state reserves would continue to be held in the United States.[2]  *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 473 (2d Cir. 2007) (Congress intended Section 1611(b)(1) "to provide an incentive for foreign central banks to maintain their reserves in the United States"); Paul L. Lee, *Central Banks and Sovereign Immunity*, 41 Colum. J. Transnat'l L. 327, 376 (2003) (Section 1611(b)(1) appears to have been developed to avoid the "potential difficulties" that central banks would face if their assets were subject to attachment).

Section 1611(b)(1) was added to the FSIA at the urging of the State Department because Congress recognized that, without the immunity provided by this provision, foreign governments "might ultimately remove all or a substantial portion of their reserves from the United States,"

---

03-MD-1570 (GDB) (SN) ("MDL"); S*mith v. Taliban et al.*, 01-cv-10132 (LAK) (Dkt. #50, 51).

[2] Section 1611(b)(1) provides that, *notwithstanding* the exceptions to immunity from attachment and execution in Section 1610:

> [T]he property of a foreign state shall be immune from attachment or execution if . . .the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution . . . .

which in turn could undermine the dollar's status as the world's reserve currency and the stability of the international financial system along with it." *See* Letter of Charles N. Brower, Department of State Acting Legal Advisor, to Elliott L. Richardson, Attorney General, dated July 23, 1973, 1973 Dig. of U.S. Prac. of Int'l L. 227, quoted in Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265, 270 (1982).

If the FSIA's legal protections are viewed as uncertain, as noted above, that may discourage foreign official deposits in the United States and could prompt central banks to move their reserves to jurisdictions that offer more clarity and legal certainty. The resulting impact on the international financial system, and the treatment of the United States' own reserves held abroad, could be profound. The New York Fed responds to the Motion for these reasons, and not in support of or in opposition to any party in this litigation.

**B. The Court Should Determine FSIA Immunity as a Threshold Matter**

The Owens Plaintiffs suggest that "the Court need not resolve FSIA immunity at this juncture" because they are "not yet seeking turnover" of the Funds. Owens Plaintiffs' Brief in Support of Motion ("OP Br.") at 23. But the threshold determination of whether the FSIA's immunity protections bar prejudgment attachment here is precisely what the FSIA requires. *See, e.g.*, *EM Ltd. v. Republic of Argentina*, 06 Civ. 7792 (TPG), 2010 WL 11586676, at *2-4 (S.D.N.Y. Jun. 11, 2010) (denying motion to confirm *ex parte* prejudgment attachment of Argentine central bank's funds at New York Fed because funds were immune under FSIA).

Under the FSIA, all "foreign state" property in the United States is immune from prejudgment attachment unless that foreign state has explicitly waived its immunity *and* the property is being used for a commercial activity at the time of attachment. 28 U.S.C. §§ 1609, 1610(d); *S & S Machinery Co. v. Masinexportimport*, 706 F.2d 411, 416 (2d Cir. 1983) (FSIA

"immunizes a foreign state from prejudgment attachment of its assets in the United States, unless that state explicitly waives its immunity.") (internal quotations and citations omitted).

If that "foreign state" is a central bank, the immunity protections are even greater.  The Second Circuit has instructed that "[w]here funds are held in an account in the name of a central bank or monetary authority, the funds are presumed to be immune from attachment under § 1611(b)(1)."  *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 194 (2d Cir. 2011).  That presumption can be rebutted only where a plaintiff "demonstrat[es] with specificity that the funds are not being used for central banking functions as such functions are normally understood, irrespective of their 'commercial' nature."  *Id.*; *see also* US SOI at 23-24 (detailing Section 1611(b)(1) principles applicable in this context).

Importantly, a central bank's immunity from prejudgment attachment under Section 1611(b)(1) for property held for its own account cannot be waived under any circumstances.  *Libancell S.A.L. v. Republic of Lebanon*, No. 06 Civ. 2765(HB), 2006 WL 1321328, at *3 (S.D.N.Y. May 16, 2006) ("while a central bank's immunity from attachment in aid of execution (i.e., post judgment attachment) may be waived, the property of a foreign central bank 'is absolutely immune from *prejudgment* attachment, and that immunity cannot be waived'"); *Weston Compagnie de Fin. Et D'Investissement, S.A. v. La República del Ecuador*, 823 F. Supp. 1106, 1111 (S.D.N.Y. 1993) ("there was reason for Congress not to provide for waiver of prejudgment attachment of property of central banks held for their own account, and…it did not").

This enhanced protection for foreign central bank property was deliberate; the potential foreign relations problems caused by creditor interference with foreign state reserves are magnified in the prejudgment context.  *See Weston*, 823 F. Supp. at 1111 ("[T]he effect of the

[pre-judgment] attachment can be very disruptive. . . . Prejudgment attachment. . . is unique in that it affords plaintiff a substantial measure of relief absent a final determination that plaintiff is entitled to any relief whatsoever." (internal citations and quotations omitted)).

Here, the Owens Plaintiffs argue that these FSIA immunities do not apply because DAB is being used by the Taliban for non-central banking activities and is not a "foreign state" covered by the statute.  OP Br. at 23-25.  The New York Fed notes that in other proceedings against the Taliban where this issue is being litigated, the United States has stated that DAB "is an agency or instrumentality of the State of Afghanistan under the FSIA's definition and thus is to be treated as a 'foreign state' for purposes of the FSIA."  U.S. SOI at 21.

Should the Court conclude that Section 1611(b)(1) applies, the Funds would be immune from attachment and execution, and the *Ex Parte* Attachment Order could not be confirmed.  The *Ex Parte* Attachment Order also could not be confirmed if the Court finds that DAB is a "foreign state" and that Section 1610(d)(1)'s immunity exception does not apply.  We respectfully submit that the Court must address these threshold issues in resolving the Motion.

## CONCLUSION

The New York Fed takes no position on the Motion, but respectfully offers its views on the relevant FSIA provisions for the Court's consideration.

Dated:      New York, New York
            June 6, 2022

                                        Respectfully submitted,

                                        /s/ Michele Kalstein
                                        MICHELE KALSTEIN
                                        MICHAEL BRENNAN
                                        Federal Reserve Bank of New York
                                        33 Liberty Street
                                        New York, New York 10045

                                        Counsel for Non-Party Garnishee
                                        Federal Reserve Bank of New York