**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES OWENS, et al., *Plaintiffs,* v. TALIBAN a/k/a ISLAMIC EMIRATE OF AFGHANISTAN, *Defendant.* | Civil Action No. 22-cv-01949 (VEC) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO CONFIRM THE ORDER OF ATTACHMENT**

**PRELIMINARY STATEMENT**

Plaintiffs' Motion to Confirm this Court's Order of Attachment, Dkt. 47, is unopposed. To date, neither Defendant Taliban a/k/a Islamic Emirate of Afghanistan ("Taliban"), nor garnishee the Federal Reserve Bank of New York ("New York Fed"), nor any other entities have opposed the motion. Accordingly, the Court should confirm the Order of Attachment. *See* CPLR § 6211(b).

In response to Plaintiffs' Motion to Confirm this Court's Order of Attachment, the New York Fed filed a "Response" that "takes no position on the Motion" but has offered "its views" on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, "to the extent those issues apply in this action." Dkt. 61, at 1. Those views cast no doubt on the propriety of Plaintiffs' Order of Attachment.

Notably, the New York Fed does not contend that the FSIA *actually* renders the blocked funds here immune from attachment. And as Plaintiffs have explained, it does not. *See* Dkt. 48, at 23–25. As the New York Fed agrees, the presumption that FSIA immunity applies to funds held in a central bank's name may be rebutted by "specifi[c]" evidence that the funds are not being used for "central banking functions." Dkt. 61, at 5. Plaintiffs have adduced exactly such evidence, as well as evidence showing that Da Afghanistan Bank ("DAB") is no longer an instrumentality of the foreign state of Afghanistan, but an alter ego of the Taliban—evidence the New York Fed does not attempt to refute.

In any event, because Plaintiffs are not yet seeking turnover, the Court need not resolve FSIA immunity at this juncture. None of the generic theoretical concerns the New York Fed raises in favor of immediate decision—about maintaining the certainty of the FSIA's protections or avoiding "potential foreign relations problems," Dkt. 61, at 4–5—have any purchase in the unusual

circumstances of this case, where a globally recognized terrorist entity has taken control of a foreign state and its central bank.

The Court should confirm the Order of Attachment.

## ARGUMENT

1. Because no party, garnishee, or non-party, for that matter, has opposed Plaintiffs' confirmation motion, this Court should simply grant it as unopposed.[1] *See, e.g.*, *DirecTV Latin America, LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 415 n.2 (S.D.N.Y. 2010) ("DirecTV's motion to confirm the order of attachment as to Clemente was granted as unopposed."); *see also SEC v. Vaskevitch*, 657 F. Supp. 312, 313 (S.D.N.Y. 1987) ("The motion [for a preliminary injunction] is unopposed and will be granted."). It is a bedrock principle that courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present"; they "normally decide only questions presented by the parties." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *see also Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."). Thus, there is no need to delve into a hypothetical opposition.

---

[1] In a blatant effort to avoid this Court's jurisdiction, the so-called *Federal Insurance* creditors did file a motion to vacate this Court's Order of Attachment in the 9/11 MDL. *See Federal Insurance* Creditors' Cross-Mot. to Vacate *Owens Ex Parte* Provisional Prejudgment Attachment, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. May 27, 2022), Dkt. 8055. As Plaintiffs have explained in that case, the *Federal Insurance* creditors' motion was wholly improper and runs afoul of the blackletter rule that one district court cannot overrule the decision of another. *See* Opp. to *Federal Insurance* Creditors' Cross-Mot. to Vacate *Owens* Prejudgment Attachment 3–12, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. June 10, 2022), Dkt. 8091. And in any event, the *Federal Insurance* creditors' attacks against this Court's Order of Attachment are baseless. *See id.* at 17–25.

