```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 02/24/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
JAMES OWENS, et al., :
:
                          Plaintiffs, :
            -against- :
: 22-CV-1949 (VEC)
:
TALIBAN a/k/a ISLAMIC EMIRATE OF : OPINION AND ORDER
AFGHANISTAN, :
:
                          Defendant. :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

On August 7, 1998, al-Qaeda killed more than 200 people and injured thousands in terrorist attacks on the U.S. embassies in Dar es Salaam, Tanzania and Nairobi, Kenya (the "Embassy Bombings"). Although al-Qaeda was responsible for the attack, several countries and groups provided assistance that made the attacks possible, including Iran, Sudan, and, allegedly, the Taliban, a fundamentalist Islamic organization that then controlled, and now again controls, Afghanistan.

In 2021, approximately 20 years after being ousted from Afghanistan, the Taliban effectively reseized control of Afghanistan, after which it laid claim to funds held by the Afghan central bank at the Federal Reserve Bank of New York (the "N.Y. Fed"). In February 2022, President Joseph R. Biden issued an Executive Order blocking the transfer of those funds. *See* Executive Order, Dkt. 6-1. The Executive Order prompted approximately 200 surviving victims, estates of victims who did not survive, and family members of the victims of the Embassy Bombings, both domestic and foreign, to sue the Taliban for its alleged role in the attack. *See generally* Compl., Dkt. 7. To preserve their chance of collecting a future judgment, they filed an *ex parte* emergency motion seeking pre-judgment attachment of the funds, which the Court

1

granted on March 21, 2022.  *See* Orders, Dkts. 33, 38.  Plaintiffs now seek to confirm the Court's pre-judgment attachment order.  *See* Pls. Not. of Mot., Dkt. 47.  For the following reasons, Plaintiffs' motion is DENIED.

## BACKGROUND[1]

In 1996, after being expelled from Sudan, al-Qaeda and its leader, Osama bin Laden, relocated to Afghanistan, where the Taliban had recently emerged as a fundamentalist movement that was attempting to take over Afghanistan.  Once in Afghanistan, al-Qaeda allegedly began to receive support from the Taliban in the form of, among other things, weapons, training, facilities, and protection.  *See* 9/11 Commission Report, Dkt. 6-6, at 66; L.A. Times Article, Dkt. 6-8, at 3.  While he was allegedly being protected by the Taliban, bin Laden declared war on the United States in a 1996 fatwa; he reiterated that declaration in February 1998.  *See* bin Laden 1996 Fatwa, Dkt. 6-9; bin Laden 1998 Fatwa, Dkt. 6-10, at 2.  Eventually, bin Laden and al-Qaeda orchestrated the attacks on two U.S. embassies in the summer of 1998, killing hundreds and injuring thousands.  *See* History Report, Dkt. 6-12, at 2.

Horrific in their own right, the 1998 bombings were a harbinger of what was to come.  In 2000, al-Qaeda attacked the USS Cole, killing 17 sailors and injuring approximately 40 other crew members.  Then, on September 11, 2001, al-Qaeda attacked the World Trade Center and the Pentagon, an attack with far-reaching domestic and international consequences.  *See generally* N.Y. Times Article, Dkt. 6-20.  The Taliban was pushed from power in Afghanistan when North Atlantic Treaty Organization ("NATO") forces, led by the United States, invaded the country.  *Id.*  Although a fragile democracy was formed, Afghanistan was rocked by insurgent attacks from the Taliban for years.  Eventually, in the summer of 2021, NATO allies

---

[1]  The facts are taken from the Complaint and supporting exhibits and declarations to the Complaint and Plaintiffs' motions and are assumed to be true for purposes of this opinion.

and the United States withdrew their troops from the country, and the Taliban retook control. *Id.* Although no country has recognized it as an official, legitimate government, the Taliban currently controls Afghanistan. ICCT Article, Dkt. 6-21, at 1. In that capacity, the Taliban laid claim to the roughly $7 billion in assets held by Afghanistan's central bank, Da Afghanistan Bank ("DAB"), at the N.Y. Fed. *See* N.Y. Times Article, Dkt. 6-22, at 2.

