**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

JAMES OWENS, et al.,

        *Plaintiffs,*

    *v.*

TALIBAN a/k/a ISLAMIC EMIRATE OF
AFGHANISTAN,

        *Defendant.*

Civil Action No. 22-cv-01949 (VEC)

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR STAY PENDING APPEAL**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT.............................................................................................1

BACKGROUND ...........................................................................................................4

ARGUMENT ................................................................................................................8

    I.    Plaintiffs Are Likely To Succeed On The Merits Of Their Appeal, And At Minimum Their Appeal Raises "Serious Questions" Warranting a Stay.....................8

        A.    The Court Erred By Enforcing Attachment Immunity *Sua Sponte* When The Sovereign Status Of The Property At Issue Was Disputed And Unclear. .............................................................................................8

        B.    The Court Erred By Concluding that the FSIA Provides Attachment Immunity For DAB's Assets............................................................12

        C.    The Court Inappropriately Deferred To The Executive Branch In Determining DAB's Status. .........................................................15

    II.    Plaintiffs Will Suffer Irreparable Injury Absent A Stay. .........................................18

    III.    The Balance Of Harms Decidedly Favors Plaintiffs.................................................21

    IV.    The Public Interest Clearly Lies In Providing Effective Remedies For Victims Of Terrorism. ..........................................................................................23

CONCLUSION...........................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*In re 650 Fifth Ave. & Related Props.*,
   2020 WL 3000382 (S.D.N.Y. June 4, 2020)........................................................................23

*In re A2P SMS Antitrust Litig.*,
   2014 WL 4247744 (S.D.N.Y. Aug. 27, 2014).......................................................................8

*Bank of China v. Wells Fargo Bank & Union Tr. Co.*,
   209 F.2d 467 (9th Cir. 1953).................................................................................................14

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999)..................................................................................... 3, 15, 17

*Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petrol. Corp.*,
   948 F.2d 111 (2d Cir. 1991)...........................................................................................20, 21

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010)................................................................................... 3, 7, 8, 18

*City of New York v. Permanent Mission of India to United Nations*,
   618 F.3d 172 (2d Cir. 2010)....................................................................................................9

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949).........................................................................................................20, 21

*Estevez v. Berkeley Coll.*,
   2022 WL 1963659 (S.D.N.Y. June 6, 2022)...........................................................................8

*Exp.-Imp. Bank of the Rep. of China v. Grenada*,
   768 F.3d 75 (2d Cir. 2014)......................................................................................................3

*Kato v. Ishihara*,
   360 F.3d 106 (2d Cir. 2004)..................................................................................................16

*Kensington Int'l Ltd. v. Republic of Congo*,
   461 F.3d 238 (2d Cir. 2006)............................................................................................20, 21

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
   830 F.3d 107 (2d Cir. 2016)....................................................................................... 15, 16, 17

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*,
   300 F. 891 (S.D.N.Y. 1924)..................................................................................................11

*Linde v. Arab Bank, PLC*,
   706 F.3d 92 (2d Cir. 2013)....................................................................................................23

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Martinez v. Cuomo,*
    459 F. Supp. 3d 517 (S.D.N.Y. 2020)....................................................................22

*Mitchell v. Cuomo,*
    748 F.2d 804 (2d Cir. 1984)............................................................................22

*Nat'l Bank & Tr. Co. of N. Am. v. J.L.M. Int'l, Inc.,*
    421 F. Supp. 1269 (S.D.N.Y. 1976) ...............................................................16

*Nken v. Holder,*
    556 U.S. 418 (2009) ....................................................................................7, 8

*NML Cap., Ltd. v. Banco Cent. de la Rep. Arg.,*
    652 F.3d 172 (2d Cir. 2011).............................................................2, 13, 14, 16

*Owens v. Turkiye Halk Bankasi A.S.,*
    2021 WL 638975 (S.D.N.Y. Feb. 16, 2021) ......................................................18

*Pashaian v. Eccelston Props., Ltd.,*
    88 F.3d 77 (2d Cir. 1996) ..............................................................................19

*Peterson v. Islamic Republic of Iran,*
    627 F.3d 1117 (9th Cir. 2010).....................................................................10, 11

*Philipp Bros. Div. of Engelhard Mins. & Chems. Corp. v. El Salto, S.A.,*
    487 F. Supp. 91 (S.D.N.Y. 1980) ..................................................................19

*Playboy Enters., Inc. v. Dumas,*
    960 F. Supp. 710 (S.D.N.Y. 1997) ..................................................................9

*Puente v. Spanish Nat'l State,*
    116 F.2d 43 (2d Cir. 1940)..............................................................................11

*Republic of Argentina v. NML Cap., Ltd.,*
    573 U.S. 134 (2014) ....................................................................................15

*Republic of Panama v. Republic Nat'l Bank of N.Y.,*
    681 F. Supp. 1066 (S.D.N.Y. 1988) ................................................................14

*Republic of Philippines v. Marcos,*
    806 F.2d 344 (2d Cir. 1986)......................................................................10, 11

*Rubin v. Islamic Republic of Iran,*
    637 F.3d 783 (7th Cir. 2011)........................................................................1, 10

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015).........................................................................23

*Selchow & Righter Co. v. McGraw-Hill Book Co.*,
    580 F.2d 25 (2d Cir. 1978)...........................................................................22

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ...................................................................................18

*Strauss v. Credit Lyonnais, S.A.*,
    242 F.R.D. 199 (E.D.N.Y. 2007)..................................................................23

*Sutherland v. Ernst & Young LLP*,
    856 F. Supp. 2d 638 (S.D.N.Y. 2012)............................................................8

*In re Terrorist Attacks on September 11, 2001*,
    No. 03-MD-01570 (S.D.N.Y. Feb. 11, 2022)..................................................15

*Thapa v. Gonzales*,
    460 F.3d 323 (2d Cir. 2006)..........................................................................7

*Trump v. Vance*,
    481 F. Supp. 3d 161 (S.D.N.Y. 2020).............................................................8

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020)...........................................................................5, 12

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
    946 F.3d 120 (2d Cir. 2019).........................................................................11

*Vera v. Republic of Cuba*,
    651 F. App'x 22 (2d Cir. 2016).....................................................................21

*Verlinden B.V. v. Cent. Bank of Nigeria*,
    461 U.S. 480 (1983) ...................................................................................16

*Walters v. Indus. & Comm. Bank of China, Ltd.*,
    651 F.3d 280 (2d Cir. 2011).....................................................................1, 10

*Weiss v. Nat'l Westminster Bank, PLC*,
    242 F.R.D. 33 (E.D.N.Y. 2007) ...................................................................23