2

It is especially appropriate to grant the motion as unopposed here because the substantive standard for confirmation is the same as for the original order of attachment, and confirmation is merely a procedural vehicle to ensure that the defendant receives due process. *Nippon Emo-Trans Co. v. Emo-Trans, Inc.*, 744 F. Supp. 1215, 1234 (E.D.N.Y. 1990); David D. Siegel, N.Y. Prac. § 315 (6th ed.). The Court has already concluded that attachment is warranted, *see* Dkt. 38, and given the lack of opposition, there is no need for the Court to revisit or revise this conclusion.

2. The New York Fed has offered various statements on the FSIA, without taking a position on the motion, *see* Dkt. 61, but those statements should in no way disturb the Court's earlier ruling. The New York Fed asserts its "[c]lear" "[i]nterest" in "FSIA [i]mmunity for "[f]oreign [c]entral [b]ank [p]roperty," *id.* at 2, but the concerns it raises do not apply here. As Plaintiffs and the New York Fed both have observed, the relevant provision of the FSIA, 28 U.S.C. § 1611(b)(1), provides that "the property of a foreign state" is immune from attachment if it is the property of a central bank "held for its own account." *See* Dkt. 48, at 23; Dkt. 61, at 4–5. Here, DAB's property is neither that of "a foreign state," nor that of a central bank "held for its own account."

As Plaintiffs explained at length in their confirmation motion and multiple experts have concluded, today DAB is "an alter ego of the Taliban," a non-state actor. Dkt. 50 ¶ 109 (Piatetsky Decl.); *see* Dkt. 51 ¶ 61 (Templeton Decl.). It is no longer an agent or instrumentality of the legitimate "foreign state" of Afghanistan. 28 U.S.C. §§ 1603(b), 1611(b); *see* Dkt. 48, at 18–24. Taliban leaders—including individually sanctioned terrorists—have been installed to head DAB. Dkt. 50 ¶¶ 48–59. The Taliban's Council of Ministers supervises meetings and issues directives for DAB to implement. *Id.* ¶¶ 60–61. The Taliban is using DAB to advance its own illicit ends—including illegal narcotics trafficking, the Taliban's principal revenue-generating activity. *Id.* ¶¶ 87–89; Dkt. 51 ¶¶ 52, 57–59; Dkt. 49-5 ¶¶ 55, 58 (Zerden Decl.). And the Taliban has removed

3

controls against money laundering and terrorism financing in Afghanistan.  Dkt. 50 ¶ 87; Dkt. 49-5 ¶ 151.  In short, DAB today is the Taliban's alter ego—"one and the same" entity, *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 553 (7th Cir. 2021).

The New York Fed disputes none of the facts supporting this conclusion.  It notes only that "in other proceedings," "the United States has stated that DAB 'is an agency or instrumentality of the State of Afghanistan under the FSIA's definition.'"  Dkt. 61, at 6 (quoting U.S. Statement of Interest 21, *Havlish v. Bin Laden*, No. 03-cv-9848 (S.D.N.Y. Feb. 11, 2022), Dkt. 563 ("U.S. SOI")).  But the government made this stray remark in the context of addressing whether "the Terrorism Risk Insurance of Act of 2002, 28 U.S.C. § 1610 note ('TRIA'), entitles" two other sets of Taliban judgment creditors  "to execute" on the funds.  U.S. SOI 2.  The United States only briefly mentioned the FSIA's definition as a "starting point" for its discussion of TRIA.  *Id.* at 21.  That single sentence cannot fairly be characterized as the United States' considered view on the question of DAB's current status under the FSIA, including whether the FSIA can apply to an entity controlled and run by a non-state actor.  Indeed, the government provided no analysis at all on these issues—it did not evaluate whether DAB today is the Taliban's alter ego, or consider any of the facts Plaintiffs have presented.  To the contrary, the government underscored that "the FSIA applies only to foreign sovereigns."  *Id.*  Applying that principle to the facts here, the FSIA plainly does not extend to the Taliban's alter ego.[2]

Notwithstanding the government's statement, multiple other courts in this district have issued writs of execution against the blocked DAB assets to Taliban judgment creditors, implicitly