Since taking control of Afghanistan, the Taliban has installed its own officials at DAB, controlled DAB's decision-making, established a committee to replace Afghanistan's central banking laws with traditional Islamic banking, and eliminated (or, at a minimum, seriously compromised) DAB's anti-money laundering and anti-terrorism financing efforts. *See* Piatetsky Decl., Dkt. 50, ¶¶ 46–72, 82–108; Templeton Decl., Dkt. 51, ¶¶ 40–61; Zerden Decl., Dkt. 49-5, ¶¶ 54–139, 144–79. Foreign governments and organizations have avoided transacting with DAB due to its affiliation with the Taliban. *See* Piatetsky Decl. ¶¶ 73–81; Zerden Decl. ¶¶ 140–43.

On February 11, 2022, President Biden, via Executive Order, froze DAB's assets being held by the N.Y. Fed. The President subsequently authorized approximately half the balance to be transferred out of the United States to be used on behalf of the people of Afghanistan. That left approximately half in the United States, "subject to ongoing litigation by U.S. victims of terrorism." White House Fact Sheet, Dkt. 6-25; *see also* Executive Order.[2] President Biden's order set off a race among creditors and would-be creditors of the Taliban to attach the funds.

---

[2] The Court noted in its order preliminarily approving Plaintiffs' pre-judgment attachment motion that "[w]hether the funds Plaintiffs seek to attach are actually funds belonging to the Taliban is a complicated question" that is "not ripe for final decision at this stage of Plaintiffs' case." Order, Dkt. 38, at 3 n.2. That remains true, but as further discussed *infra*, the funds are presumptively immune from attachment. The Court also notes its skepticism that, even if the funds were not immune from attachment, Plaintiffs would be able to establish, as they must before the Court could issue a post-judgment writ of execution, that the funds in fact belong to the Taliban, its agent, or its instrumentality, and, therefore, should be available to satisfy any judgment Plaintiffs may get against the Taliban. *See In Re: Terrorist Attacks on September 11, 2001*, No. 03-MD-01570 (GBD) (SN), 2023 WL 2138691 (S.D.N.Y. Feb. 21, 2023) (denying post-judgment turnover motions seeking DAB's New York assets).

Among the terrorism victims seeking to lay claim to those funds are victims of the September 11, 2001, terrorist attacks (the "September 11 Attacks") — many of whom (the "9/11 Victim Creditors") have been engaged in a complex set of lawsuits filed years ago in this District — who wish to levy writs of execution on the $2.1 billion in frozen funds still in the United States. *See* Order, *In Re: Terrorist Attacks on September 11, 2001*, No. 03-MD-01570, Dkt. 7717 (S.D.N.Y. Mar. 2, 2022) (lifting stays on writs of execution for two sets of plaintiffs in cases related to the September 11 Attacks); Order, *Smith v. Islamic Emirate of Afg.*, No. 01-CV-10132 (LAK), Dkt. 48 (S.D.N.Y. May 2, 2022) (extending a writ of execution for another set of plaintiffs in a case related to the September 11 Attacks).[3] The 9/11 Victim Creditors commenced turnover proceedings.[4] On February 21, 2023, Judge George Daniels denied their turnover motions. *See In Re: Terrorist Attacks on September 11, 2001*, No. 03-MD-01570 (GBD) (SN), 2023 WL 2138691 (S.D.N.Y. Feb. 21, 2023). Judge Daniels concluded that DAB is immune from jurisdiction and immune from attachment and execution under the Foreign Sovereign Immunities Act (the "FSIA"). In a nutshell, he concluded that DAB is the central bank of Afghanistan and no exception to sovereign immunity applies; the Terrorism Risk Insurance Act of 2002 (the "TRIA") does not nullify DAB's immunity; and the Court is constitutionally restrained from finding that the Taliban is entitled to DAB's assets under the TRIA. *Id.*

---

[3]    There are numerous other creditors with unpaid judgments against the Taliban who may also attempt to levy writs of execution on the frozen funds remaining in the United States. *See* Letter, *O'Neill v. Republic of Iraq, et al.*, No. 04-CV-01076, Dkt. 612, at 2 (S.D.N.Y. Feb. 15, 2022) (discussing individuals with "pending motions for judgment of money damages" against the Taliban); Letter, *Havlish v. Bin-Laden*, No. 03-CV-9848 (GBD) (SN), Dkt. 568, at 2 (S.D.N.Y. Feb. 15, 2022) (same).