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................8

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Zachman v. Hudson Valley Fed. Credit Union*,
    2021 WL 1873235 (S.D.N.Y. May 10, 2021) ....................................................... 8

**Statutes**

28 U.S.C. § 1330 ................................................................................................................ 11

28 U.S.C. § 1331 ................................................................................................................ 11

28 U.S.C. § 1332 ................................................................................................................ 11

28 U.S.C. § 1350 ................................................................................................................ 11

28 U.S.C. § 1367 ................................................................................................................ 11

28 U.S.C. § 1611 ....................................................................... 1, 2, 6, 9, 12, 13, 14

**Regulations**

88 Fed. Reg. 7837 (Feb. 3, 2023) .................................................................................. 21

Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) .................................... 16

**Rules**

Fed. R. App. P. 8 ................................................................................................................. 4

**Other Authorities**

*Black's Law Dictionary* 177 (11th ed. 2019) .............................................................. 14

Ernest T. Patrikis, *Foreign Central Bank Property: Immunity From Attachment In
    The United States*, 1982 U. Ill. L. Rev. 265, 274 (1982) ........................................ 14

H.R. Rep. No. 94–1487 (1976) ....................................................................................... 16

## PRELIMINARY STATEMENT

Plaintiffs request a stay pending appeal of the Court's February 24, 2023 order, Dkt. 82 ("Order"), denying Plaintiffs' motion to confirm the Court's prejudgment attachment order, Dkt. 47, and vacating the attachment, Dkts. 33, 72.  The basis for the Order was the Court's "*sua sponte*" invocation of 28 U.S.C. § 1611(b), a provision of the Foreign Sovereign Immunities Act ("FSIA"), which addresses foreign central bank immunity.  Order at 8.  The Court held that this statute immunizes the blocked funds of Da Afghanistan Bank ("DAB") from attachment.  Plaintiffs respectfully submit that the Court's *sua sponte* invocation of FSIA execution immunity rests on multiple legal errors, which Plaintiffs intend to raise before the Second Circuit.  In the interim, to preserve the status quo and ensure that the Court's Order does not prejudice their right to recover, Plaintiffs request a stay pending appeal.

A stay is appropriate because Plaintiffs are likely to succeed on their appeal for at least three reasons:

*First*, a court may enforce execution immunity under the FSIA *sua sponte* only when the sovereign status of the judgment debtor or the sovereign ownership of the targeted property is *undisputed*.  *See Walters v. Indus. & Comm. Bank of China, Ltd.*, 651 F.3d 280, 292–94 (2d Cir. 2011).  By contrast, when there is a "questionable" and disputed claim to immunity, a district court should not address and apply attachment immunity *sua sponte*; the instrumentality asserting the immunity instead must establish a prima facie case of immunity.  *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 800 n.16 (7th Cir. 2011).  Here, the entire basis for Plaintiffs' attachment has always been that DAB is no longer functioning as a sovereign central bank of the state of Afghanistan—it has instead become an alter ego of the Taliban, "a *non-state* actor."  Dkt. 48, at 2.

1

Because DAB's sovereign status is disputed, it was inappropriate for the Court to apply § 1611 immunity *sua sponte*.

*Second*, even if the Court properly considered § 1611 of its own accord, that statute nonetheless provides no immunity for the funds at issue, and there was no basis to vacate the attachment. Section 1611 by its plain terms extends only to "the property . . . of a foreign *central bank*." 28 U.S.C. § 1611(b)(1) (emphasis added). And critically, § 1611 affords protection to a bank's funds only when those contested funds are "being used for central banking functions." *NML Cap., Ltd. v. Banco Cent. de la Rep. Arg.*, 652 F.3d 172, 194 (2d Cir. 2011). Yet DAB's funds plainly are *not* "being used for central banking functions." *Id.* To the contrary, as this Court acknowledged (but failed to grapple with in its analysis), it is undisputed that half of the funds have been seized and liquidated by the United States to finance humanitarian efforts in Afghanistan, while the other half is frozen at the Federal Reserve Bank of New York, explicitly to prevent DAB—and the Taliban—from accessing them for *any* banking functions. Neither use constitutes "central banking functions as such functions are normally understood"—for instance, regulating monetary policy or managing the credit system. *Id.* And while the Court accepted as true the evidence submitted by Plaintiffs—that the Taliban has installed named terrorists to head DAB, directs DAB's decisions, and has eliminated "DAB's anti-money laundering and anti-terrorism financing efforts," Order at 3—it similarly ignored their legal import: DAB is no longer functioning as a central bank of Afghanistan. Accordingly, Section 1611 does not immunize the funds at issue in this case.

*Third*, the Court legally erred when it credited "above all" the Executive Branch's assertion that DAB is entitled to immunity because it remains the "central bank" of Afghanistan. Order at 9, 10 n.10. The very "purpose of the FSIA was . . . to remove the decision as to immunity in

particular cases from the [E]xecutive [B]ranch" and to "shif[t] the responsibility for making determinations about foreign sovereign immunity from the Executive Branch to the Judiciary." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 253 (2d Cir. 1999); *Exp.-Imp. Bank of the Rep. of China v. Grenada*, 768 F.3d 75, 84 (2d Cir. 2014). It was thus error not only to accord deference to the Executive Branch's views, but to place them "above all" when assessing immunity. Order at 10 n.10. And this is especially true when the United States failed even to acknowledge the Taliban's takeover of DAB in its statement of interest, much less assess its impact on central bank immunity.

Stays pending appeal were designed for these circumstances. Plaintiffs respectfully submit that they are likely to succeed on all of these arguments on appeal, any one of which would warrant reversal. At the very least, there are "serious questions" to be answered about the merits of Plaintiffs' attachment, which suffices for a stay, given that the balance of hardships tips decidedly in Plaintiffs' favor. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 38 (2d Cir. 2010). Plaintiffs will face irreparable injury without a stay because, absent attachment, they may never be able to collect on any final judgment against the Taliban— which was the central reason for the Court's original decision to grant prejudgment attachment. The harms to the Taliban from a stay, by contrast, would be non-existent. DAB's funds have *already* been frozen by the federal government. Staying the Order thus would have no effect on the Taliban's access to the funds. Finally, the public interest overwhelmingly favors a stay, given the public's powerful interest in ensuring remedies to the victims of horrific terrorist attacks.

For those reasons, as discussed more fully below, Plaintiffs respectfully request that the Court stay its Order pending appeal. If the Court concludes that a stay is inappropriate, Plaintiffs respectfully request that the Court expeditiously deny this motion, so that Plaintiffs can seek

appropriate relief from the Second Circuit.  *See* Fed. R. App. P. 8(a)(2)(A)(ii).