---

[2]  Because the Taliban is not a recognized foreign government, and DAB, as its alter ego, is not a foreign governmental entity either, other provisions of the FSIA, which create immunity for "property . . . of a foreign state," 28 U.S.C.§§ 1609, 1610, also do not apply.

concluding that the Taliban holds an interest in the blocked funds held in DAB's name. *See* Writ of Execution, *John Does 1 Through 7 v. Taliban*, No. 20-mc-00740 (S.D.N.Y. Dec. 13, 2021); Writ of Execution, *Havlish v. Bin Laden*, No. 03-cv-09848 (S.D.N.Y. Jan. 19, 2022);[3] Writ of Execution, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Apr. 20, 2022); Writ of Execution, *Smith v. Islamic Emirate of Afghanistan, et al.*, No. 01-cv-10132 (S.D.N.Y. Feb. 22, 2022).[4]  This Court should do the same.

3. In any event, to trigger § 1611(b) immunity for an actual sovereign central bank authority, the funds at issue still must be "held for [the central bank's] own account"—that is, "used for central banking functions." *NML Cap., Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 194 (2d Cir. 2011).  While funds held in a central bank's name are presumed to satisfy this test, the New York Fed *agrees* that "[t]h[e] presumption can be rebutted" by specific evidence that the funds are not used for traditional central banking functions. Dkt. 61, at 5.

Plaintiffs have provided exactly such evidence here, which the New York Fed does not

---

[3] The *Doe* and *Havlish* writs were originally issued before the U.S. Statement of Interest, but the court has not vacated them since that statement, and indeed, those writs are now in turnover proceedings, where the United States has filed no objection. *See infra* p. 8 (discussing turnover motions).

[4] Those creditors have judgments against the Taliban—but not the former Islamic Republic of Afghanistan (the last-recognized government of Afghanistan). *See* Abstract of Judgment, *John Does 1 Through 7 v. Taliban*, No. 20-mc-00740 (S.D.N.Y. Feb. 10, 2021) (judgment against "The Taliban, Al-Qaeda and The Haqqani Network"); Memorandum Decision and Order at 1, *Havlish*, No. 03-cv-09848 (S.D.N.Y. Oct. 13, 2012), Dkt. 316 (directing entry of judgment against "non-sovereign defendants, including Osama bin Laden, the Taliban, and al Qaeda"); Rule 54(b) Judgment, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Apr. 20, 2022), Dkt. 7888 (entering judgment on behalf of *Federal Insurance* creditors "against defendant the Taliban"); Judgment # 03,1446, *Smith v. Islamic Emirate of Afghanistan, et al.*, No. 01-cv-10132 (S.D.N.Y. July 14, 2003) (directing judgment against "the Taliban" and "the Islamic Emirate of Afghanistan" among others); *see also* Dkt. 50 ¶¶ 31, 35 (explaining that the Islamic Republic of Afghanistan was the last recognized government of Afghanistan).  As a result, those creditors can only execute against the blocked funds insofar as the Taliban holds an interest them.  *See* Siegel, N.Y. Prac. § 488.

even attempt to refute. *See* Dkt. 48, at 24–25. As multiple experts have stated, DAB's central banking functions have "atrop[hied]" since the Taliban takeover. Dkt. 50 ¶ 59; Dkt. 49-5 ¶ 102. Its dollar auctions "have been curtailed," and it is not apparent that DAB will be able to obtain more currency. Dkt. 50 ¶ 67; *see* Dkt. 51 ¶¶ 33, 48. Rather than performing legitimate banking functions, DAB and its resources are being used to further the Taliban's illicit drug trade, terrorist financing, and money laundering. Dkt. 50 ¶¶ 81–89; Dkt. 51 ¶¶ 13, 50–52. The United Nations and NGOs trying to send aid into Afghanistan are re-directing money around DAB that would have gone through it if it were still functioning as a legitimate central bank. Dkt. 50 ¶¶ 76–77. And since the United States has diverted half of DAB's assets at the FRBNY for its own foreign policy goals, *see* Dkt. 6-23, the assets are clearly not being held for the central bank's "own account," 28 U.S.C. § 1611(b). If DAB were ever able to access the remaining blocked funds, the Taliban would assuredly use the funds to advance its terroristic ends. Dkt. 51 ¶ 48.