[4]    Insurance companies that made payments because of the September 11 Attacks have also obtained a writ of execution against the Taliban and are engaged in turnover proceedings. *See* Minute Entry, *Fed. Ins. Co. et al.*, No. 03-CV-6978 (GBD) (SN) (S.D.N.Y. Apr. 20, 2022) (granting a writ of execution).

In part because of the 9/11 Victim Creditors, this case was filed with an *ex parte* emergency motion for pre-judgment attachment. Pls. Mem., Dkt. 48, at 1–2.[5] Although Plaintiffs seek to confirm pre-judgment attachment of Taliban assets in the amount of approximately $4.6 billion plus pre-judgment interest (the "Funds"), with respect to the funds located at the N.Y. Fed, they seek to attach only their expected compensatory damages, in the amount of approximately $1.4 billion plus pre-judgment interest (i.e., the amount of the funds that have not already been attached by others). *Id.* at 9 & n.6.

After the Court granted Plaintiffs' pre-judgment attachment motion, *see* Orders, Dkts. 33, 38, on April 21, 2022, the U.S. Marshal Service levied upon the Funds, *see* McGill Decl., Dkt. 49, ¶¶ 3–6; Process Receipt & Return, Dkt. 49-1.[6] Plaintiffs timely moved to confirm their pre-judgment attachment on May 2, 2022. *See* Pls. Not. of Mot. As a non-party garnishee in this case, and without taking a position on Plaintiffs' motion, the N.Y. Fed responded to the motion to offer its views on relevant FSIA provisions. In its submission, the N.Y. Fed noted "that in other proceedings against the Taliban where this issue is being litigated, the United States has stated that DAB 'is an agency or instrumentality of the State of Afghanistan under the FSIA's definitions and is to be treated as a "foreign state" for purposes of the FSIA.'" *See* N.Y. Fed Response, Dkt. 61, at 8. In their reply, Plaintiffs argue that the Court may, but need not, address the FSIA at this stage of the proceeding, and that the FSIA does not pose an obstacle to confirmation. *See* Pls. Reply, Dkt. 63, at 2–3. The Court invited the Government to submit a statement of interest setting forth its position on the extent to which the FSIA precludes

---

[5] Magistrate Judge Sarah Netburn denied certain of the September 11 plaintiffs' request to consolidate this action with the September 11 cases. Order, *In Re: Terrorist Attacks on September 11, 2001*, No. 03-MD-01570, Dkt. 7754 (S.D.N.Y. Mar. 15, 2022).

[6] The Court granted Plaintiffs' motion to extend the levy of the Court's order of attachment indefinitely on July 7, 2022. *See* Order, Dkt. 72.

5

confirmation of the Court's attachment order.  *See* Order, Dkt. 80.  In response, the Government opined that the FSIA precludes confirmation because DAB's assets are immune from attachment.  *See* Gov't Statement, Dkt. 81.

On July 15, 2022, Plaintiffs filed a proposed order to show cause why default judgment should not be entered against the Taliban, a supporting declaration, and a proposed default judgment order.  *See* Proposed Order to Show Cause, Dkt. 75; Proposed Default Judgment Order, Dkt. 76.  To date, the Court has not entered judgment against the Taliban.

## DISCUSSION

The standard for confirming an attachment order is the same as that for granting an *ex parte* order of attachment in the first instance.[7]  *See Nippon Em-Trans Co. v. Emo-Trans, Inc.*, 744 F. Supp. 1215, 1234 (E.D.N.Y. 1990).  Upon careful consideration of the applicability of the FSIA, the Court has concluded that the attachment order should not have been granted in the first instance and will, therefore, not be confirmed.  As the central bank of Afghanistan, DAB is immune from execution.