## BACKGROUND

On August 7, 1998, simultaneous suicide bombings occurred at the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania.  Dkt. 7, Compl. ¶ 1.  The attacks resulted in hundreds of deaths and thousands of injuries to both U.S. and foreign citizens.  *Id.*  The bombings were masterminded by Osama Bin Laden, carried out by members of al-Qaeda, and were supported and facilitated by the Taliban, a/k/a the Islamic Emirate of Afghanistan.  *Id.*  The Taliban provided Bin Laden and al-Qaeda with weapons, training, and safe haven, all while knowing that Bin Laden and al-Qaeda intended to commit acts of terror on U.S. targets overseas.  *Id.*  And both before and after the attacks, the Taliban refused to hand Bin Laden over to U.S. authorities.  *Id.*

Plaintiffs in this suit are the survivors or legal representatives of the victims of those attacks, along with their family members.  Asserting statutory and common-law causes of action, they seek compensatory and punitive damages against the Taliban.  Plaintiffs' motion for default judgment requests an award in the amount of $5,157,247,666.79. Dkt. 74, ¶ 65.  To protect their ability to recover on an ultimate judgment, Plaintiffs initially moved for prejudgment attachment in the amount of approximately $4.7 billion, plus prejudgment interest, though Plaintiffs requested a levy of only approximately $1.4 billion plus prejudgment interest (*i.e.*, their expected compensatory damages) of DAB funds at the Federal Reserve Bank of New York.  *See* Dkt. 5, at 25; Dkt. 33, at 1–2.

This Court granted that attachment.  Dkt. 33.  In a subsequent opinion, it methodically detailed why Plaintiffs had satisfied the statutory requirements under New York law to obtain a prejudgment attachment.  Dkt. 38, at 5.  The Court recognized that Plaintiffs are likely to succeed

on the merits of their federal causes of action. *Id.* at 6.[1]  It also recognized that various statutes of limitations pose no bar to Plaintiffs' likelihood of success, either because those limitations periods are affirmative defenses that must be raised by the Taliban, if it ever should appear, or because the limitations periods were statutorily and equitably tolled given the decades-long conflict in Afghanistan, which made an earlier-filed suit against the Taliban a practical impossibility. *Id.* at 8–10.  The Court thus held that Plaintiffs were entitled to prejudgment attachment. *Id.* at 12.  As the Court explained, "the nature of the Taliban's limited assets in the United States and the potential disbursal of the funds"—which very well could preclude satisfaction of any ultimate judgment—"prevent[ed]" the Court from reaching any other conclusion. *Id.*

The Marshals Service levied the DAB funds at the Federal Reserve Bank of New York, and Plaintiffs timely moved to confirm the Court's order of attachment. *See* Dkt. 47, 48.  As Plaintiffs pointed out, "nothing ha[d] changed to warrant" a departure from the Court's prior, correct order granting the attachment. Dkt. 48, at 1.  The only response to Plaintiffs' confirmation motion was from garnishee the Federal Reserve Bank of New York, which conspicuously took "*no position*" on the merits of Plaintiffs' confirmation motion, yet opined that the Court should address the applicability of the FSIA "to the extent" it applied before confirming the attachment. Dkt. 61, at 1, 6 (emphasis added).  In reply, Plaintiffs argued that their confirmation motion should simply be granted "as unopposed," and that it would be inappropriate for the Court to delve into "hypothetical" arguments against confirmation, given the bedrock principle that courts "normally decide only questions presented by the parties." Dkt. 63, at 1–2 (citing *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)).

---

[1] Given that conclusion, the Court found it unnecessary to additionally evaluate likelihood of success as to the common-law claims.  Dkt. 38, at 6.

Months later, the Court *sua sponte* requested the views of the United States on the question whether the FSIA "precludes confirmation of the Court's attachment order." Dkt. 80. In response, the U.S. Department of Justice ("DOJ") baldly stated that the FSIA "does preclude confirmation." Dkt. 81, at 1. But in its three-page letter, DOJ did not even mention that the Taliban has seized control of DAB, let alone offer any analysis whatsoever on the impact of this reality on DAB's immunity. Instead, the government apparently assumed that because DAB was at one time the central bank of Afghanistan, that must also be true today. Yet DOJ provided no evidence or arguments demonstrating that DAB is still fulfilling central banking functions. *See* Dkt. 81.

Before Plaintiffs could respond to DOJ's new and unsupported assertions, the Court entered its Order denying confirmation and vacating Plaintiffs' attachment. The Order elected to apply this assumed immunity under § 1611 "*sua sponte*" because the funds at issue are held in "a sovereign's central bank," *i.e.*, DAB. Order at 8. The Court reasoned that Plaintiffs' evidence that the Taliban—not the nonfunctioning state of Afghanistan—controls DAB "cannot change the fact that President Biden's Executive Order expressly defines DAB as 'the Central Bank of Afghanistan,'" nor "the federal Government's statements of interest" reflecting its position that DAB is "a sovereign's [*i.e.*, Afghanistan's] agency or instrumentality." *Id.* at 9. The Court thus held that "central bank immunity" must be "presumed," and that Plaintiffs' evidence of Taliban control failed to "rebu[t]" that presumption. *Id.* at 10. Moreover, while accepting "the facts as relayed" by Plaintiffs' experts as true, the Court expressed skepticism "that DAB is currently *operating* as an arm of the Taliban," even though the Taliban has installed named terrorists to head

DAB. *Id.* at 8–9. The Court further reasoned that even if the Taliban controls DAB, it does not control "the specific Funds at issue, which remain frozen in the United States." *Id.* at 10.

Plaintiffs now respectfully request that the Court grant a stay pending appeal of its Order vacating Plaintiffs' attachment.

## LEGAL STANDARDS

Courts consider four factors in deciding whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The Second Circuit applies a "sliding scale" approach, under which "[t]he necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors," and "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (alterations in original) (internal quotation marks omitted).

Under this "sliding scale" approach, a party can satisfy the standard by showing "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) . . . that there are *serious questions* going to the merits, . . . [and that] the balance of hardships tips *decidedly* in its favor." *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35, 38 n.8 (first emphasis added) (internal quotation marks omitted). This "venerable" "serious questions" standard "permits a district court to grant a [stay] in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the [stay]." *Id.* at 35, 38. "Applying the 'serious questions' standard

is particularly appropriate" when, as here, "a movant asks the district court to find that its own

opinion is likely to be overturned." *Zachman v. Hudson Valley Fed. Credit Union*, 2021 WL

1873235, at *1 (S.D.N.Y. May 10, 2021); *accord Estevez v. Berkeley Coll.*, 2022 WL 1963659, at

*2 (S.D.N.Y. June 6, 2022); *In re A2P SMS Antitrust Litig.*, 2014 WL 4247744, at *2 (S.D.N.Y.