Although the New York Fed is clearly concerned about protecting its normal institutional clients (*i.e.*, legitimate central banks), *see* Dkt. 61, at 1–3, the terrorist takeover of a foreign state and its central bank is "unprecedented," Dkt. 50 ¶¶ 70, 100, and there has "never been a case" like this one, Dkt. 49-5 ¶ 45. The Taliban's hijacking of DAB surely suffices to rebut, if not wholly eradicate, the normal central-banking presumption. *See* Dkt. 48, at 25; *Peterson v. Islamic Republic of Iran*, 2013 WL 5538652, at *4 (S.D.N.Y. Oct. 8, 2013). And given these highly unusual circumstances (which hopefully will never be repeated), the New York Fed need not be concerned about any ramifications for its other institutional clients.

4. Plaintiffs have thus amply demonstrated that FSIA immunity does not apply. And although the Court *may* decide the FSIA question now, contrary to the New York Fed, the Court is under no obligation to do so. As Plaintiffs have explained, a confirmation motion is a

mechanism to "protec[t]" a defendant when a plaintiff receives an order of attachment *ex parte* under CPLR § 6211(a), Dkt. 38, at 5, by "afford[ing] the defendant" due process, Siegel, N.Y. Prac. § 315.  But it imposes no new substantive requirements—the standard "is the same." *Nippon Emo-Trans Co.*, 744 F. Supp. at 1234.  New York law allows prejudgment attachment even when there is uncertainty regarding the defendant's interest in assets held by the garnishee. *See, e.g.*, Siegel, N.Y. Prac. § 320 (discussing levy where "garnishee may not know that the property belongs to the defendant").

This Court has already reasoned that whether "the funds Plaintiffs seek to attach are actually funds belonging to the Taliban" is "not ripe" for decision. Dkt. 38, at 3 n.2.  The question of FSIA immunity, which likewise goes to attachability, is no different.  The two determinations overlap significantly in this case:  If DAB is the Taliban's alter ego, then the assets belong to the Taliban, *and* since the Taliban is not a foreign sovereign for FSIA purposes, DAB cannot be covered by the FSIA either.

None of the New York Fed's atmospheric concerns about maintaining the certainty of the FSIA's protections or "potential foreign relations" problems have any purchase here, and they do not necessitate that the Court decide the FSIA issue now.[5]  Dkt. 61, at 4–6. While prejudgment attachment on an unquestioned legitimate central bank might be "disruptive" to "foreign relations," *id.* at 5–6 (internal quotation marks omitted), the assets at issue are currently blocked by Executive Order 14064.  Thus, the United States itself has apparently concluded that DAB is no longer functioning as a legitimate central bank—it has blocked the funds to "kee[p] them out of the hands

---

[5]  The court's decision in *EM Ltd. v. Republic of Argentina*, 2010 WL 11586676, at *3 (S.D.N.Y. June 11, 2010), does not prove the contrary.  The court there *did* decide the FSIA immunity question on a cross-motion to vacate a writ of attachment (and thus denied a motion to confirm the attachment), but the court pointed to nothing in the FSIA that *required* it to rule at that juncture.  And there is no such motion before this Court.

of the Taliban"—and DAB is barred from accessing the funds, irrespective of attachment. Dkt. 6-25, at 1. Plaintiffs do not question the importance of foreign sovereign immunity in encouraging foreign governments to deposit their reserves in the United States. But denying such immunity *to the Taliban* would in no way "undermine the dollar's status as the world's reserve currency" or render the FSIA's legal protections otherwise "uncertain," Dkt. 61, at 4 (internal quotation marks omitted).