### I.     Legal Standard

A foreign state is immune from attachment of its assets in the United States, subject to certain exceptions.  The FSIA addresses two distinct types of immunity: jurisdictional and execution.  *See Walters v. Indust. & Comm. Bank of China, Ltd.*, 651 F.3d 280, 286–88 (2d Cir.

---

[7]     New York state law governs the ability of a party to obtain a prejudgment attachment.  Fed. R. Civ. P. 64.  Under New York law, in order to obtain a pre-judgment attachment, the plaintiff must show that: (1) the plaintiff has a cause of action for a money judgment; (2) it is probable that the plaintiff's claim will succeed on the merits; (3) one or more grounds for attachment provided under New York law exist; and (4) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.  CPLR § 6212(a).  The remedy of pre-judgment attachment "is discretionary with the Court and should be used sparingly."  *Katz Agency, Inc. v. Evening News Ass'n*, 514 F. Supp. 423, 429 (S.D.N.Y. 1981), *aff'd sub nom. Katz Commc'ns, Inc. v. Evening News Ass'n*, 705 F.2d 20 (2d Cir. 1983) (citation omitted).  The Second Circuit recently concluded that courts have "discretion to weigh extraordinary circumstances" against granting an attachment motion under New York law "even where the statutory requirements for attachment are satisfied."  *Iraq Telecom Ltd. v. IVL Bank S.A.L.*, 43 F.4th 263, 272 (2d Cir. 2022).

2011) (discussing the "two types of foreign sovereign immunity addressed in the FSIA" and concluding that "the FSIA's provisions governing jurisdictional immunity, on the one hand, and execution immunity, on the other, operate independently"); *see also Peterson v. Islamic Rep. of Iran*, 876 F.3d 63, 91 (2d Cir. 2017), *vacated sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813, *reinstated in relevant part*, 963 F.3d 192, 196 (2d Cir. 2020).

Section 1604 addresses jurisdictional immunity and provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless an exception applies. 28 U.S.C. § 1604; *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983) (noting that Section 1604 "must be applied by the District Courts in every action against a foreign sovereign"). The term "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."[8] 28 U.S.C. § 1603(a).

Execution immunity is addressed at 28 U.S.C. § 1609. That section broadly immunizes from execution property of a foreign state that is located in the United States. Section 1610 establishes a number of exceptions to section 1609, none of which is relevant here. Section 1611(b) makes clear that, notwithstanding the section 1610 exceptions, "the property of a foreign state shall be immune from attachment and from execution, if the property is that of a foreign

---

[8]    A "state" under the FSIA is limited to "'entities that have a defined territory and a permanent population, that are under the control of their own government, and that engage in, or have the capacity to engage in, formal relations with other such entities.'" *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 47 (2d Cir. 1991) (cleaned up) (quoting *Nat'l Petrochemical Co. v. M/T Stolt Sheaf*, 860 F.2d 551, 553 (2d Cir. 1988)). Under the U.S. Constitution, the Executive has "the exclusive prerogative" to recognize a foreign state. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 19 (2015); *see also Baker v. Carr*, 369 U.S. 186, 212 (1962) (noting that "recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called a republic of whose existence we know nothing") (internal quotation marks and citation omitted).

An "agency or instrumentality of a foreign state" means any entity "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country." 28 U.S.C. § 1603(b).

central bank or monetary authority held for its own account" unless certain exceptions (which are inapplicable here) apply. 28 U.S.C. § 1611(b).

Funds "held in an account in the name of a central bank or monetary authority" are "presumed to be immune from attachment" under Section 1611. *NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 197 (2d Cir. 2011). This presumption "may be rebutted by demonstrating with specificity that the funds are not being used for central banking functions as such functions are normally understood . . . ." *Id.*

A court may apply the immunity protections of the FSIA regardless of whether the sovereign appears in the action. *Walters*, 651 F.3d at 294.