Aug. 27, 2014) (same).[2]

## **ARGUMENT**

I.     **Plaintiffs Are Likely To Succeed On The Merits Of Their Appeal, And At Minimum
       Their Appeal Raises "Serious Questions" Warranting a Stay.**

       A.     **The Court Erred By Enforcing Attachment Immunity *Sua Sponte* When The
              Sovereign Status Of The Property At Issue Was Disputed And Unclear.**

At every stage of this proceeding, Plaintiffs have disputed the idea that any sovereign

currently owns the funds at issue, or that DAB remains a sovereign central bank entitled to

immunity under the FSIA.  That is because DAB is now an instrumentality of the Taliban—"a

*non-state* actor."  Dkt. 48, at 2.  Accordingly, Plaintiffs have always maintained that the FSIA is

inapplicable.

Until the day the Court issued its Order vacating Plaintiffs' attachment, no party to this

litigation had ever contended that the FSIA precluded that attachment.  The Federal Reserve Bank

---

[2] This "flexible approach" for "assessing a movant's probability of success on the merits"
survived the Supreme Court's decisions in *Nken* and *Winter v. Natural Resources Defense
Council, Inc.*, 555 U.S. 7 (2008).  *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 37–38 & nn.7–9.  And
though *Citigroup* involved a request for a preliminary injunction, both *Citigroup* and *Nken*
recognized that "[t]here is substantial overlap between [the factors governing a motion to stay]
and the factors governing preliminary injunctions."  *Id.* at 38 n.8 (alterations in original) (quoting
*Nken*, 556 U.S. at 434).  Accordingly, courts in this District routinely apply the standards
articulated in *Citigroup*—including the "serious questions" standard—in evaluating motions for
stay pending appeal.  *See Estevez*, 2022 WL 1963659, at *2; *Zachman*, 2021 WL 1873235, at
*1; *Trump v. Vance*, 481 F. Supp. 3d 161, 163–64 (S.D.N.Y. 2020); *In re A2P SMS Antitrust
Litig.*, 2014 WL 4247744, at *2; *Sutherland v. Ernst & Young LLP*, 856 F. Supp. 2d 638, 640–
41 (S.D.N.Y. 2012).

of New York had tautologically suggested that the FSIA could be a "threshold" issue "to the extent" it applies, but its brief expressly refrained from taking any "position on the Motion," and certainly never claimed that the FSIA necessarily precludes attachment.  Dkt. 61, at 1, 6.  In their subsequent reply brief, Plaintiffs pointed out that it would be inappropriate for the Court to deny confirmation based on a "hypothetical opposition" raising an FSIA immunity defense. Dkt. 63, at 2.

Nonetheless, at the invitation of the Court, DOJ filed a letter on February 24 which broke from the Federal Reserve by contending, for the first time, that "the FSIA precludes confirmation of the Court's prejudgment attachment order."  Dkt. 81 at 3.  Hours later—and as Plaintiffs were formulating their response to DOJ's letter—the Court entered the instant Order, denying confirmation and vacating Plaintiffs' attachment under § 1611 of the FSIA.  The Court expressly acknowledged that it was "address[ing] the applicability of Section 1611 immunity *sua sponte*," rather than on the initiative of the Taliban.  Order at 8.[3]

The Court appears to have based its *sua sponte* application of an immunity defense on two grounds: (1) the Second Circuit's decision in *Walters v. Industrial & Commercial Bank of China, Ltd.*, and (2) a statement from Plaintiffs' reply to the Federal Reserve's letter that the Court "may

---

[3] Plaintiffs note that the Court's Order repeatedly cited DOJ's same-day letter as grounds to vacate Plaintiffs' attachment.  *See, e.g.*, Order at 9 (expressly citing the letter); *id.* at 10 n.10 (expressly citing the letter again); *id.* at 10 (explaining that the government had now "reaffirmed DAB's status as a sovereign agency or instrumentality entitled to immunity").  Plaintiffs respectfully suggest that it would have been customary to permit them to respond to DOJ's letter before issuance of the Order.  *See, e.g.*, *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 179 (2d Cir. 2010) (giving parties the opportunity to respond to government's late-filed amicus brief); *cf. Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("It would be manifestly unfair to allow Dumas to make a complex and possibly dispositive argument after Playboy's opportunity to respond has passed, thereby silencing Playboy on the issue and depriving the Court of Playboy's views on the question raised.").

decide the FSIA question now." *See* Order at 8 (citing *Walters*, 651 F.3d at 291, and then quoting reply brief). But neither authorized the *sua sponte* enforcement of an immunity defense in these circumstances.

In *Walters*, the Second Circuit held that district courts may *sua sponte* enforce an immunity defense to execution (which is governed by the same portion of the FSIA as attachment) when the action involves "an *undisputed* foreign sovereign" or when the attempted collection is "against what are *undisputed* sovereign assets." 651 F.3d at 294. (emphases added). But *Walters* specifically carved out from its holding the situation "where . . . the sovereign ownership of the targeted property is *in doubt*." *Id.* at 294 n.11 (emphasis added).

This important qualification is not only correct under the principles of party presentation— it is built on longstanding precedent. *See Walters*, 651 F.3d at 294 n.11 (citing *Rubin*, 637 F.3d at 800 n.16). As the Seventh and Ninth Circuits have explained, when the immunity claim is "questionable," "not clear," and "not . . . uncontested," the foreign state or instrumentality "*must* establish a prima facie case that it fits the FSIA's definition of a foreign state." *Rubin*, 637 F.3d at 800 n.16 (emphasis added); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1128 (9th Cir. 2010). This is especially true where, as here, the sovereign is "not a party to the suit," and it is "not clear" that the property belongs to the sovereign. *Peterson*, 627 F.3d at 1128. In these circumstances, "a foreign state must make a *prima facie* case of ownership in order for the presumption of immunity to apply." *Id.* at 1128; *see also id.* ("[W]e require the defendant to make a *prima facie* case that it is a foreign state only when that fact is not obvious or uncontested.").