Moreover, postponing the FSIA question to any future turnover proceedings would follow a similar path employed for other Taliban judgment creditors. Other courts in this district have granted *post*judgment creditors writs of execution against the blocked DAB assets without first formally addressing whether the funds at issue actually belong to the Taliban or are immune under the FSIA.[6] *See* Writ of Execution, *John Does 1 Through 7*, No. 20-mc-00740; Writ of Execution, *Havlish*, No. 03-cv-09848; Writ of Execution, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570; Writ of Execution, *Smith*, No. 01-cv-10132. Instead, any FSIA issues are currently being adjudicated in turnover proceedings in those actions. *See, e.g.*, *Havlish* Turnover Br. 9, 15–24, *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (S.D.N.Y. Mar. 20, 2022), Dkt. 7764 (noting that "Havlish Creditors obtained a writ of execution from this court against the DAB assets at the FRBNY on August 27, 2021," and contending that TRIA circumvents FSIA immunity, or, in the alternative, that DAB is the Taliban's alter ego); *Doe* Turnover Br. 8, 14–24, *John Does 1 Through 7 v. Taliban*, No. 20-mc-00740 (S.D.N.Y. Mar. 20, 2022), Dkt. 80 (similar); *Federal Insurance* Creditors' Turnover Br. 15–24, No. 03-md-1570 (S.D.N.Y. Apr. 29, 2022), Dkt. 7937 (similar); *Smith/Soulas* Turnover Br. 6–15, *Smith v. The Islamic Emirate of Afghanistan*,

---

[6] And insofar as these courts have analyzed the issue implicitly, they have concluded that the funds at issue belong to the Taliban and issued writs against the funds. *See supra* pp. 4–5.

No. 01-cv-10132 (S.D.N.Y. May 18, 2022), Dkt. 63 (similar). This Court can do the same.

## CONCLUSION

The New York Fed's response should not give the Court any hesitation regarding Plaintiffs' confirmation motion. Whether the Court decides the issue now or postpones it, the FSIA poses no obstacle to confirmation. Plaintiffs respectfully request that this Court confirm the Order of Attachment.

Dated: June 13, 2022

Respectfully submitted,

/s/ Matthew D. McGill

| | |
|---|---|
| Rebecca Monck Ricigliano<br>CROWELL & MORING LLP<br>590 Madison Avenue, 20th Floor<br>New York, NY 10022<br>Telephone: (212) 895-4000<br>Facsimile: (212) 223-4134<br>rricigliano@crowell.com<br><br>John L. Murino<br>(*pro hac vice* application forthcoming)<br>Stuart H. Newberger<br>(*pro hac vice* application forthcoming)<br>Emily M. Alban<br>(admitted *pro hac vice*)<br>CROWELL & MORING LLP<br>1001 Pennsylvania Ave. NW<br>Washington, DC 20004<br>Telephone: (202) 624-2500<br>Facsimile: (202) 628-5116<br><br>Caragh Glenn Fay<br>(*pro hac vice* application forthcoming)<br>Amanda Fox Perry<br>(*pro hac vice* application forthcoming)<br>FAY LAW GROUP, P.A.<br>6205 Executive Boulevard<br>Rockville, MD 20852<br>Telephone: (202) 589-1300<br>Facsimile: (202) 216-0298<br><br>Jane Carol Norman<br>(admitted *pro hac vice*)<br>BOND & NORMAN LAW, PC<br>6205 Executive Blvd.<br>Rockville, MD 20852<br>Telephone: (202) 682-4100<br>Facsimile: (202) 207-1041<br>jnorman425@icloud.com | Matthew D. McGill<br>Jessica L. Wagner<br>(admitted *pro hac vice*)<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br>Telephone: (202) 955-8500<br>Facsimile: (202) 530-9522<br>mmcgill@gibsondunn.com<br><br>Robert L. Weigel<br>Jason W. Myatt<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, New York 10166<br>Telephone: (212) 351-4000<br>Facsimile: (212) 351-5236<br>rweigel@gibsondunn.com<br>jmyatt@gibsondunn.com |

*Counsel for Plaintiffs*