## II.     Application

The Court addresses the applicability of Section 1611 immunity *sua sponte* because property held in the name of a sovereign's central bank is presumptively immune from attachment, and because the Second Circuit has signaled that Section 1611's use of the term "shall" indicates that execution immunity inures in property that belongs to a foreign sovereign. *Walters*, 651 F.3d at 291, 298; *see also Weinstein v. Albright,* 261 F.3d 127, 137 (2d Cir. 2001) (noting that when a statute uses "both 'may' and 'shall,' the normal inference is that each is used in its usual sense–the one act being permissive, the other mandatory") (internal citation omitted); *cf.* Pls. Reply at 6 (acknowledging that the Court "*may* decide the FSIA question now").

The Court is not persuaded that Plaintiffs have rebutted the presumption that DAB's assets are immune from pre-judgment attachment. Plaintiffs proffer three expert declarations setting forth the Taliban's activities vis-à-vis DAB's operations, and the Court has no reason to second-guess the facts as relayed by those experts. *See generally* Piatetsky Decl.; Templeton Decl.; Zerden Decl. While Plaintiffs assert that the expert declarations demonstrate that DAB's

resources "are being used to further the Taliban's illicit drug trade, terrorist financing, and money laundering," Pl. Reply at 6, the Court does not read the declarations as going that far. Instead, they warn that because the Taliban has eliminated a number of controls that previously existed at DAB, the Taliban is *able* to engage in financial misconduct without interference from DAB. Although there is no doubt that the experts believe that the Taliban will use that freedom of movement to facilitate drug operations (including associated money laundering) and terrorist financing, the declarations stop short of opining, other than in the most conclusory ways, *see, e.g.,* Templeton Decl. ¶ 12, that DAB is currently *operating* as an arm of the Taliban.

Even if they did so opine, however, their opinions cannot change the fact that President Biden's Executive Order expressly defines DAB as "the Central Bank of Afghanistan." *See* Executive Order § 4(a).[9] DAB's status as Afghanistan's central bank, and, therefore, its status as a sovereign's agency or instrumentality whose assets are afforded immunity from attachment under the FSIA, is also reflected in the federal Government's statements of interest in this case, *see* Gov't Statement, Dkt. 81 ("confirm[ing] again" that DAB is Afghanistan's central bank and an agency or instrumentality under the FSIA), and in parallel proceedings involving the 9/11 Victim Creditors, *see* Gov't Statement, *In Re: Terrorist Attacks on September 11, 2001*, No. 03-MD-01570, Dkt. 7661, at 21 (S.D.N.Y. Feb. 11, 2022) ("The DAB is an agency or

---

[9] The Court is therefore not swayed by Plaintiffs' conclusory assertion that DAB is, instead, the Taliban's "alter ego." Pls. Mem. at 24. Plaintiffs cite *Palestine Monetary Auth. v. Strachman*, 873 N.Y.S.2d 281, 286 (N.Y. App. Div. 2009) and *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 435–36 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017), as cases analyzing comparable alter ego relationships. *See* Pls. Mem. at 20–21. But those cases are readily distinguishable. In *Palestine*, the judgment debtor Palestinian Authority, which controlled the terrorist organization Hamas, had "established" the third-party entity whose assets had been frozen. 873 N.Y.S.2d at 217. And in *Strauss*, the Court concluded that a reasonable jury could find that thirteen charities operated as Hamas front groups because the charities*, inter alia*, had been "founded by" members of Hamas, had been designated by the United States as a "Specially-Designated Global Terrorist" organization, or were "the most important Hamas association on the West Bank." 925 F. Supp. 2d at 435–36.