And, importantly, because execution immunity is not jurisdictional, *see Walters*, 651 F.3d at 288–89, where sovereign status is disputed, third parties should not be permitted to "invoke immunity on behalf of a foreign state." *Peterson*, 627 F.3d at 1128 (citing *Republic of Philippines*

*v. Marcos*, 806 F.2d 344, 360 (2d Cir. 1986)).  In the context of a disputed issue of immunity, "when the party before the court as claimant or as defendant is neither the sovereign nor his ambassador, it is now the established rule that the claim will not be recognized, unless by diplomatic intervention" of the foreign state itself.  *Puente v. Spanish Nat'l State*, 116 F.2d 43, 45 (2d Cir. 1940) (quoting *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*, 300 F. 891, 893–94 (S.D.N.Y. 1924) (Hand, L., J.)).[4]  In such situations, a mere "'suggestion' from . . . an amicus curiae" of immunity does not suffice for *sua sponte* enforcement of that immunity.  *Id.* at 44–45. In *Marcos*, the Second Circuit referred to this concept as "standing," and it held that various private individuals and corporations had "no standing" to assert a questionable claim of sovereign immunity on behalf of the former president of the Philippines.  806 F.2d at 360; *compare Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019) (allowing banks to raise Cuba's "jurisdictional" immunity because, unlike here, it went to subject-matter jurisdiction).

In light of these principles, Plaintiffs respectfully suggest that the Court's *sua sponte* application of a putative central bank immunity to vacate Plaintiffs' attachment was erroneous. From the outset, Plaintiffs have disputed the sovereign status of DAB and its funds—their entire attachment was premised on that notion.  *See, e.g.*, Dkt. 5, at 20–21.  Neither Afghanistan nor DAB is a party to this action.[5]  (Although DAB's assets were garnished, the Federal Reserve, not DAB, is the garnishee.)  And neither Afghanistan nor DAB has ever appeared in this action—much less asserted a prima facie case that DAB's funds are entitled to immunity under the FSIA.  Thus, it

---

[4] The FSIA codified pre-1976 practice in this respect.  *See Peterson*, 627 F.3d at 1128 n.3 (citing *Puente*, 116 F.2d at 45).

[5] And for this reason, Judge Daniels' conclusion in the MDL litigation that DAB is protected by jurisdictional immunity is incorrect—since DAB is not a party to the litigation, the Court's jurisdiction is not at issue.  The Court's subject-matter jurisdiction derives from 28 U.S.C. §§ 1331, 1332, 1350, & 1367(a), *see* Dkt. 7 ¶¶ 4–6, not 28 U.S.C. § 1330(a).

was improper for the Court to apply the defense *sua sponte*.

Nor does Plaintiffs' statement in their confirmation-motion reply brief that the Court "may decide the FSIA question now" (*i.e.*, at the attachment stage), Dkt. 63, at 6, authorize *sua sponte* enforcement of execution immunity, *contra* Order at 8. Plaintiffs' primary submission has always been that the FSIA is inapplicable to this lawsuit. *E.g.*, Dkt. 48, at 23; Dkt. 63, at 3. But Plaintiffs' secondary submission was that to the extent the Court addressed the FSIA at all, it was irrelevant to the propriety of Plaintiffs' suit whether the Court rejected application of FSIA immunity at the attachment stage or at the execution stage—the defense was meritless either way. Plaintiffs' statement in their reply that the Court could recognize the inapplicability of FSIA immunity at the attachment stage or wait until execution, Dkt. 63, at 6, thus in no way conceded that it was appropriate for the Court to *enforce* a putative execution immunity to vacate Plaintiffs' attachments *sua sponte* under FSIA § 1611. Context makes this clear. In the immediately preceding sentence of Plaintiffs' reply brief, Plaintiffs explained that they "have thus amply demonstrated that FSIA immunity does not apply"—*i.e.*, that the FSIA is not at issue. *Id.* And earlier in their reply, Plaintiffs argued that it would be improper to "delve into a hypothetical opposition" based on the FSIA because "[i]t is a bedrock principle that courts 'rely on the parties to frame the issues for decision.'" *Id.* at 2 (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)).

**B.  The Court Erred By Concluding That The FSIA Provides Attachment Immunity For DAB's Assets.**

Even if the Court properly raised FSIA immunity *sua sponte*, it nonetheless erred by concluding that DAB is the "instrumentality" of a "foreign state," and the funds at issue are protected by "central bank immunity" under 28 U.S.C. § 1611. Order at 9–10. The Court recited the proper legal standards—that "property . . . of a foreign central bank or monetary authority held for its own account" is immune, and that immunity may be overcome where the "funds are not

being used for central banking functions."  Order at 7–8 (quoting 28 U.S.C. § 1611(b); *NML Cap., Ltd.*, 652 F.3d at 197).  And it accepted as true Plaintiffs' evidence that "the Taliban has installed its own officials at DAB, control[s] DAB's decision-making . . . and eliminated . . . DAB's anti-money laundering and anti-terrorism financing efforts."  *Id.* at 3.  But the Court did not grapple with the legal import of these facts.

In particular, the Court did not explain how an institution that the Taliban, a non-state actor, indisputably now "control[s]" could retain its sovereign status as an "instrumentality" of Afghanistan.  Plaintiffs presented overwhelming evidence—credited by the Court—that the Taliban has installed named terrorists to head DAB, and that the Taliban's Council of Ministers governs DAB's day-to-day operations, by supervising meetings and issuing directives for DAB to implement.  Dkt. 50, ¶¶ 48–59, 60–61.  As a result, important banking "functions" have "atroph[ied] or altogether disappear[ed]," and DAB's dollar auctions "have been curtailed," *id.* ¶¶ 59, 67; *see also* Dkt. 51, ¶ 61 ("Under Taliban control, DAB no longer functions as a central bank.").  Moreover, the United Nations and non-governmental organizations have been channeling international aid that ordinarily would have gone through DAB around it, via private banks, underscoring that DAB is nonfunctional and controlled by the Taliban.  Dkt. 50, ¶¶ 76–79.  Accordingly, various experts, including U.S. Special Representative for Afghanistan Thomas West, and a bipartisan group of Congressmembers have publicly proclaimed that Afghanistan needs—but currently lacks—a central bank.  Dkt. 49-5, ¶¶ 104, 138.  The Court failed to address *any* of the implications of this evidence in concluding that DAB remains "a sovereign's agency or instrumentality."  Order at 9.  That was legal error.

Likewise, the Court recognized the undisputed facts that DAB's funds have been appropriated by the United States and blocked so that DAB cannot use them for any banking

functions.  Order at 3.  But the Court failed to address the import of these facts in concluding that the frozen funds (not just DAB itself) are protected by sovereign immunity.  This, too, was legal error.  The Court reasoned that because the "specific Funds at issue" "remain frozen in the United States," they are not in the hands of the Taliban and retain immunity.  *Id.* at 10.  But even if the funds are *not* directly accessible by the Taliban (because they are frozen), they still must remain "the property . . . of a foreign central bank" to merit immunity under § 1611.  And property merely held in the *name* of a foreign central bank is not immune if "the funds are not being used for central banking functions as such functions are normally understood."  *NML Cap., Ltd.*, 652 F.3d at 194.