instrumentality of the State of Afghanistan under the FSIA's definition and thus is to be treated as a 'foreign state' for purposes of the FSIA.") (citation omitted).[10]

Although sovereign central bank assets must be "held" for the bank's "own account" to be immune from attachment, 28 U.S.C. § 1611(b), the Court is not persuaded that Plaintiffs have rebutted the Funds' presumed central bank immunity, see *NML Cap., Ltd.*, 652 F.3d at 197. Neither the Taliban's ousting of DAB's leadership nor its elimination of financial controls has any bearing on how the specific Funds at issue, which remain frozen in the United States, are being used, and neither has any bearing on Afghanistan's legitimate interest in maintaining reserves abroad. In the case Plaintiffs rely on in support of their argument, by contrast, *Peterson v. Islamic Republic of Iran*, No. 10-CV-4518 (KBF), 2013 WL 1155576, at *26 (S.D.N.Y. Mar. 13, 2023), *aff'd*, 758 F.3d 185 (2d Cir. 2014), an executive order blocked Iran's assets in the United States expressly because of its central bank's "deceptive practices."[11] There has been no similar finding by the Executive Branch relative to DAB. To the contrary, the Government has reaffirmed DAB's status as a sovereign agency or instrumentality entitled to immunity notwithstanding a non-state terrorist entity's efforts to assert control over it. *See also Republic of*

---

[10] Plaintiffs urge the Court essentially to ignore that statement because it was a "stray remark" made in the context of discussing the applicability of the TRIA, not the FSIA. Pls. Reply, Dkt. 63, at 4. The mere fact that the Government was focused on the TRIA does not render the statement inconsequential. In any event, the Government has since "confirm[ed]" that its conclusion applies with equal force in this case. *See* Gov't Statement, Dkt. 81, at 2.

Plaintiffs also invoke writs of execution issued by courts in other parallel proceedings involving the 9/11 Victim Creditors as evidence that other courts have "implicitly conclude[ed] that the Taliban holds an interest in the blocked funds held in DAB's name." *Id.* at 4–5. Putting aside whether those writs even remain valid in light of the Second Circuit's recent decision in *Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91, 97 (2d Cir. 2022) (holding that "[t]o be entitled to attachment or execution under [the] TRIA, a plaintiff must first establish [the] defendant's status as an agent or instrumentality" of a terrorist party), Judge Daniels recently denied their turnover motions in part because "neither the Taliban nor the [creditors] are entitled to raid the coffers of the state of Afghanistan to pay the Taliban's debts," *In Re: Terrorist Attacks on Sept. 11*, 2023 WL 2138691, at *14. Moreover, the Court looks above all to the Executive Branch when assessing sovereignty. *See Zivotofsky*, 576 U.S. at 19; *Baker*, 369 U.S. at 212.

[11] The *Peterson* Court also did not conclusively decide this issue, and merely noted that these facts "suggest[ed]" Iran's central bank was not engaged in activities that would entitle it to Section 1611 immunity. 2013 WL 1155576, at *26.

*Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014) (noting the "narrower" nature of execution immunity exceptions).

Because the Court concludes that Section 1611, based on current circumstances, protects DAB's funds from attachment, it need not decide whether Plaintiffs have satisfied the statutory requirements for attachment under New York law. *Cf. Iraq Telecom Ltd.*, 43 F.4th at 272 (holding that courts have "discretion to weigh extraordinary circumstances" against granting an attachment motion under New York law "even where the statutory requirements for attachment are satisfied"); *Dayco Corp. v. Foreign Transactions Corp.,* 705 F.2d 38, 39 (2d Cir. 1983) ("[T]he denial of an application to confirm will not preclude a subsequent attachment proceeding where there has been an intervening change of circumstances.") (citation omitted).

## CONCLUSION

Although the Court previously granted Plaintiffs' pre-judgment attachment motion, it declines to confirm its attachment order because the Funds are immune from attachment under the FSIA. Plaintiffs' motion to confirm the Court's *ex parte* emergency attachment order is therefore DENIED and the Court's orders granting *ex parte* emergency attachment, Dkt. 33, and extending the levy of its order of attachment indefinitely, Dkt. 72, are VACATED.

Not later than **March 13, 2023**, Plaintiffs must submit a short status update to the Court, including whether they still seek default judgment at this time.

The Clerk of Court is respectfully directed to vacate the Court's orders at Docket Entries 33 and 72, and to close the open motion at Docket Entry 47.

**SO ORDERED.**

Date: February 24, 2023
New York, New York

VALERIE CAPRONI
**United States District Judge**