Although "there is no definitive list of activities 'normally understood' to be central banking functions," "even in unusual circumstances it is not difficult to tell" whether a "function [is] characteristic of central banks," *NML Cap.*, 652 F.3d at 194 n.20, such as issuing and redeeming bonds, issuing legal tender, maintaining monetary reserves, controlling the money supply, regulating credit, and supervising other banks, *see Bank of China v. Wells Fargo Bank & Union Tr. Co.*, 209 F.2d 467, 473–74 (9th Cir. 1953) (supplying a classic statement of these functions); *Republic of Panama v. Republic Nat'l Bank of N.Y.*, 681 F. Supp. 1066, 1073–74 (S.D.N.Y. 1988) (applying that test); *see also* Ernest T. Patrikis, *Foreign Central Bank Property: Immunity From Attachment In The United States*, 1982 U. Ill. L. Rev. 265, 274 (1982) (compiling similar list of activities); Central Bank, *Black's Law Dictionary* 177 (11th ed. 2019) ("A central bank normally issues currency, functions as the government's bank, regulates the credit system, provides oversight for commercial banks, manages exchange reserves, and implements monetary policy.").

By any "norma[l]" understanding of central banking functions, the funds at issue here do not qualify.  As this Court has recognized, the Biden Administration froze the funds and siphoned

half of them off for its own humanitarian aid program; the other half remain blocked by Executive

Order at the Federal Reserve Bank of New York where DAB cannot use them for *any* purposes,

let alone central banking ones.  *See* Order at 3; Dkt. 6-1; Dkt. 6-23.  Thus, the government's own

actions directly contradict its bald assertions that DAB remains the legitimate central bank of

Afghanistan, or that its funds are being used for central banking functions.  If, as the United States

has previously asserted, "[s]eizing a foreign state's property is a serious affront to its sovereignty,"

Gov't Statement, *In re Terrorist Attacks on September 11, 2001*, No. 03-MD-01570, Dkt. 7661, at

21 (S.D.N.Y. Feb. 11, 2022) (quoting *Rubin*, 830 F.3d at 480), and DAB is a sovereign entity, the

United States has never explained why it was appropriate for it to freeze, seize, and siphon off

DAB's funds.  Despite the government's statements to this Court, its *actions* powerfully confirm

that it does not view DAB as a central bank entitled to assert sovereign immunity.

### C.   The Court Inappropriately Deferred To The Executive Branch In Determining DAB's Status.

In any event, it was legal error for the Court to defer to the United States' contradictory

and unexplained views on immunity.  Before 1976, foreign sovereign immunity rested on an

"executive-driven, factor-intensive, loosely common-law-based immunity regime."  *Republic of*

*Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141 (2014).  The FSIA replaced that system, "shift[ing]

the responsibility for making determinations about foreign sovereign immunity from the Executive

Branch to the Judiciary."  *Exp.-Imp. Bank of the Rep. of China*, 768 F.3d at 84; *see Brenntag Int'l*

*Chems., Inc.*, 175 F.3d at 253 ("The purpose of the FSIA was . . . to remove the decision as to

immunity in particular cases from the executive branch.").  Under the FSIA, whether immunity

applies depends on "'purely legal grounds,'" not the Executive's "case-by-case" determinations.

*Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983) (quoting H.R. Rep. No. 94–1487, at 7 (1976)).

In refusing to confirm attachment, however, the Court "look[ed] above all to the Executive Branch when assessing sovereignty." Order at 10 n.10. The Court credited but then discounted Plaintiffs' expert declarations—despite its obligation to "give [Plaintiffs] the benefit of all the legitimate inferences that can be drawn from the stated facts." *Nat'l Bank & Tr. Co. of N. Am. v. J.L.M. Int'l, Inc.*, 421 F. Supp. 1269, 1272 (S.D.N.Y. 1976) (cleaned up). This was because in the Court's view, Plaintiffs' mountain of undisputed evidence could not "change the fact that President Biden's Executive Order expressly defines DAB as 'the Central Bank of Afghanistan.'" Order at 9 (citing Exec. Order No. 14,064 § 4(a), 87 Fed. Reg. 8391, 8392 (Feb. 11, 2022)). Likewise, the "Taliban's ousting of DAB's leadership" and "its elimination of financial controls" had no "bearing," absent a "finding by the Executive Branch" that DAB engaged in activities that stripped it of immunity. Order at 10.

That analysis is in direct tension with the FSIA, which does not permit "case-by-case diplomatic pressures" to determine questions of immunity. *Verlinden*, 461 U.S. at 488; *see also Kato v. Ishihara*, 360 F.3d 106, 108 (2d Cir. 2004). Rather, "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text," "[o]r it must fall." *NML Cap.*, 573 U.S. at 141–42. Because foreign sovereign immunity turns on legal questions, a court errs by substituting deference to the Executive for its own independent judgment. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 124 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

Though the Executive no doubt has the conclusive power to recognize foreign governments for diplomatic purposes, it is improper for federal courts applying the FSIA to defer to the

Executive's definition of what *constitutes* a "foreign state." *Kirschenbaum*, 830 F.3d at 123–25 (rejecting Executive definition of foreign state that included natural persons).  Instead, a "foreign state" or its instrumentalities—and correspondingly foreign state immunity—must be "defined according to established constructions" of those terms under the statute and international law, not "by reference to an Executive Order." *Id.* at 125; *see id.* (explaining that "Executive branch definitions . . . cannot be used to expand sovereign statehood under the FSIA"); *see also Brenntag*, 175 F.3d at 253.  The Court was thus required to undertake an independent inquiry into whether DAB remains a "foreign state" instrumentality protected by immunity under the FSIA, rather than accepting the Executive's ipse dixit.[6]

Deference to the Executive's views is particularly inappropriate here given the Executive Branch's inconsistent positions on the status of DAB's assets.  In its statement of interest, the government said that DAB is "an agency or instrumentality" and the "central bank" of Afghanistan.  Dkt. 81, at 2.  But, as discussed, *see supra* p. 15, the government cannot square that position with its own decision to both seize and re-appropriate DAB's funds.  As the government's actions implicitly recognize, where a terrorist organization has installed known terrorists to head a former state agency and controls the agency to achieve its terroristic ends—money laundering, narcotics trafficking, and the like—it is far more natural to impute the terrorists' status to the agency, rather than to impute the agency's former sovereign status to the terrorists.

Moreover, as this Court previously explained, the Executive Order blocking the funds "designated some of the blocked funds for payment of civil judgments that have been obtained by victims of the Taliban's acts of terrorism."  Dkt. 38, at 1; *see also* Dkt. 6-1, at 2.  So when the

---

[6]  Moreover, a holding that DAB's blocked funds are not being used for central banking functions—irrespective of DAB's sovereign status—raises no recognition concerns.

United States now says that funds are unavailable to satisfy terrorism judgments, its waffling weakens the persuasive power of its submission to the Court.  *Cf. Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

*     *     *

Because it was error for the Court to apply execution immunity *sua sponte*, because neither DAB nor its funds are performing central banking functions, and because the Court gave seemingly dispositive weight to the Executive's erroneous views on DAB, Plaintiffs are likely to succeed on appeal.  At minimum, Plaintiffs have raised "serious questions" justifying a stay.  *See Citigroup*, 598 F.3d at 35, 38.

## II.    Plaintiffs Will Suffer Irreparable Injury Absent A Stay.

Plaintiffs will be irreparably harmed if the Court does not stay its Order pending appeal. Due to the severe and substantial physical and emotional injuries that Plaintiffs suffered as a result of the Taliban's heinous conduct, Plaintiffs are entitled to judgment against the Taliban in the amount of $1,861,997,697.53 in compensatory damages and $3,295,249,969.26 in punitive damages, for a total award of $5,157,247,666.79, plus postjudgment interest.  *See* Dkt. 73-3, at 3; Dkt. 74, ¶ 65.  The Taliban has been in default for nearly eight months, and its failure to answer or otherwise to defend Plaintiffs' complaint not only establishes the Taliban's liability, but also confirms that the Taliban will not willingly pay any judgment.  *See* Dkt. 69 (clerk's certificate of default); Dkt. 74, ¶¶ 18–19.  Though Plaintiffs have previously obtained similarly substantial U.S. court judgments against Iran and Sudan for their roles in the embassy bombings, those judgments remain largely unsatisfied due to the challenges of recovering against recalcitrant foreign debtors, who can immunize their assets from the powers of U.S. courts by keeping them abroad.  *See* Dkt. 5, at 22; *see also Owens v. Turkiye Halk Bankasi A.S.*, 2021 WL 638975, at *1 (S.D.N.Y. Feb. 16,

18

2021). Plaintiffs have sought to avoid the same result here, especially since it is unlikely that any other Taliban assets will come within the reach of U.S. courts in the foreseeable future.

In moving for prejudgment attachment, Plaintiffs argued—and this Court agreed—that "the nature of the Taliban's limited assets in the United States and the potential disbursal of the funds" warranted attachment to preserve Plaintiffs' ability to collect a judgment against the Taliban. Dkt. 38, at 12; *see* Dkt. 5, at 19, 21–23. That conclusion remains true today, and nothing in the Court's Order denying Plaintiffs' confirmation motion suggests otherwise. The Taliban's assets in the United States remain limited, and its financial condition weak, due to the continued instability in Afghanistan and the sizeable sums that the Taliban owes to other creditors. *See* Dkt. 5, at 21–22, 24; Dkt. 48, at 15–16; *Philipp Bros. Div. of Engelhard Mins. & Chems. Corp. v. El Salto, S.A.*, 487 F. Supp. 91, 95 (S.D.N.Y. 1980) (holding that plaintiff seeking "judgment for money damages" had "demonstrated the need for preliminary injunctive relief to protect it from irreparable harm" where "several factors suggest[ed] that [plaintiff] might encounter difficulty collecting a money judgment," including that defendant "[was] located in a relatively distant foreign country with admitted current political instability" and that defendant's "financial condition" was poor). Notably, thousands of plaintiffs have obtained or are seeking judgments against the Taliban arising from the September 11 attacks. *See* Dkt. 5, at 21 & n.6; Dkt. 48, at 16.

In addition, though the remaining $3.5 billion in DAB funds at the Federal Reserve Bank of New York are currently blocked, it is entirely possible that the United States could unblock or reallocate those funds in light of the shifting situation in Afghanistan (especially considering that it has already siphoned off half of the original funds). *See* Dkt. 5, at 23; Dkt. 48, at 15. And if the United States were to order the funds unblocked, the Taliban almost certainly would remove those funds from New York instantaneously. *See* Dkt. 6-22, at 2; Dkt. 48, at 15; *Pashaian v. Eccelston*

*Props., Ltd.*, 88 F.3d 77, 86–87 (2d Cir. 1996) (holding that "[a] fortiori, the irreparable harm requirement [wa]s satisfied," "where the evidence show[ed] that a party intend[ed] to frustrate any judgment on the merits by making it uncollectible").

Vacatur of Plaintiffs' prejudgment attachment of the DAB funds thus leaves Plaintiffs bereft of any way to preserve their ability to collect on a judgment against the Taliban. A stay of this Court's order denying confirmation of the attachment is thus essential to maintaining the status quo and securing Plaintiffs' access to the DAB funds in the event of reversal on appeal. As the Second Circuit has explicitly recognized, "dissolution of a prejudgment attachment"—which is analogous to the "denial of a motion for security"—means that "funds may not be available at a later date to satisfy a judgment" and therefore necessarily causes irreparable injury because the loss of funds "cannot be redressed on appeal at the conclusion of the action." *Kensington Int'l Ltd. v. Republic of Congo*, 461 F.3d 238, 241 (2d Cir. 2006) (internal quotation marks omitted); *Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petrol. Corp.*, 948 F.2d 111, 114 (2d Cir. 1991); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (holding that order denying security was immediately appealable because otherwise "the rights conferred by" the security would be "lost, probably irreparably").

To be sure, the MDL court recently denied the turnover motions and motions for postjudgment attachment of creditors in that action—including the *Havlish* and *Doe* creditors and the *Federal Insurance* creditors—against the DAB funds and then denied the creditors' motion for a stay pending appeal. *See* No. 03-md-1570, Dkt. 8866, at 30; *id.*, Dkt. 8876, at 5. Judge Daniels did so on the unsupported assumption that his decision "would not prejudice any of the Judgment Creditors' asserted priority or alter the current status quo." *Id.*, Dkt. 8876, at 4. But if the writs of any creditors—Plaintiffs here or the MDL creditors in that action—are vacated, their priority is

affected because they no longer hold a secured claim to the DAB funds.  Recognizing this, the MDL creditors intend to seek a stay from the Second Circuit.  *See id.*, Dkt. 8869 (noting intention to "seek appropriate relief from the Court of Appeals").  Plaintiffs accordingly request the same from this Court.

A stay of the Court's order vacating Plaintiffs' attachment is essential to maintaining the status quo regarding access and priority to the DAB funds and to prevent Plaintiffs from suffering irreparable harm while the Second Circuit reviews the rulings of this Court and the MDL Court.

### III.   The Balance Of Harms Decidedly Favors Plaintiffs.

Unlike Plaintiffs, the Taliban—which still has not appeared in this action and has been in default for eight months, *see* Dkt. 69; Dkt. 74, ¶ 18—DAB, and any other Afghans who desire to access the funds will suffer no injury from a stay, much less irreparable harm.  First, so long as the DAB funds remain blocked, neither the Taliban, DAB, nor anyone else can utilize them, irrespective of any stay.  *See* Continuation of the National Emergency with Respect to the Widespread Humanitarian Crisis in Afghanistan and the Potential for a Deepening Economic Collapse in Afghanistan,  88 Fed. Reg. 7837, 7837 (Feb. 3, 2023).  Accordingly, a stay places the Taliban in no worse position than it would be absent a stay.

Moreover, a stay order here is equivalent to an order reinstating Plaintiffs' prejudgment attachment, which, as noted, is in turn equivalent to "an order [for Defendant] to post security." *Kensington Int'l Ltd.*, 461 F.3d at 241. (Additionally, to effectuate their prejudgment attachment, Plaintiffs themselves have posted a bond to protect against an erroneous attachment.  Dkt. 37.) "[A]n order to post security . . . 'generally cause[s] no irreparable loss.'"  *Kensington Int'l Ltd.*, 461 F.3d at 241 (alteration in original) (quoting *Caribbean Trading & Fid. Corp.*, 948 F.2d at 114); *see also Vera v. Republic of Cuba*, 651 F. App'x 22, 26 (2d Cir. 2016) (holding that order "denying immunity from attachment" was not immediately appealable because "the mere loss of

funds [via attachment] pending final judgment can be remedied on appeal"). Thus, the Taliban would suffer no irreparable harm from reinstatement of Plaintiffs' attachment pending appeal, even if the United States were to unblock the DAB funds while the appeal is pending.

Regardless, any theoretical harm to the Taliban or DAB caused by a stay is easily outweighed by the irreparable harm that Plaintiffs would incur from the loss of their attachment. *See supra* Part II. Plaintiffs are victims of gruesome terrorist attacks for which the Taliban's liability has now been established. *See* Dkt. 74, ¶¶ 3, 19. As this Court previously concluded in granting the attachment, Plaintiffs are unlikely to collect on a judgment without attachment. *See* Dkt. 38, at 12 ("Plaintiffs have proven a need to secure the remaining available funds."). Moreover, if the Taliban were able to access the funds through DAB, not only would it remove them from Plaintiffs' reach, the Taliban likely would use them to support illegal narcotics trafficking, money laundering, and terrorism financing. *See* Dkt. 28, at 2, 6–7, 21, 23–24; Dkt. 50, ¶¶ 87–89; Dkt. 51, ¶¶ 52, 57–59; Dkt. 49-5, ¶¶ 55, 58, 151; Dkt. 63, at 3–4. The Second Circuit and this Court have found that the balance of harms tips "decidedly" in one party's favor in circumstances far less lopsided than those here. *See Mitchell v. Cuomo*, 748 F.2d 804, 807–08 (2d Cir. 1984) (having "little difficulty concluding" that "the balance of hardships tip[ped] decidedly in plaintiffs' favor" where "the risk of substantial constitutional harm to plaintiffs" outweighed "the state's financial and administrative concerns"); *Selchow & Righter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 28 (2d Cir. 1978) (agreeing with district court that plaintiff "ha[d] shown that the balance of hardships tip[ped] decidedly in its favor," given that "[t]hreatened destruction or serious dilution of [a trademark] may well be found substantially to outweigh any possible loss to defendant during the pendency of th[e] litigation"); *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 527 (S.D.N.Y. 2020) (Caproni, J.) (holding that "the balance of hardship tip[ped] decidedly in favor of

the Plaintiffs" where "Plaintiffs . . . experience[d] hardship on a daily basis as a result of their inability to access Governor Cuomo's briefings," while implementing the requested disability relief would not have been "burdensome" for Governor Cuomo); *see also New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 661 n.38 (2d Cir. 2015) ("Certainly, courts do not consider the harm a party suffers from being prevented from violating the law."). The balance of hardships unquestionably tips in Plaintiffs' favor here.

## IV.   The Public Interest Clearly Lies In Providing Effective Remedies For Victims Of Terrorism.

A stay also is in the public interest.  "[T]he public undoubtedly [h]as a strong interest in . . . making victims of terrorism whole to the fullest extent possible." *In re 650 Fifth Ave. & Related Props.*, 2020 WL 3000382, at *4 (S.D.N.Y. June 4, 2020); *see also Linde v. Arab Bank, PLC*, 706 F.3d 92, 99 (2d Cir. 2013) (noting that the district court had recognized "the substantial public interest in compensating victims of terrorism and combating terrorism"); *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 50 (E.D.N.Y. 2007) ("Certainly, private tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism vindicate the national and international public interest."); *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 218 (E.D.N.Y. 2007) (same).  The Taliban's liability for its role in the embassy bombings is uncontested.  *See* Dkt. 74, ¶ 19. Accordingly, Plaintiffs are entitled to damages of more than $5 billion for the severe physical and emotional injuries they suffered as a result of the Taliban's heinous conduct.  *Id.* ¶ 65.  Ensuring that Plaintiffs are able to collect some measure of a judgment against the Taliban—and thus receive compensation for the terrorist attacks the Taliban helped perpetrate—necessarily furthers the public interest.

## **<u>CONCLUSION</u>**

Plaintiffs respectfully request that the Court stay its February 24, 2023 Order pending

Plaintiffs' appeal to the Second Circuit.

Dated:  March 1, 2023                                             Respectfully submitted,


                                                                                 /s/ Matthew D. McGill

Rebecca Monck Ricigliano
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Telephone:  (212) 895-4000
Facsimile:  (212) 223-4134
rricigliano@crowell.com

John L. Murino
(*pro hac vice* application forthcoming)
Stuart H. Newberger
(*pro hac vice* application forthcoming)
Emily M. Alban
(admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave. N.W.
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Caragh Glenn Fay
(*pro hac vice* application forthcoming)
Amanda Fox Perry
(*pro hac vice* application forthcoming)
FAY LAW GROUP, P.A.
6205 Executive Boulevard
Rockville, MD 20852
Telephone:  (202) 589-1300
Facsimile: (202) 216-0298

Jane Carol Norman
(admitted *pro hac vice*)
BOND & NORMAN LAW, PC
6205 Executive Blvd.
Rockville, MD 20852
Telephone:  (202) 682-4100
Facsimile: (202) 207-1041
jnorman425@icloud.com

Matthew D. McGill
Jessica L. Wagner
(admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9522
mmcgill@gibsondunn.com

Robert L. Weigel
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 351-4000
Facsimile: (212) 351-5236
rweigel@gibsondunn.com
jmyatt@gibsondunn.com

*Counsel for Plaintiffs*